Eastern District of Kentucky
FILED
DEC 18 2006
AT LEXINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON

CIVIL ACTION NO. 04-84-GFVT

STATIC CONTROL COMPONENTS, INC.,     PLAINTIFF/COUNTERCLAIM DEFENDANT

V.

LEXMARK INTERNATIONAL, INC.,     DEFENDANT/COUNTERCLAIM PLAINTIFF

V.

WAZANA BROTHERS INTERNATIONAL, INC.,
d/b/a MICRO SOLUTIONS ENTERPRISES, PENDL
COMPANIES, INC., and NER DATA PRODUCTS, INC.,     COUNTERCLAIM DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

\* \* \* \* \* \* \* \* \* \*

**I. INTRODUCTION**

On February 24, 2004, plaintiff Static Control Components, Inc. (hereafter "SCC"), filed this declaratory judgment action against defendant Lexmark International, Inc. ("Lexmark"), seeking a judgment that SCC had not violated the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, in respect to Lexmark's copyrighted computer programs, and that SCC had not violated the Digital Millennium Copyright Act, 17 U.S.C. §§ 1201 *et seq.*, (hereafter "DMCA").

In responding to SCC's complaint, on March 16, 2004, Lexmark asserted counterclaims against SCC for alleged patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, alleged violations of the DMCA[1], and for alleged violations of the laws of the Commonwealth of Kentucky, including intentional interference with contractual relations, intentional interference with prospective economic advantage, and civil conspiracy. Lexmark seeks

---

[1] However, as a result of the Sixth Circuit's decision on appeal of the "'02 action," the parties agreed to file a stipulation to entry of summary judgment on Lexmark's DMCA claims.

damages and injunctive relief. In its counterclaims, Lexmark also asserted claims against Wazana Brothers International, Inc., d/b/a Micro Solutions Enterprises; Pendl Companies, Inc.; and NER Data Products, Inc.

Specifically, this action concerns (1) Lexmark's Toner Loading Program and Printer Engine Program Lexmark incorporated in Lexmark's T520/522 and T620/622 laser printers, (2) Lexmark's Prebate toner cartridges and Regular toner cartridges used in Lexmark's T520/522 and T620/622 laser printers, and (3) SCC's "redesigned microchips, which Lexmark alleges contain unauthorized copies of its copyrighted Toner Loading Programs, as asserted in its counterclaims. In Counts 2 and 3 of the complaint, SCC seeks a determination that it has not violated the DMCA in respect to Lexmark's Toner Loading Programs and Printer Engine Programs, respectively.

Subsequently, Lexmark moved for a preliminary injunction, pursuant to Fed.R.Civ.P. 65, requesting the court to enjoin SCC from making, selling, distributing, importing, marketing, offering for sale, or otherwise trafficking in its "redesigned" microchips intended for use with Lexmark's T520/522, T620/622, and T630/632 printers and toner cartridges. This motion was later resolved by entry of an Agreed Order.

Thereafter, on September 12, 2005, the district court entered a Scheduling Order herein. [DE #145]. In numerical ¶ 13 thereof, the district court referred all discovery disputes to the Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(A), for resolution.

This matter is before the court on Lexmark's motion for a protective order, filed pursuant to Fed.R.Civ.P. 26(c), to relieve it from having to respond to certain discovery requests it received from Pendl and MSE on October 16, 2006. [DE #421]. This motion has been fully briefed and is ripe for review.

## II. LEXMARK'S MOTION FOR PROTECTIVE ORDER

As grounds for its motion for protective order, Lexmark states that on October 16, 2006, the last day to serve written discovery in this matter so that a response could be made thereto by November 15, 2006, the discovery deadline, Pendl and MSE served a combination of 1,371

discovery requests to Lexmark.[2] However, Lexmark does not seek a blanket protective order as to all 1,371 of these discovery requests. Lexmark only seeks a protective order as to 1,305 of these discovery requests and advises that it is diligently working to respond to 65 of the discovery requests.

Lexmark advises that the discovery requests for which it seeks a protective order can be classified generally into the following three categories: (1) requests for voluminous information concerning Lexmark's business in over 150 foreign countries; (2) requests for documents concerning Lexmark's resellers, and (3) nearly 1,300 Requests for Admission (RFA) contained in Pendl's Third Set of RFAs. In evaluating Lexmark's motion for a protective order, the Magistrate Judge shall consider each of the foregoing categories of discovery requests, in turn, as Lexmark as characterized them.

### A.  Requests for information concerning Lexmark's business in over 150 foreign countries

Lexmark asserts that Pendl and MSE's discovery requests seeking information concerning Lexmark's business activities in 150 foreign countries are not only overly broad and unduly burdensome but also seek information that is irrelevant to any claim in this case. As to relevancy, Lexmark explains that one of its patent infringement theories focuses upon foreign cartridge sales and holds that for any Lexmark toner cartridge first sold outside of the United States, the remanufacture, reuse, or resale of that cartridge within the United States constitutes patent infringement. *See* 35 U.S.C. § 271 (stating "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."). Lexmark points out that this claim is based on well-established Federal Circuit precedent, including *Fuji Photo Corp. v. Jazz Photo Corp.*, 394 F.3d 1368 (Fed. Cir. 2005), and that this claim applies to Lexmark's toner cartridges *regardless of whether they are Prebate cartridges*. In short, Lexmark notes that what it

---

[2] Lexmark also advises that on October 16, 2006, it received seven discovery requests from NER; however, Lexmark states that it is not seeking protection from NER's discovery requests, only those served by Pendl and MSE.

3

has or has not done outside of the United States concerning its Prebate program is simply irrelevant to its patent infringement claim asserted herein, and it is irrelevant because any cartridge that is first sold in a foreign country, irrespective of its Prebate status, and then remanufactured, reused, or resold *within the United States*, constitutes patent infringement.

Lexmark further notes that much of the discovery it has produced in this case subsequent to 2002 relates to the enforcement of its Prebate program within the United States and that Pendl and MSE essentially are, at the eleventh hour, requesting Lexmark to replicate the same discovery that has occurred in this case thus far 150 times, a task which Lexmark asserts is Herculean and when accomplished, many months later, would not result in any information relevant to this action. Nevertheless, Lexmark advises that subsequent to the telephone conference with the Magistrate Judge on October 6, 2006, it has, per the court's direction, worked diligently to gather and produce the following twelve separate categories of foreign-sales related information:

1. Volumes of the cartridges at issue sold worldwide, broken down by geography.

2. Worldwide sales training materials for the cartridges at issue.

3. Worldwide marketing strategy materials for the cartridges at issue.

4. Artwork showing how the cartridges and/or cartridge boxes at issue are marked for foreign use, as well as:

> a. documents describing any differences in the markings of the cartridge and/or cartridge box at issue; and,
> b. documents describing the reasons for any differences in the markings of the cartridge and/or cartridge boxes at issue.

5. Data evidencing the volumes of cartridges at issue manufactured at each of Lexmark's manufacturing facilities worldwide.

6. Any manufacturing contracts for Lexmark facilities worldwide (to the extent such facilities are not Lexmark owned and operated).

7. Master carriage contracts, if available, for transporting the cartridges at issue from any such manufacturing facility to a Lexmark Distribution Center in the United States.

8. To the extent Lexmark does not manage any United States Distribution Centers, contracts for said management.

9. If any cartridges at issue have ever been transported from a Lexmark United States Distribution Center to potentially be sold in the United Kingdom, Germany, Singapore and/or Canada, Lexmark will provide data indicating the volumes, dates and location where such cartridges have been shipped from the United States Distribution Center.

10. Master carriage contracts, if available, for transporting any cartridges at issue from a United States Distribution Center to potentially be sold in the United Kingdom, Germany, Singapore and/or Canada.

11. Sales figures for the cartridges at issue in the United Kingdom, Germany, Singapore and/or Canada, and contracts with Lexmark's top five resellers for the cartridges at issue, by volume, in each of the United Kingdom, Germany, Singapore and/or Canada.

12. Documents known as "sourcing rules" that are distributed to Lexmark Distribution Centers worldwide instructing them as to which manufacturing plant they should obtain the cartridges at issue from to fulfill distribution needs.

Lexmark asserts that producing the foregoing information outlined above is an extensive and reasonable response to the foreign discovery sought by MSE and Pendl.

The Magistrate Judge concurs with Lexmark's assessment of Pendl and MSE's request for information concerning Lexmark's business activities in 150 foreign countries. These discovery requests, even if they had not been served to Lexmark during the waning hours of discovery, are overly broad and unduly burdensome. Additionally, for the reasons explained by Lexmark in its motion for a protective order, the requested information is irrelevant to Lexmark's patent infringement claims asserted in this action. Consequently, the Magistrate Judge concludes that the twelve (12) categories of information outlined above, which Lexmark has produced concerning its sales of cartridges in foreign countries is sufficient. Other than the foreign sales information Lexmark has already provided to Pendl and MSE, Lexmark need not respond to Pendl and MSE's

5

discovery requests for information concerning Lexmark's efforts to enforce its Prebate program in 150 foreign countries.

**B.     Certain requests made by Pendl for documents concerning Lexmark's resellers**

Pendl's Requests for Production Nos. 1667, 1669, and 1670 request, respectively: (1) all documents related to contract negotiations between Lexmark and its Lexmark Laser Toner Cartridge resellers; (2) all communications between Lexmark and entities that Lexmark considered but ultimately did not contract with to serve as Lexmark Laser Toner Cartridge resellers; and (3) all documents related to contract negotiations between Lexmark and its Lexmark Laser Printer resellers.[3]

In opposing this request, Lexmark notes that, even when this request is limited to sales within the United States, Lexmark's reseller network within the United States is extensive and complicated. Elaborating, Lexmark states that most of its cartridge sales, numbering in the millions, occur through resellers rather than through direct end user customers. Consequently, there are dozens and dozens of resellers of Lexmark cartridges. As to its printer resellers, Lexmark states that the network of printer resellers is equally as extensive.

Lexmark also points out that Pendl has been in possession of the actual contracts between Lexmark and its cartridge and printer resellers for about two years. Thus, Pendl had no good reason to wait until the eve of the expiration of the discovery deadline to request communications and negotiations underlying those contracts. Lexmark also points out that thousands of additional documents concerning Lexmark's resellers have also been produced such as: (1) reseller-by-reseller sales data covering hundreds of thousands of transactions; (2) a wide variety of communications with resellers such as announcement letters, pricing materials, and product bulletins; (3) marketing

---

[3] Lexmark advises that it interprets this request to only seek such documents for Lexmark's resellers within the United States; however, Lexmark states that if Pendl's request is intended to include foreign countries, Lexmark would have to investigate its reseller relationships in over 150 countries, which countries might individually have hundreds of resellers, and that such an effort into foreign resellers is just as burdensome and abusive as Pendl's request for information concerning Lexmark's efforts to enforce the Prebate agreement in foreign countries.

program documentation such as incentive and rebate programs (like Platinum Plus or the Lexmark Cartridge Collection Program) with Lexmark's resellers; (4) analyses of Lexmark's reseller network; and (5) documents describing how Lexmark's product is delivered to its resellers. Furthermore, Lexmark notes that it has provided Rule 30(b)(6) testimony concerning its resellers, and that in particular, Lexmark has provided testimony on the following Rule 30(b)(6) topics served by the Counterclaim-Defendants:

- "Lexmark's selection and termination of distributors, resellers, and retailers of Lexmark Laser Toner Cartridges"

- "Forecasts and analyses of as well as strategies and plans for selling Lexmark Laser Toner Cartridges"

- "Forecasts and analyses of as well as strategies and plans for marketing Lexmark Laser Toner Cartridges"

- "Lexmark Laser Toner Cartridge sales"

- "Lexmark Laser Printer sales"

- "Forecast and analyses of as well as strategies and plans for marketing Lexmark Laser Printers" and,

- "Forecasts and analyses of as well as strategies and plans for selling Lexmark Laser Printers".

Given the nature of Lexmark's relationships with its cartridge and printer resellers that has already been the subject of extensive discovery, including the production of thousands of documents and Rule 30(b)(6) testimony, which directly relate to Pendl's Request Nos. 1667, 1669, and 1670, Lexmark submits that these Document Requests seek duplicative and wasteful discovery and that it should be protected from having to respond to these Document Requests.

In response, Pendl states that while it appreciates that "Lexmark's reseller network is extensive and complicated," it must be kept in mind that Lexmark chose to assert claims for patent infringement and for tortious interference which gave rise to these discovery requests, which in Pendl's view of the world are relevant to determining whether there were valid and enforceable contracts between Lexmark and its resellers and to where the cartridges were first sold. Pendl argues

that Lexmark should not be allowed to assert claims for patent infringement and for tortious interference and then decline to engage in meaningful discovery by arguing that these discovery requests are too burdensome. Pendl further argues that Lexmark had a full month to respond to these three requests and that Lexmark should have expected such information and documents would be requested to investigate the claim for tortious interference.

For all of these reasons, Pendl submits that Lexmark should be not be relieved of its obligation to respond to these discovery requests and that Lexmark should be required to provide full and complete responses thereto.

As Lexmark observes in its reply, notably absent from Pendl's response is any explanation why, although it has had the actual United States reseller contracts in its possession for up to two years, it waited until thirty (30) days before the discovery deadline expired to request the information that is the subject of Document Request Nos. 1667, 1669, and 1670. The Magistrate Judge concurs with Lexmark that if the documents Pendl seeks by these three discovery requests were as important to Pendl as Pendl now asserts, then Pendl should not have waited until the eleventh hour to request their production, given that Pendl has had the contracts in question in its possession for two years. Such dilatory discovery practice, especially given the amount of time necessary to respond to these discovery requests, cannot be sanctioned.

**C.     Pendl's Third Set of Requests for Admission**

Lexmark states that Pendl's Third Set of Requests for Admissions (RFAs) includes 1,296 separate requests which relate to two broad subject matters: (1) Lexmark's foreign cartridge sales, and (2) Lexmark's disclosure of the customers Lexmark believes have breached the Prebate Agreement.

Concerning Pendl's RFAs concerning Lexmark's foreign cartridge sales, Lexmark asserts that the same burdens accompany these discovery requests as mentioned above in subsection A. For example, Lexmark points out that Pendl's RFA No. 2392 states: "Lexmark sells cartridges to Office Depot or one if [sic] subsidiaries, which Office Depot, or one of its subsidiaries, sells outside the

United States." Lexmark states that to respond to RFA No. 2392, it would be required to explore Office Depot's domestic versus foreign cartridge sales, an unduly burdensome task at this stage of discovery. However, Lexmark notes that the majority of these RFAs (approximately 1,280) concern a discovery disclosure it made on April 6, 2006 – nearly seven months ago – of the customers it believes have breached the Prebate Agreement, which relates to it claims of tortious interference. Again, Lexmark argues that Pendl has offered no reason, good or otherwise, why it waited nearly seven months, until the last minute, to serve Lexmark with an additional 1,280 RFAs.

In response, Pendl argues that Lexmark should be required to respond to its Third Set of RFAs for the following two reasons: (1) although RFA Nos. 2377-3673 are numerous on their face, they are really only nineteen (19) requests, and that Lexmark would only have to respond to the additional, more detailed RFAs if it failed to admit one or more of the general factual statements contained in the basic 19 requests, and (2) it was Lexmark's identification of 159 separate entities or individuals involved in the claim for tortious interference that made the additional RFAs (Nos. 2396-3673) necessary. Therefore, Lexmark should be obligated to respond to its Third Set of RFAs.

The Magistrate Judge is unpersuaded by Pendl's math that 1,296 RFAs are really only 19 RFAs. Additionally, Pendl fails to explain why it waited nearly seven months after Lexmark disclosed the 159 customers Lexmark believes have violated the Prebate Agreement to serve Lexmark with additional RFAs (Nos. 2396-3673) concerning these 159 customers.

### III. CONCLUSION

For all of the foregoing reasons, the Magistrate Judge concludes that Lexmark's motion for a protective order concerning 1,305 of the discovery requests Pendl and MSE served to Lexmark on October 16, 2006, has merit. Lexmark need only respond to those approximate 65 discovery requests contained therein to which it has already responded or has advised Pendl and MSE that it will respond.

9

Accordingly, **IT IS HEREBY ORDERED** that Lexmark's motion for a protective order to relieve it from responding to 1,305 of the combined discovery requests served to it by Pendl and MSE on October 16, 2006 [DE #421] is **GRANTED**.

This ___18th___ day of December, 2006.

JAMES B. TODD,
UNITED STATES MAGISTRATE JUDGE