UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| STATIC CONTROL COMPONENTS, INC., | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| V. | ) | |
| | ) | CONSOLIDATED CIVIL ACTION NOS. |
| LEXMARK INTERNATIONAL, INC., | ) | |
| | ) | 5:02-571 AND 5:04-84 |
| Defendant/Counterclaim Plaintiff, | ) | |
| | ) | |
| V. | ) | **AMENDED MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| NER DATA PRODUCTS, INC., ET AL., | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |
| | ) | |
| | ) | |

*** *** *** ***

This matter is before the Court on Lexmark International, Inc.'s Motion for Summary Judgment on the Remanufacturers' Claims of affirmative antitrust and Lanham Act violations. [R. 529]. Also before the Court is Wazana Brothers International, Inc.'s Motion for Summary Judgment on three of its Lanham Act claims. [R. 534].

Lexmark's Motion must be largely denied. It is granted only to the extent that the Remanufacturers have failed to produce sufficient evidence from which a reasonable jury could find that certain distribution contracts at issue are horizontal, *per se* restraints on trade and on the issue of the *per se* tying claim. Wazana's Motion is granted only to the extent that the Court holds that, as a matter of law, the allegedly false or deceptive statements at issue are not ambiguous. The remainder of Wazana's Motion must be denied since Lexmark has presented

sufficient facts from which a reasonable jury could find that the statements were not false or deceptive.

# I.

## BACKGROUND

### A.    FACTS

Defendant, Lexmark International, Inc. ("Lexmark"), is a manufacturer of laser printers. [R. 531 at 1].  It controls approximately 10%-15% of the national and international laser printer market, whereas its largest competitor, Hewlett-Packard ("HP") controls between 50%-75% of the national and international markets. [*Id.*].  In addition to being in the laser printer business, Lexmark also manufactures and sells the toner cartridges for its printers.  Sometimes these toner cartridges are sold under Lexmark labels. [*Id.*].  Other times, Lexmark sells its cartridges to resellers, and the cartridges are sold under those companies' labels. [R. 540, attach. A; R. 680 at 14 n.21; R. 678, attachs. 22-27].  One of these resale agreements is with IBM, under which IBM and Lexmark entered into "a multinational procurement relationship under which Lead Buyer[, IBM,] and its Affiliates may purchase or license from Lead Supplier[, Lexmark]." [R. 540, attach. A at 3].  The procurement contract was not limited simply to the cartridges, but also includes equipment. [*Id.*].  Under the IBM-Lexmark contract, if IBM, while selling Lexmark products, sold compatible cartridges or re-fill cartridge kits, IBM would face contractual penalties. [R. 540, attach. A, *(First) Amendment 003 To the Statement of Work under Transaction Attachment # 4997S23861* at ¶ 4.3; *Id.* at *Amendment 006 To the Statement of Work under Transaction Attachment # 4997S23861* at ¶ 4.2].

Lexmark is not only engaged in the sale, either directly or through resellers, of Lexmark

equipment and toner cartridges, but Lexmark also sells remanufactured toner cartridges. [R. 531 at 1-2]. Lexmark's only competition for the sale of printer cartridges is in this remanufacturing market. [R. 628 at 2-3]. An industry has been built up around this remanufacturing process in which remanufacturers purchase parts from a supplier, take used toner cartridges, repair them, refill the toner, and resell the cartridges to end-user consumers. [*Id.*]. The Plaintiff, Static Control Components, Inc. ("SCC"), is "a leading supplier to toner cartridge remanufacturers." [R. 172 at 16, Case No. 5:02-571]. The Counterclaim Defendants, Pendl Companies, Inc. ("Pendl"), and Wazana Brothers International, Inc. ("Wazana"), are toner cartridge remanufacturers (collectively "Remanufacturers"). [R. 628 at 2-3].

Lexmark runs what it at one time called the "Prebate Program" and what now is referred to as the "Lexmark Return Program." [R. 594 at 3 n.4]. The program began with the new 1997 printer models [R. 593 at 1-2], and in that program, Lexmark's customers buy printer cartridges at an up-front discount in exchange for the customer agreeing to use the cartridge only once and then returning the empty cartridge only to Lexmark. [R. 594 at 3 n.4]. According to Lexmark, Lexmark offers "'[r]egular' toner cartridge[s] for those customers who do not choose the Prebate/Cartridge Return Program toner cartridge[s] with [their] terms." [R. 2 at 8]. Therefore, "Prebate" is temporally the reverse of a rebate. Roughly 90% of Lexmark's new cartridges are "Prebate cartridges" and 10% are non-prebate or "Regular cartridges." [R. 520 at 7].

When Lexmark sells a cartridge subject to Prebate, it labels the package as follows:[1]

RETURN  EMPTY CARTRIDGE TO LEXMARK FOR
REMANUFACTURING AND RECYCLING
Please read before opening. Opening this package or using the patented cartridge

---

[1]Lexmark has not always used this exact wording but has used a close estimation of it. [*See,* R. 573 at 3].

> inside confirms your acceptance of the following license agreement: This patented Return Program cartridge is sold at a special price subject to a restriction that it may be used only once. Following this initial use, you agree to return the empty cartridge only to Lexmark for remanufacturing and recycling. If you don't accept these terms, return the unopened package to your point of purchase. A regular price cartridge without these terms is available.

[R. 531 at 2]. According to Lexmark, the Prebate program is further explained in the cartridge's packaging materials, and "if the customer does not agree to these terms, a regular price cartridge with no restrictions is available." [*Id*.]. However, there is evidence that Lexmark does not make regularly priced cartridges available for at least five of its cartridge models. [R. 534 at 9-10]. Because of the Prebate program, Lexmark has been able to achieve a 90% loyalty among toner cartridge customers, i.e. 90% of customers purchase Lexmark manufactured or remanufactured cartridges. [R. 628 at 4]. Prior to Prebate, Lexmark only had a 60% loyalty among cartridge purchasers. [*Id*.]. Lexmark's remanufactured cartridges, which sell for $41.00, are $10 more than the Defendants' remanufactured cartridges, which sell for $31.00. [*Id*. at 10]. The Remanufacturers contend that the Prebate program has resulted in an increase in the remanufactured toner cartridge price. [*Id*.]. This increase is due to the share of the market that Lexmark has been able to take from the Remanufacturers. [*Id*.]. This increase allegedly represents approximately 7% of the Lexmark toner cartridge market. [*Id*.].

Under the Prebate program, customers have three options for their empty cartridges:  keep them, throw them in the trash, or return them to Lexmark. According to the Remanufacturers, though contested by Lexmark, in order to ensure that customers do not resell the cartridges, Lexmark has installed a "lock-out" microchip on its cartridges. [R. 628 at 4]. The alleged "lock-out" microchip prevents the toner from properly putting toner on the paper. [*See* R. 831]. The

Remanufacturers present evidence that Lexmark included this microchip on both its Prebate and Non-Prebate labels, and the true purpose of installing the microchip on *all* of the printers was to "reduce manufacturing." [R. 628 at 4]. The microchips are not sold separately from the cartridges, and thus remanufacturing of used cartridges containing a lock-out microchip is theoretically foreclosed. [*Id*.]. SCC, however, has been able to create a microchip that enables the Remanufacturers to continue to remanufacture the cartridges. [*Id*. at 12].

As a result of the Prebate program, Lexmark, over time, accumulated a large number of empty cartridges. [*Id*. at 6]. Lexmark does not remanufacture all of these cartridges [*id*.], and due to cost concerns, when it does remanufacture the cartridges, it does not remanufacture all of the parts. [R. 534 at 9]. Hundreds of thousands of cartridges have been and continue to be incinerated, [R. 628 at 6], and the ash from these cartridges goes to a landfill. [R. 534 at 7]. Incineration is sometimes called "thermally recycling." [R. 628 at 6]. Lexmark's prebate cartridge boxes contain the following label concerning Lexmark's "Environmental Program": "We manage resources today to ensure a beautiful tomorrow. Small steps can have big rewards. Thank you for your ongoing support, together we have recycled millions of toner cartridges, one cartridge at a time. See details inside about how you can continue to participate in this important environmental initiative." [R. 534 at 4].

Consumers who look to Lexmark's website for information concerning the prebate or environmental programs are informed that "Return Prebate cartridges are a great choice for the environment." [*Id*. at 2]. They can also read that "Lexmark Return Prebate Program Cartridges are sold at a discount in exchange for the customer's agreement to use the cartridge only once and return it only to Lexmark for remanufacturing or recycling" and that "Lexmark recycles

-5-

Return Program Cartridges, keeping them out of the waste stream." [*Id.* at. 5].  A question and answer section on Lexmark's website gives the following exchange:  "Q. What happens to the empties I return?  A. Lexmark remanufacturers and/or recycles the cartridges." [*Id.*].

Lexmark's market research examined the effects of this label language.  [R. 622, attach. B].  Lexmark's survey included "managers who are involved in making the laser printer purchase decision," and "[p]articipants responsible for 20+ printers in the organization." [*Id.* at 7].  These participants were not only the people responsible for the purchase of the printers, but were also, primarily, the people responsible for physically replacing used cartridges with new or repaired cartridges. [*Id.* at 17-18].  When asked about the "environmentally friendly message" of the prebate program, the responses included the following:

> The manufacturer may not dispose of the cartridge, but do something with it to have recycling.
> I think you want to know that things are disposed of in an environmentally friendly way.
> . . . .
> It makes everybody look good because they are recycling.
> The green environmental label gives you a better conscience.
> . . . .
> You want it to be green.  You don't want this stuff out in the street.  You want it to be recycled; you want it to be treated properly.

[*Id.* at 15].  When asked about their concerns regarding the prebate label, one participant replied: "It's not readily apparent that this box is to return the cartridge.  The label is missing the whole point that the program is a simple/convenient way to use the box to recycle." [*Id.* at 21].  When the focus groups were pushed to create their own names for the prebate program, the names suggested included "HP's Recycle Program,"[2] "Save the Toner Tree," "Responsible Use of

---

[2]The focus group was never told which printer cartridge company sponsored the focus group.  Many of them assumed that HP was sponsoring the group, and they were never informed otherwise. [R. 622, attach. B at 6].

Resources," "Environmental Express (so that people get the impression that it speeds up the process)," "Different Users for the Sake of the Environment," "Envirosave," "Save $ and the Environment," and "Stewardship of Resources." [*Id.* at 25].

## B.     RELEVANT PROCEDURAL HISTORY

The lead case in this action was brought by SCC. [R. 1].  SCC seeks declaratory relief against Lexmark on various issues related to the toner cartridges. [*Id.*].  Lexmark filed its current Second Amended Counterclaim on November 8, 2004, in which it asserted counterclaims against the Remanufacturers.  [R. 67].  Lexmark makes allegations of patent violations, which are predicated on the Prebate Program. [*Id.*; *see also* R. 1008 (explaining in detail the patent and prebate claims)].  Lexmark's counterclaims also accuse the counterclaim-defendants, SCC and the Remanufacturers, of interfering with Lexmark's business and contractual relations and conspiring to do the same, presumably by causing end users of Lexmark's cartridges to breach the Prebate agreement by sending spent cartridges to entities other than Lexmark. [R. 67].  Since filing its counterclaim, these state law claims have been dismissed. [R. 1020 (granting Lexmark's Motion to Dismiss its state law claims)].

Wazana asserted several of its own counterclaims against Lexmark, including violations of section 1 of the Sherman Act, which it states is "a [c]ontract, [c]ombination or [c]onspiracy in [r]estraint of [t]rade," [R. 175 at 54]; violation of section 2 of the Sherman Act, which is described as an "[a]ttempted [m]onopolization and [m]onopolization," [*id.* at 55]; violation of section 3 of the Clayton Act, which is an exclusive dealing contract lessening competition, [*id.* at 57]; and, violations of section 43(a) of the Lanham Act, which Wazana label's as "[f]alse [a]dvertising, [p]roduct [l]ibel, and [u]nfair [c]ompetition," [*id.* at 58].  Pendl has asserted the

same counterclaims under the Sherman Act, sections 1 and 2, [R. 144 at 19, 22], and the Clayton

Act, section 3 [*id*. at 23], but it has not asserted the Lanham Act claims.

## II.

## DISCUSSION

### A.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that judgment for the moving party is

appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law."  *See also Browning v. Dep't of

Army*, 436 F.3d 692, 695 (6th Cir. 2006).  While all inferences are drawn in favor of the non-

moving party, that party still must present some affirmative evidence supporting its position to

defeat an otherwise appropriate motion for summary judgment.  *See id.*; *see also Matsushita

Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986) (non-movant must "do

more than simply show there is some metaphysical doubt as to the material facts") (citations

omitted); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-325 (1986).  Stated alternatively, "[t]he

mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;

there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson v.

Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

There is no special burden placed on an antitrust plaintiff at the summary judgment stage.

*PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 814 (6th Cir. 1997).  In the context of

antitrust, just as in all cases, the non-movant's "version of any issue of fact . . . is presumed

correct . . . ."  *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992).

**B.      ANTITRUST CLAIMS**

**1.      Relevant Antitrust Law**

Wazana and Pendl have asserted three separate, statutory antitrust claims against Lexmark.  The first of these, Sherman Act section 1, provides, in pertinent part: "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.

The second claim asserted is a violation of Sherman Act section 2, which makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . ."  15 U.S.C. § 2.

Finally, Pendl and Wazana argue that Lexmark has violated section 3 of the Clayton Act:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14.

In addition to meeting the various tests for recovery under these three statutory schemes, an antitrust plaintiff must also prove antitrust injury.  *Valley Prods. Co. v. Landmark, a Div. of*

-9-

*Hospitality Franchise Sys., Inc.*, 128 F.3d 398, 402 (6th Cir. 1997).  Proving antitrust injury simply requires a plaintiff to prove that the defendant's conduct causes the type of market-based injury that antitrust laws are designed to prevent.  *Id.*

### 2.    Specific Claims Asserted

Lexmark makes three arguments supporting summary judgment on the claims made under the Sherman Act and the Clayton Act.  First, Lexmark argues that its patents render prebate valid as a matter of law, and even if not valid, any misuse was in good faith and precludes a finding of anticompetitive behavior. [*See* R. 531].  It next argues that, in light of little evidence of market imperfections and information costs, the lack of a "lock-in," low switching costs, an inability to exploit ignorant customers, and an inability to charge supracompetitive prices, there is insufficient evidence for finding that Lexmark possesses market power. [*Id.*].  Finally, Lexmark argues that the alleged antitrust violation cannot be traced to an antitrust injury. [*Id.*].

The Court, taking these arguments in turn, will first turn to what effect, if any, Lexmark's patent rights have on the antitrust claims.  Second, the Court must determine whether there has been a sufficient showing of market power under each of the antitrust statutes.  Third, the Court will examine whether, assuming that there is an antitrust violation, there are sufficient facts from which a jury could conclude that there is an antitrust injury.

In addressing these arguments, the Court notes that the Remanufacturers have taken the position that Lexmark's Motion addresses only Sherman Act section 2 claims. [R. 628 at 16 n.29].  The Court disagrees.  Market power and antitrust injury are critical to all of the Remanufacturers' antitrust claims, and this issue was extensively briefed by Lexmark. Furthermore, the Court notes that the Remanufacturers stated that they would seek leave to file

an additional response if it was clear in Lexmark's Reply that Lexmark was seeking summary

judgment on all antitrust claims.  It was clear, [R. 680 at 13 ("IV. The Remanufacturers Do Not

State Any Section 1 Claims.")], and Pendl did not move to file an additional response.

Lexmark's Motion, therefore, will be construed to encompass exactly what the Court has

understood it to include—any and all antitrust allegations.  To the extent that there may be

discrete points relevant to a Section 1 inquiry and those points were briefed by Lexmark, those

arguments are refined within the applicable section.

### 3.    Effect of Patent Validity on Antitrust Claims

"Asserted 'tensions' between the antitrust and patent laws have been the subject of

extensive commentary."  *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 706 n. 5 (Fed. Cir.

1992) (citations omitted).  In the case of patent antitrust cases, "it is possible for manufacturers to

draft specific patent license terms so as to insure the cooperation of licensees in effecting

anticompetitive ends."  *Moraine Prods. v. ICI Am., Inc.*, 538 F.2d 134, 144 (7th Cir. 1976). *Cf.*

*Lexmark Int'l v. Static Control Components, Inc.*, 387 F.3d 522, 551 (6th Cir. 2004) (Merritt, J.,

concurring) ("We should make clear that in the future companies like Lexmark cannot use the

DMCA in conjunction with copyright law to create monopolies of manufactured goods for

themselves just by tweaking the facts of this case . . . .").

Lexmark argues that the Remanufacturers' antitrust claims fall within the line of case law

explaining and ruling on this very tension.[3]  Specifically, Lexmark maintains that 35 U.S.C. §

271(d) protects it from antitrust liability. [R. 531 at 13-14 (citing, among others, *Axis v. Micafil,*

*Inc.*, 870 F.2d 1105, 1111 (6th Cir. 1989)], for the proposition that "a lawfully acquired patent

---

[3]The Court notes that it has already addressed the related issue of patent validity. [R. 1008].

creates a monopoly that does not violate the antitrust laws," and *Mallinckrodt, Inc.*, 976 F.2d 700 for the holding that a post-sale "single-use" restriction on reuse of a patented medical device to be lawful under patent law. To the extent that Lexmark argues that it cannot be held liable for any antitrust liability because it refuses to license its otherwise valid patents, its argument must fail. Holding valid patents might make it more difficult to act in an anticompetitive manner, but it does not, conversely, necessarily preclude an antitrust violation or prevent a finding of anticompetitive behavior. *Moraine Prods.*, 538 F.2d at 144. Lexmark cannot, therefore, rely on any potential finding of patent validity when defending the antitrust claims.[4]

### 4. The Relevant Market, Market Power, and Other Factors: Sherman Act Section 1

#### i. Market Power

"'Market power is the power to force a purchaser to do something that he would not do in a competitive market,'" and it entails the ability of one seller to restrict output or raise prices. *PSI Repair Servs., Inc.*, 104 F.3d at 817 (quoting *Eastman Kodak Co.*, 504 U.S. at 464). In order for a Sherman Act claim to lie against a defendant, there must be a finding of market power. *Hand v. Cent. Transp., Inc.*, 779 F.2d 8, 11 (6th Cir. 1985). Determining market power is, thus, critical to this Court's inquiry. A toner cartridge is nothing more than a part which is purchased in order to make a machine function. As such, this Court must begin its market power examination with the line of case law examining market power in the context of a machine repair market.

---

[4]The Court notes, however, that the issue of holding patents will come up again in this Opinion, at which point it becomes a valid reason for granting summary judgment on the discrete issue of a *per se* tying agreement. In order to avoid confusion, the Court has not delved into that discussion at this point.

The line of on-point cases traces back to *Eastman Kodak*.  In *Eastman Kodak*, the Supreme Court looked to whether Kodak affected an illegal tying agreement when it entered into a contract with its copy machine parts suppliers.  504 U.S. at 458.  The contract was formed after Kodak sold the original copiers, and it prevented the parts suppliers from selling replacement parts to copy machine repairmen.  *Id*.  This prohibition essentially allowed Kodak to corner the repair market through its control of the parts markets.  *Id*.  The issue in *Eastman Kodak* was whether the service market could be tied to the parts market, not whether the service or parts markets were tied to the equipment market.  *Id*. at 459.  The Court distinguished between two possible markets within an aftermarket, one for service and the other for parts, *id*. at 461, and it left to the jury the issue of whether these two aftermarkets were separate.  *Id*. at 463.  Ultimately, the Court held that a company need not have market power in the primary, i.e., copier, market in order to have market power in the tying, i.e., copy machine parts, market.[5]  *Id*. at 477.

Out of this broad holding grew a Sixth Circuit case, which at first seems analogous to the current action.  In *PSI Repair Service, Inc.*, the issue was whether Honeywell, an industrial control equipment manufacturer, should be allowed to prevent customers from seeking outside service repair by requiring that customers purchase a repair part, a circuit board, from Honeywell.  104 F.3d at 813-14.  Only a small percentage of the parts on the circuit board were made exclusively by Honeywell, and the rest of the board was made for Honeywell by outside contractors.  *Id*.  In effect, Honeywell's policy devastated the third party repair industry by

---

[5]The Court notes that in *Kodak*, the parts market was a tying market whereas the service market was a tied market.  To clarify the terms, in the patent context, a tying product is the patented product, and the secondarily purchased product is a tied product.  *See Ill. Tool Works, Inc. v. Indep. Ink, Inc.*, 126 S. Ct. 1281, 1284 (2006) ("This presumption of market power, applicable in the antitrust context when a seller conditions its sale of a patented product (the "tying" product) on the purchase of a second product (the "tied" product), has its foundation in the judicially created patent misuse doctrine." (citing *United States v. Loew's Inc.*, 371 U.S. 38, (1962))).

-13-

cutting off the supply of replacement parts.  *Id.*

The Sixth Circuit took a two step approach to determine if Honeywell possessed market power sufficient to support Sherman Act claims.  First, the court decided that the primary equipment market was the relevant market for an antitrust analysis.  *Id.* at 821 ("Since PSI has not alleged or shown that Honeywell has market power in *the relevant market—the primary equipment market*—summary judgment is appropriate in favor of Honeywell on PSI's § 1 claim." (emphasis added)).  Second, the court decided that Honeywell could not, as a matter of law, have sufficient power within the primary market to support Sherman Act claims.  *Id.*.

In distinguishing the holding in *Eastman Kodak* from that of *PSI Repair Services*, the Sixth Circuit set out the following language, which is instructive to this Court's query:

> We likewise agree that the change in policy in *Kodak* was the crucial factor in the Court's decision.  By changing its policy after its customers were "locked in," Kodak took advantage of the fact that its customers lacked the information to anticipate this change.  Therefore, it was Kodak's own actions that increased its customers' information costs.  In our view, this was the evil condemned by the Court . . . .
> . . . [W]e thus hold that an antitrust plaintiff cannot succeed on a *Kodak*-type theory when the defendant has not changed its policy after locking-in some of its customers, and the defendant has been otherwise forthcoming about its pricing structure and service policies. . . .
> . . . . If there were any evidence in the record that Honeywell took advantage of its customers' imperfect information in order to reap supracompetitive profits in the aftermarkets for its equipment, we would not hesitate to allow a *Kodak*-type theory to be submitted to the jury.

*Id.* at 820.

The factual underpinnings of *PSI Repair Services* elucidate the Sixth Circuit's reasoning. There were "no allegations that Honeywell changed its parts-restrictive policy," and the seller's policy was generally known.  *Id.*  Prior to sale, there were lengthy negotiations, during which

-14-

various service plans were offered and estimates of service costs and parts' failure rates were provided upon request. *Id.* The evidence of information availability, specifically information provided and limited by the manufacturer as opposed to the general information costs imposed by a functioning marketplace, was the crucial distinction from *Kodak* which lead the court to ultimately determine that there was insufficient market power as a matter of law. *Id.* at 820-21. Under this Sixth Circuit precedent, in order for a plaintiff to succeed on a *Kodak*-type theory—that a lack of market power in the equipment market does not necessarily preclude market power sufficient for a section 1 claim—there must be some evidence that the defendant has changed its policy after locking-in customers and that the defendant has not "been otherwise forthcoming about its pricing structure and service policies." *Id.*

Though the Motion before the Court involves a myriad of alleged anticompetitive behavior going well beyond the scope of the *PSI Repair Service* and *Kodak* holdings (i.e., tying), these cases remain relevant to the determination of market power. First, the Court notes that implicit in both parties' discussions of the instant motion was the assumption that the cartridge and printer markets are separate. However, even if the parties' were to contest this issue, their dispute would leave a question of fact. *See PSI Repair Servs., Inc.*, 104 F.3d at 817. Second, it is clear under both *Eastman Kodak* and *PSI Repair Services* that the printer market is, at least initially, the relevant market for the determination of market power. *See PSI Repair Servs., Inc.*, 104 F.3d at 821.

The seminal question, then, is whether Lexmark possesses sufficient market power when applying the rule of *PSI Repair Services*. It is undisputed that Lexmark does not hold a sufficient grasp on the printer market such that an inference of market power can be drawn. *See id.* at 818

-15-

(citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 26-29 (1984) ("A thirty-percent

share of the market, standing alone, provides an insufficient basis from which to infer market

power."), *abrogated on other grounds by Ill. Tool Works, Inc.*, 126 S. Ct. at 1291 (holding patent

grant does not lead to automatic presumption of market power)).  Thus, the issue becomes

whether the Remanufacturers have submitted sufficient evidence of a change in Lexmark's

policy such that market power may still be present.  *See PSI Repair Servs.*, 104 F.3d at 820-821.

   The Remanufacturers have presented several pieces of evidence in favor of a finding of

market power. [R. 628 at 13-15].  Especially important to the disposition of this Motion are the

following facts:  (1) imperfect ability to determine life-time, or life-cycle, costs for printers, [*id*.];

(2) Lexmark was able to increase the price of remanufactured cartridges, [*id*. at 10]; and (3)

Lexmark did not actually always provide non-prebate cartridges, [R. 534 at 21-22].  To the extent

that Lexmark argues that these facts are incorrect, there is a disputed issue of fact that, for the

purposes of summary judgment, must be resolved in favor of the Remanufacturers.  When the

Remanufacturers' facts are taken as true, they are sufficient under the *Kodak*-theory, as

developed by *PSI Repair Services*, to create a genuine issue of fact best left for the jury.  Stated

alternatively, a reasonable jury could find that the Remanufacturers have presented more than a

mere scintilla of evidence that Lexmark misled customers into believing that non-prebate

cartridges would be available; lifetime costs were impossible to calculate; and that Lexmark

caused an increase in the overall price of available cartridges.  To wit, the Remanufacturers' have

presented evidence which falls squarely within the factors outlined and decried by *Kodak* and *PSI

Repair Services*.  *See PSI Services Repair, Inc.*, 104 F.3d at 820 (holding that a change in policy

or otherwise not being forthcoming in a policy can allow a party to succeed on a *Kodak*-type

-16-

theory).  If a jury finds that Lexmark did, in fact, not provide non-prebate cartridges when it claimed that those cartridges were available, the jury could also find that Lexmark used market power to take advantage of its customers' imperfect knowledge in order to corner the remanufactured cartridge market.  In sum, this Court cannot determine, at this stage, that Lexmark does not possess market power.  Summary judgment on Sherman Act section 1 cannot be granted based on an absence of market power.

The Court should caution, however, that situations such as this, wherein market power does not automatically flow from market share, are difficult to prove.  The Supreme Court's cautionary language is instructive:

> [i]n the end, of course, [the defendant]'s . . . argument[] may prove to be correct. It may be . . . that the equipment market does discipline the aftermarkets so that [both] are priced competitively overall, or that any anti-competitive effects of [the defendant]'s behavior are outweighed by its competitive effects.  But [this Court] cannot reach these conclusions as a matter of law on [this] record . . . .

*Eastman Kodak Co.*, 504 U.S. at 486.  The disputed issues of fact must first go to the jury.

### ii.   Remaining Section 1 Factors

While the Court has concluded its analysis under the market share argument made by Lexmark, it has by no means addressed all the arguments raised by Lexmark.  Lexmark makes specific arguments under both a *per se* and a *rule-of-reason* approach.  For the purposes of analysis under those approaches, the Court assumes that there is sufficient market power.

Several additional reasons supporting summary judgment were woven into Lexmark's argument on market power.  Specifically, Lexmark argues that there is insufficient evidence for finding anticompetitive behavior under any of the Sherman Act section 1 standards.  There are two standards for determining whether actions violate section 1 of the Sherman Act:  (1) *per se*

-17-

violations and (2) violations subject to the *rule of reason*.  *Per se* violations do not require a

finding that the defendant's actions were anticompetitive, but they do require the plaintiff to

show that the defendant "possesses market power or unique access to a business element

necessary for effective competition."  *Nw. Wholesale Stationers, Inc. v. Pac. Stationary &*

*Printing*, 472 U.S. 284, 298 (1985).

    If the facts do not sustain a finding of a *per se* violation, then the Court will apply the

*rule-of-reason* approach.  *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 708 (Fed. Cir.

1992).  ("Anticompetitive effects that are not *per se* violations of law are reviewed in accordance

with the *rule of reason*.").  "There is an automatic presumption in favor of the rule of reason

standard."  *Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1012 (6th Cir.

2005).  A *rule-of-reason* "analysis involves, inter alia, a study of consequences of the conduct on

the affected market before imposition of antitrust sanctions." *Moraine Prods.*, 538 F.2d at 144;

*PSI Repair Sers., Inc.*, 104 F.3d at 815 n. 2 ("Under *rule-of-reason* analysis, the antitrust plaintiff

must show, inter alia, an adverse effect on competition.").  While the *rule of reason* and *per se*

analyses have merged together over time, *PSI Repair Servs., Inc.*, 104 F.3d at 815 n.2, courts still

tend to separate the two.  *See, e.g., Care Heating & Cooling*, 427 F.3d at 1013-14 (separating

discussion of *per se* and *rule of reason* analysis).

### (a)    *Per Se* **Violations**

    Typically, *per se* violations are seen within the context of a boycott of supplies or

customers.  *See generally, Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1012 (6th Cir.

1999) (explaining that the Supreme Court's precedent seems to suggest that a boycott of supplies

or customers is often present in *per se* antitrust violations but is not present in a *rule-of-reason*

case).  "[T]he *per se* rule should be applied only in 'clear cut cases' of trade restraints that are so unreasonably anticompetitive that they present straightforward questions for reviewing courts." *Care Heating & Cooling, Inc.*, 427 F.3d at 1012.  A refusal to deal may qualify as a *per se* restraint, but "[t]he mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominantly anticompetitive."  *Nw. Wholesale Stationers, Inc.*, 472 U.S. at 298; *see also Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1001-02 (Fed. Cir. 1986) ("To sustain a misuse defense involving a licensing arrangement not held to have been *per se* anticompetitive by the Supreme Court, a factual determination must reveal that the overall effect of the license tends to restrain competition unlawfully in an appropriately defined relevant market.").

### (1)    Tying

A per se tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier."  *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958).  In a tying claim, a party is able to exclude competitors from a market because of its "power or leverage in another market."  *Id*. at 6.  In order to present a *per se* tying claim, a "seller must possess substantial market power in the tying product market."  *PSI Repair Servs., Inc.*, 104 F.3d at 815 n.2.  If there is appreciable power in the tying market, then a court must determine whether the defendant's conduct is procompetitive or anticompetitive.  *Id*.  Determining whether a party's actions have an anticompetitive effect requires use of the Sixth Circuit's three step analysis:  "(1) the seller must have power in the tying product market; (2) there must be a substantial threat that the tying seller will acquire market power in the tied-product market; and

-19-

(3) there must be a coherent economic basis for treating the tying and tied products as distinct."
*Hand*, 779 F.2d at 11.

As to the first prong, the Supreme Court reexamined the market power of patent holders within the context of a tying claim. *Ill. Tool Works, Inc.*, 126 S. Ct. at 1284-93. The issue before the Court was whether there was an automatic presumption of market power with patented goods. 126 S. Ct. at 1289-91. The Supreme Court rejected a *per se* approach to patented good tying claims and held that patented products should be examined under a case-by-case, market based approach. *Id*. at 1291.

Lexmark is seeking summary judgment on the issue of whether the Remanufacturers can prove that there is impermissible tying between Lexmark's printers and its printer cartridges. [R. 680 at 14]. Regardless of any *Kodak-PSI* theory that might ultimately lead to a finding of market power, the *per se* approach is no longer an appropriate means by which a patented good can be found to be an illegal tying agreement. *Ill. Tool Works, Inc.*, 126 S. Ct. at 1291. The means available to the Remanufacturers is through applying the *rule of reason*. To the extent that Lexmark seeks summary judgment on the issue of a *per se* tying arrangement, this Court will grant the Motion.

### (2)    Contracts

The next issue before the Court is whether Lexmark's distribution contracts are *per se* restraints of trade. When looking to whether a contract in restraint of trade is anticompetitive under section 1 of the Sherman Act, the key issue is whether that contract addresses a horizontal or vertical market. *Care Heating & Cooling, Inc.*, 427 F.3d at 1013 (citing *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 805 (6th Cir. 1988)). Horizontal conspiracies are

"agreements among competitors at the same level of market structure to stifle trade, such as agreements among manufacturers or among distributors to fix prices for a given product . . . ." *Care Heating & Cooling, Inc.*, 427 F.3d at 1013 (citations omitted).  Vertical conspiracies are "agreements among actors at different levels of market structure to restrain trade, 'such as agreements between a manufacturer and its distributors to exclude another distributor from a given product and geographic market.'"  *Id.* (quoting *Crane & Shovel Sales Corp.*, 854 F.2d at 805).  While horizontal restraints of trade fall under *per se* analysis, a vertical restraint will be analyzed pursuant to the *rule of reason*.  *Id.*

The Remanufacturers state that Lexmark's contracts with certain resellers, specifically Dell and IBM, are horizontal restraints of trade, which are *per se* anticompetitive. [R. 628 at 18 n.30].  The Remanufacturers do not, however, cite to any evidence submitted in support of this position. [*Id.*].  In contrast, Lexmark has submitted examples of six separate resale agreements, none of which are with Dell or IBM, [R. 680 at 14 n.21; R. 678, attachs. 22-27], and has referred the Court to a copy of the IBM agreement, which was submitted by SCC. [R. 540, attach. A].  Though this Court must presume that the Remanufacturers' version of the facts are correct, *see Eastman Kodak Co.*, 504 U.S. at 456, they must still present some affirmative evidence to support their position.  *See Browning*, 436 F.3d at 695; *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 586-587 (non-movant must "do more than simply show there is some metaphysical doubt as to the material facts") (citations omitted); *Celotex Corp.*, 477 U.S. at 324-325.  Because the Remanufacturers have not presented any evidence in support of their allegation of a horizontal restraint of trade, Lexmark's evidence must be taken as true.

A review of the contracts provided by Lexmark reveals that these are not horizontal

restraints of trade.  They go well beyond "'naked restraints of trade with no purpose except stifling competition,'" *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 132 (2d. Cir. 1978) (quoting *White Motor Co. v. United States*, 372 U.S. 253, 263 (1963)), and move into the realm of agreements that are "combinations of persons at different levels of the market structure, such as manufacturers and distributors."  *Oreck Corp.*, 579 F.2d at 132  (citing *United States v. Topco Assocs.*, 405 U.S. 596, 608 (1972)); *see also Crane & Shovel Sales Corp.*, 854 F.2d at 805 (quoting *Oreck*).  The contracts are specifically designated as "resale" agreements that provide for sale of goods under the purchaser's label. [R. 678, attachs. 22-27].  The IBM contract is "for a multinational procurement relationship." [R. 540, attach A at 3].  Lexmark's agreements, therefore, "involve agreements among actors at different levels of market structure to restrain trade."  *Care Heating & Cooling, Inc.*, 427 F.3d at 1013.  To the extent that Lexmark seeks summary judgment that the agreements between it and IBM, Dell, and any other reseller are not horizontal restraints of trade which are *per se* anticompetitive, summary judgment is appropriate.  As vertical trade agreements, they are subject to the *rule of reason*.  *Care Heating & Cooling, Inc.*, 427 F.3d at 1013.

### (b)    The *Rule of Reason*

When applying the *rule of reason*, "'an agreement limiting consumer choice by impeding the 'ordinary give and take of the market place' cannot be sustained.'"  *Re/Max Int'l, Inc.*, 173 F.3d at 1014 (*quoting FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986)).  The general test for whether there is an antitrust violation under the *rule of reason* "'is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.'"  *Ind. Fed'n of Dentists*, 476 U.S. at 458

-22-

(quoting *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918)).

The parties do not clearly distinguish between the *rule of reason* and the *per se* arguments within Lexmark's Motion.  Because Lexmark is clearly seeking summary judgment on the tying and contract claims, regardless of whether Lexmark is clear in its *rule-of-reason* argument, this Court will address both of those issues.

### (1)   Tying

As already addressed, whether a patented good has created an illegal tying agreement under section 1 of the Sherman Act is a question to be analyzed under a case-by-case, *rule-of-reason* analysis.  Here, the issue of market power cannot be decided on summary judgment because there remain disputed issues of fact.  *See, supra*, § (II)(B)(4)(I).  Because Lexmark relies only on market power, [R. 680 at 14], and the issue of market power cannot be decided at this stage of the litigation, Lexmark's Motion must be denied insofar as it relates to the Remanufacturers' tying claim under the *rule-of-reason*, case-by-case, analysis articulated by the Supreme Court in *Illinois Tool Works, Inc*.

### (2)   Contract

The IBM contract cited by Lexmark contains the following clause:

> In addition, if Buyer promotes or sells non-Supplier business printer cartridges or re-fill kits that function in Eligible Printers, Buyer will notify Supplier, in which case Supplier will not be required to pay any Consideration for the annual period in which the non-Supplier inkjet cartridge or re-fill kits were promoted or sold by Buyer.

[R. 540, attach. A, *(First) Amendment 003 To the Statement of Work under Transaction Attachment # 4997S23861* at ¶ 4.3].  The contract later adds the following at the end of that clause:  "and Supplier shall have the right to immediately terminate this Appendix G." [*Id.*

*Amendment 006 To the Statement of Work under Transaction Attachment # 4997S23861* at ¶ 4.2].

This record is very limited, but it is the only evidence that the Court has before it. This contract prohibits the reseller from also selling or promoting non-Lexmark cartridges, albeit inkjet cartridges, and its enforcement tool is the threat of lost consideration. On this very limited record, this prohibition might ultimately be found to be a device through which trade was suppressed. That is to say, it is not clear that the Lexmark-IBM contract simply dictates the methods whereby trade will be effectuated. Therefore, the Court cannot hold as a matter of law that Lexmark did not unreasonably destroy competition through unreasonable, contractual market restraints.

**5.     The Relevant Market and Monopoly Power:  Sherman Act Section 2**

In order to prevail on a Section 2 claim, the Remanufacturers must demonstrate "(1) the possession of monopoly power in a relevant market; and (2) the willful acquisition, maintenance, or use of that power by anti-competitive means as opposed to 'growth or development resulting from a superior product, business acumen, or historical accident.'" *Conwood, Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002) (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 595-96 (1985); *United States v. Grinnell Corp.*, 384 U.S. 563 570-71 (1966).  Section 2 claims are examined under a fact specific analysis, and in proving its claim, a plaintiff must first "define the relevant product and geographic markets in which it competes with the alleged monopolizer, and with respect to the monopolization claim, to show that the defendant, in fact, possesses monopoly power." *Conwood Co.*, 290 F.3d at 782.

"To establish the offense of monopolization a plaintiff must demonstrate that a defendant

-24-

either unfairly attained or maintained monopoly power." *Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 574 (6th Cir. 1986). To have monopoly power, a defendant must have "the power to control prices or exclude competition." *Grinnell*, 384 U.S. at 571. "[W]hen a competitor, with a dangerous probability of success, engages in anti-competitive practices the specific design of which are, to build a monopoly or exclude or destroy competition," there is an attempted monopolization. *Smith v. N. Mich. Hosps., Inc.*, 703 F.2d 942, 954 (6th Cir. 1983). Section 2 monopoly power "requires . . . something greater than market power under § 1." *Eastman Kodak Co.*, 504 U.S. at 481.

The standard for monopoly power is, in fact, very high, and is typically defined by the market share. *See Grinnell*, 384 U.S. at 570. For example, in *Eastman Kodak*, the Supreme Court held that there was a triable issue of fact as to whether Kodak held monopoly power when Kodak controlled 80% to 95% of the service market and 100% of the parts market. *Eastman Kodak Co.*, 504 U.S. at 481. In *Grinnell*, the Court held that 87% of market power could constitute monopoly power, *see Grinnell Corp.*, 384 U.S. at 571 (determining that 87% of market constitutes a monopoly), and in *American Tobacco Co. v. United States*, 328 U.S. 781 (1946), the Court determined that control of over two-thirds of the market could amount to monopoly power. *See id*. at 797.

While market share might, in many instances, lead to an inference of monopoly power, it is not, in and of itself, the only factor to consider. *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 623 (6th Cir.1999) ("[M]arket share is only a starting point for determining whether monopoly power exists, and the inference of monopoly power does not automatically follow from the possession of a commanding market

share.").  Within the context of an aftermarket monopolization, there are special factors to consider.

When there is an allegation of aftermarket monopolization, the analysis is more complex, "because market share data standing alone is not necessarily a reliable proxy for monopoly power."  *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005) (citing *SMS Syst. Maint. Servs. Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 16 (1st Cir.1999)).  It is to be expected that a company will supply a large percentage of its aftermarket parts and services.  *Harrison Aire, Inc.*, 423 F.3d at 381.  It is only when there are "significant information and switching costs," *Eastman Kodak Co.*, 504 U.S. at 473, that the "link between the primary market and the aftermarket" is severed for monopolization purposes.  *Harrison Aire, Inc.*, 423 F.3d at 382.  In sum, "[o]nly a careful factual analysis of the market in question will reveal whether monopoly power, in fact, exists."  *Byars*, 609 F.2d at 851.

The Remanufacturers have presented a triable issue of fact as to whether Lexmark enjoyed monopoly power.  Summary judgment in *Eastman Kodak* was inappropriate because questions of fact remained regarding supracompetitive pricing, indeterminate lifecycle costs, and high switching costs.  *Eastman Kodak Co.*, 504 U.S. at 469-75, 477, 480.  The Remanufacturers have submitted evidence that would satisfy three of these factors:  that Lexmark controlled, at a minimum, 75% of the market for remanufactured sales and 80% of the overall market for Lexmark-compatible toner cartridges, [R. 628 at 8, 10]; that Lexmark was able to charge a higher price for its remanufactured cartridges than the remanufacturers charged, [R. 628 at 10]; and that determining a life-cycle cost for a printer is nearly impossible. [R. 628 at 14].  As a result, this Court cannot, at this stage of litigation, hold that the market reality was such that Lexmark was

not able to gain monopoly power.

Lexmark appears to have rested its entire section 2 argument on the issue of monopoly power. [R. 680]. Since Lexmark does not argue whether the Remanufacturers have presented sufficient evidence that it willfully acquired, maintained, or used potential monopoly power through the use of anti-competitive means, this Court need not address this issue. Even if addressed, there is evidence that Lexmark engaged in the Prebate program in order to achieve total control over the remanufactured cartridge market. [R. 628 at 3]. Suffice it to say, neither prong one or prong two under a Sherman Act § 2 analysis is sufficient to grant summary judgment for Lexmark.

### 6.    The Relevant Market and Market Power:  Clayton Act

The Clayton Act addresses the legality of exclusive dealing contracts. An exclusive dealing contract is formed when a good is sold on the condition that the buyer not deal with competitors of the seller. *See* 15 U.S.C. § 14. In order to be an illegal exclusive dealing contract, a court must engage in a three-part inquiry. First, a court must determine "line of commerce, i.e. the type of goods . . ." that are involved. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). Second, the court must determine that there is a relationship between the anti-competitive actions and the market. *Id.* ("[T]he area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies."). Third, "the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market." *Id.* at 328.

Under the Clayton Act, "the relevant market is the prime factor in relation to which the

ultimate question, whether the contract forecloses competition in a substantial share of the line of commerce involved, must be decided." *Id.* at 329. Clayton Act claims are generally analyzed in conjunction with a Sherman Act section 1 discussion, *see Ill. Took Works, Inc.*, 126 S. Ct. at 1286, and the same facts are relevant to a market power determination under both statutes. *See U.S. v. Dairyman, Inc.*, 758 F.2d 654 (6th Cir. 1985) (per curium). As the Court has previously discussed, *see supra* § (II)(B)(4)(i), the Remanufacturers have presented sufficient evidence to proceed on the question of whether Lexmark has used its power in the market to foreclose a significant amount of competition. Summary judgment is inappropriate on this issue.

### 7.   **Antitrust Injury**

Lexmark's final argument in favor of summary judgment is that the Remanufacturers have failed to prove an injury predicated on an antitrust violation. This discussion assumes that there is an antitrust violation. In other words, it poses the following question: Assuming that there is an antitrust violation, may the Remanufacturers recover for that violation? In order to recover, the Remanufacturers "must prove *antitrust* injury, which is to say injury of the type antitrust laws were intended to prevent and that flows from that which makes [Lexmark's] acts unlawful." *Valley Prods. Co.*, 128 F.3d 398, 402 (6th Cir. 1997). Whether there is an antitrust injury rests on whether the Remanufacturers can satisfy the "necessary predicate" test. This test requires the Remanufacturers to demonstrate "facts showing that [Lexmark's] alleged anticompetitive conduct was a 'necessary predicate' to their antitrust injury; i.e., that [summary judgment] is required unless [the Remanufacturers prove] facts showing that the alleged antitrust injury could not possibly have occurred absent [Lexmark's] alleged anticompetitive conduct?" *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 900 (6th Cir. 2003).

-28-

Because Lexmark does not attempt to summarize its antitrust injury argument, [*see* R. 531], this Court attempts to concisely state Lexmark's position as follows:  No antitrust injury can flow from the Prebate Program, since in the absence of that program, Lexmark would continue to attempt to obtain empty cartridges. [*Id*.].  Lexmark's argument fails for three reasons: (1) it compares analytically distinct situations; (2) it requires reliance on speculation; and (3) it ignores the Remanufacturers' Sherman Act section 1 and Clayton Act claims, i.e., whether Lexmark's resale contracts unreasonably restrain trade.

Lexmark's argument compares analytically distinct injuries.  It states that the injury alleged by the Remanufacturers—cutting off the stream of cartridges via a prebate program (the "prebate-based injury")—is the same injury as would result if there were no prebate program—where there would be a market-based competition which in turn would lesson the supply of cartridges (the "market-based hypothetical").  The former, prebate-based injury results from an alleged antitrust violation, whereas the later, market-based hypothetical is an injury outside of any antitrust violation.  Additionally, the alleged injury based on prebate falls within the type of harm for which antitrust statutes seek to remedy.  Specifically, it forecloses competition and increases prices.  The market-based hypothetical is based on the opposite type of injury; it is injury resulting from open competition.  Because two situations are not analogous, Lexmark's argument must fail.

Second, there are evidentiary concerns with Lexmark's argument.  This Court, in determining whether an issue may properly be considered at the summary judgment stage, must rely on actual evidence.  Fed. R. Civ. Pro. 56.  Arguments requiring a court's speculation, and going well beyond the submitted evidence, are insufficient means for granting summary

-29-

judgment. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586-587 (non-movant must "do more than simply show there is some metaphysical doubt as to the material facts"); *see also Browning*, 436 F.3d at 695 (requiring that some evidence be submitted to avoid summary judgment). Lexmark's argument is based on its speculation that it is more efficient than its competitors. The Court will not rely on such speculation.

Finally, Lexmark's argument ignores whether there is an antitrust injury as a result of its contracts with the Resellers. The injury argument, cannot, therefore, be grounds for granting summary judgment on the Sherman Act section 1 or Clayton Act claim.

For these three reasons, the Court must deny summary judgment on the issue of whether there is an antitrust injury.

## C.    LANHAM ACT CLAIMS

At issue is whether Lexmark violated section 43(a) of the Lanham Act:

[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

### 1.    Wazana's Motion

Wazana is only seeking summary judgment on three of its Lanham Act allegations:  (1) that Lexmark is falsely assuring customers that all prebate cartridges will be remanufactured or recycled; (2) that Lexmark falsely represents that the cartridges will be disposed of in a manner different from regular household waste; and (3) that Lexmark has falsely represented that regularly priced cartridges, or non-prebate cartridges, are available for purchase. [R. 534]. Wazana's Motion for Summary Judgment argues that all three of these statements are literally false. [*Id*.].

In order to prove liability for false advertising under the Lanham Act, a plaintiff must satisfy the follow five-element test:

> 1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually deceives or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence a deceived consumers' purchasing decisions; 4) the advertisements were introduced into interstate commerce; 5) there is some causal link between the challenged statements and harm to the plaintiff.

*Am. Council of Certified Podiatric Physicians & Surgeons*, Inc., 185 F.3d at 613; *Balance Dynamics Corp. v. Schmitt Indus.*, 204 F.3d at 689.  A plaintiff seeking monetary damages must either show that a statement "is literally false or that it is true yet misleading or confusing."  *Am. Council of Certified Podiatric Physicians & Surgeons*, 185 F.3d at 614.  For literally false statements, no evidence that consumers were mislead is necessary for recovery, i.e., there is a presumption of actual deception.  *Id.*  "[T]he initial determination concerning whether a statement is ambiguous is a matter of law, while the determination as to whether facts exist so as to justify the statement is a question of fact."  *Id.* at 615 n.2.

Lexmark contests Wazana's position that the statements at issue are clear and false, i.e., Lexmark argues that these statements are subject to multiple meanings and that it possessed sufficient factual underpinnings to support its statements.  Therefore, as to each of the three statements presented by Wazana, this Court must first determine if the statements are ambiguous.  *Am. Council of Certified Podiatric Physicians & Surgeons*, 185 F.3d at 615 n. 2.  If unambiguous, then a jury could find that the statements are either literally false or true but deceptive.  In order to proceed to the jury, there must be sufficient facts to justify Lexmark's statement as true or as not deceptive.  If those disputed issues of fact exist, then the Court cannot make a determination as to falsity or deception, but must present this issue to a jury.  *Id*.

### i.    Ambiguity of Statement

The first representation at issue states:  "Following this initial use, you agree to return the empty cartridge only to Lexmark for remanufacturing and recycling." [R. 531 at 2].  Lexmark argues that this statement does not mean that it will recycle or remanufacture 100% of each returned cartridge. [R. 613 at 18-19].  This argument goes to whether the facts support the statement, not to whether the statement is clear.  To state the representation alternatively, Lexmark is simply letting customers know that they are agreeing to return the empty cartridge to Lexmark so that the cartridges can be recycled or remanufactured.  In sum, this statement is unambiguous.

The second statement at issue states, "Lexmark recycles Return Program Cartridges, keeping them out of the waste stream."  [R. 534 at 5].  Lexmark seems to argue that this statement has never been explicitly made but could be inferred by other statements. [R. 613 at 21].  The Court is not quite clear as to exactly what Lexmark means when it states that the

statement is "implicit," and can only assume that Lexmark is contesting whether the statement ever appeared on its website.  Lexmark has not submitted any evidence supporting this claim, and therefore the Court need not consider Lexmark's blanket denial in light of Wazana's evidence that the statement appeared, explicitly, on Lexmark's website. [R. 534 at 5.  *See Browning*, 436 F.3d at 695 (noting that while all inferences are drawn in favor of the non-moving party, that party still must present some affirmative evidence supporting its position to defeat an otherwise appropriate motion for summary judgment); *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 586-587 (non-movant must "do more than simply show there is some metaphysical doubt as to the material facts")].  Therefore, in the absence of any disputed, material facts, the Court holds that this statement was, in fact, made and is unambiguous.  As to its meaning, the statement simply represents that Lexmark is recycling the returned prebated cartridge and that this recycling is keeping the returned cartridge out of the waste stream.

Finally, Lexmark argues that its statement regarding the validity of the prebate agreement is susceptible to different meanings.  Lexmark is wrong.  The statement at issue reads, "Regular cartridges without this license/agreement sold at regular prices are available." [R. 534 at 21].  In its Response, Lexmark stated that certain "kits,"[6] consisting of a cartridge and parts, contained the statement at issue. [R. 613].  Wazana did not counter Lexmark's assertion that this statement was contained on a kit containing more than just a prebate cartridge.  The statement means that if a customer does not want to accept the prebate terms placed on the kit, it may choose to buy a

_____

[6]The Court notes that Lexmark identifies these kits as *labels*.  In order to avoid confusing the general cartridge packaging from the cartridge itself from the cartridge packaged within a kit, the use of word *label* will be used when referring to the actual packaging of all cartridges and the word *cartridge kit* will be used when referring to the sale of cartridges in conjunction with various other parts.

non-prebate cartridge (not kit), which Lexmark has available. Like the others, this statement is unambiguous.

### ii.    Facts Supporting Statement

Having determined that the three statements at issue in Wazana's Motion are unambiguous, the next step is to determine if there are disputed issues of facts as to the falsity or deceptiveness of those statements. If so, the issue of whether the statements are false or are true yet deceptive must go to a jury.

### (a)    Waste Stream, Recycling, and Remanufacturing

As set out by Lexmark in its Response [R. 613], there are significant disputed facts as to whether the products were recycled, remanufactured, or placed in the waste stream. Specifically, the dispute seems to involve Lexmark's incineration of the cartridges, or as identified by Lexmark, its "thermal recycling." There appears to be significant factual disputes as to whether technically or effectively incineration would support a claim that Lexmark recycles its returned cartridges. [*Compare* R. 531, *with* R. 534]. There is also a dispute as to whether the facts support Lexmark's claim that it is recycling or reusing the cartridges when only part of the returned cartridges are reused or recycled. [R. 613 at 20]. The resolution of these disputed issues of fact must be reserved for the trial phase and left to the province of the jury. Wazana's Motion must, therefore, be denied as to the statement that Lexmark is recycling or remanufacturing the used cartridges and as to whether these cartridges are placed in the waste stream.

### (b)    Availability of Regularly-Priced Cartridges

The Court notes that when determining whether Wazana should receive summary judgment on this issue, it must construe all disputed issues in favor of Lexmark and must take as

true all proper evidence submitted by Lexmark.  Lexmark submits several pieces of evidence that it made regularly priced cartridges available to customers who did not want to purchase the cartridge kits. [R. 613].  Therefore, summary judgment cannot be granted on this issue.

### iii.    Injury and Damages

Having determined that there is conflicting evidence regarding the falsity of the statements at issue, the Court need not reach the issue of whether Wazana has met its burden for proving any injury or damages.

### 2.    Lexmark's Motion

Due to a dispute between the parties, the Court must first determine the scope of Lexmark's Motion for Summary Judgment with regard to the Lanham Act claims.  Lexmark states that

> [Wazana] asserts two distinct Lanham Act claims against Lexmark, based on two different types of allegedly false advertising. First, [Wazana] contends that Lexmark falsely advertised that Prebate-labeled cartridges are sold subject to a valid single-use patent license . . . .Second, [Wazana] contends that Lexmark falsely advertised that Prebate cartridges are more environmentally friendly than non-Prebate cartridges and that Lexmark remanufactures or recycles Prebate cartridges . . . .

[R. 531 at 30 (citations omitted)].  Lexmark, in its Memorandum, seeks summary judgment as to all Lanham Act claims but it only argues for summary judgment as to three Lanham Act issues: (1) the Prebate statement; (2) the Environmental claims; and (3) the measure of damages available. [*Id*.].  Wazana noted, in its Response, that there are more than three statements at issue under the Lanham Act in this litigation, and it sets out all of the statements that it purports to assert. [R. 638 at 11-14].  Lexmark, in turn, attempts in its Reply to address each of these additional Lanham Act claims. [R. 679 at 10-15].  Local Rule 7.1 requires parties to state

precisely the relief requested and allows a court to rest its denial of a motion on the failure to submit an accompanying memorandum.  It seems clear that, based on the Motion and Memorandum, Lexmark is only seeking summary judgment on the three statements originally mentioned. [*See* R. 531].  To the extent that Lexmark failed, when submitting its Motion, to specifically address any additional Lanham Act claims, its effort to address them in its Reply will be disregarded.  After all, what purpose does a Motion and its Memorandum serve but to inform the Court and the other parties of relief requested therein?  Therefore, to the extent that Lexmark seeks summary judgment on specific Lanham Act claims via its Reply, as opposed to its actual Motion, it must be denied.

Only three claims are before the Court pursuant to Lexmark's Motion.  First, whether the prebate label correctly stated the single-use restriction. [*Id*.].  Second, whether the environmental claims were false or misleading. [*Id*.].  Finally, whether Wazana can prove, under the applicable standard, an amount for which it is entitled. [*Id*.].

### i.    Valid Single-Use Restriction

Wazana has asserted a Lanham Act claim regarding Lexmark's statement that all prebate cartridges are sold subject to a valid, single-use restriction.  The Court need not go into the details of the single-use restriction in this Order, since there is a lengthy discussion of the single-use restriction elsewhere in the record. [*See* R. 1008].  Lexmark argues that there are three reasons why the single-use restriction representation cannot support a Lanham Act claim:  (1) the cartridges were subject to a single-use restriction; (2) there is no evidence of damages to Wazana; and (3) Wazana's response that the statement is merely deceptive, not false, is a new theory not properly considered on summary judgment. [R. 679 at 10].

-36-

The first and third arguments are quickly disposed of.  As to the first argument, the Court did not hold that *all* prebate cartridges were, in fact, sold subject to a valid, single-use restriction. [See R. 1008 at 38].  Therefore, Lexmark cannot place reliance on this proposition.  As to the third argument, this Court need not address whether the statement is deceptive since given the Court's earlier holding regarding the single-use restrictions [*id*.], facts exist that could lead a reasonable jury to conclude that the statement is literally false. [*See generally* R. 531 at 34 (Lexmark's memorandum states, "Assuming that the Prebate single-use license is not valid and enforceable, and therefore the representations are literally false . . . .")].[7]

The second argument is slightly more complex.  As cited, Lexmark's Motion states the argument as follows:  "Assuming that the Prebate single-use license is not valid and enforceable, and therefore the representations are literally false, [Wazana] must nevertheless come forward with evidence that the representations about the enforceability of Prebate caused Lexmark to gain sales at the expense of MSE." [R. 531 at 41].  In its Response, Wazana asserts that its expert "opined that [Wazana] lost approximately $2,200,000 - 2,400,00 as a result of Lexmark's prebate program." [R. 622 at 30].  Lexmark's Reply simply argues that this evidence from Wazana "fails because [Wazana] has produced no evidence of materiality, i.e. customers purchased remanufactured cartridges <u>because</u> they are sold subject to the single use restriction . . . ." [R. 679 at 10].

As to Lexmark's first argument, Wazana has met the burden.  It has submitted expert evidence that Lexmark gained sales through prebate while Wazana lost sales. [R. 622 at 30].

---

[7]The Court notes that both parties seem to imply that their positions rest on the single-use restriction being only within the context of a patent license.

Specifically, once one assumes that not all Prebate was valid, [See R. 1008 at 38 (explaining that cartridges that were originally sold unrestricted in the United States but to which Prebate later attached were not actually subject to Prebate)], it is easy to see how Lexmark could, allegedly, gain sales at Wazana's expense through its requiring, under the guise of Prebate, those cartridges to which Prebate did not validly attach.

Wazana has also met its burden on Lexmark's second argument:  that customers purchased the cartridges because of the single-use restriction.  While Wazana did not submit direct evidence that customers purchased the cartridges because they were sold subject to a valid, single-use restriction, it would seem reasonable to infer that the single-use restriction was, in fact, valuable to the customer.  Without that restriction, the price of the cartridge could be significantly higher.  Therefore, none of the arguments put forth by Lexmark are sufficient grounds for granting summary judgment in favor of Lexmark on this issue.

## ii.    Environmental Benefit of Prebate and Cartridge Disposal

As defined by Lexmark, the "environmental benefits" Lanham claim includes both the environmental benefits of the Prebate program and whether the returned cartridges were recycled or remanufactured upon return to Lexmark.  These two arguments have already been discussed in the context of literal falsity.  *See supra* §§ II(C)(1)(i)-(ii).  As explained in the previous section, there are significant disputed material facts making these statements improper for granting summary judgment.  Even if this Court were to construe all facts in favor of Wazana, which would be required on a Motion by Lexmark, summary judgment remains inappropriate as to whether these statements are literally false.  Wazana has presented evidence that incineration is not considered, or defined as, recycling and that the clear language of Lexmark's label states that

the purpose of returning cartridges is so that they may be recycled or remanufactured. [R. 622].

These are sufficient facts from which a jury could conclude that Lexmark stated it was recycling

or reusing the cartridges and that incineration does not qualify as either of those two end results.

A remaining issue in Lexmark's motion is whether, assuming that the statements are

literally true but deceptive, Wazana has presented evidence that they are actually deceptive.

"Where statements are literally true, yet deceptive, or too ambiguous to support a finding of

literal falsity, a violation can only be established by proof of actual deception . . . ." *Am. Council*

*of Certified Podiatric Physicians & Surgeons*, 185 F.3d at 614.  For deceptive statements, a

plaintiff  "cannot obtain [monetary] relief by arguing how consumers could react; it must show

how consumers actually do react." *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d

222, 229 (3d Cir. 1990).  Wazana is seeking both monetary and injunctive relief for the alleged

Lanham violations. [R. 175 at 59].

If seeking monetary relief, there must be evidence from which a jury could determine that

a substantial portion of the audience was deceived in order to support a determination that the

statement has a "tendency to deceive." *Am. Council of Certified Podiatric Physicians &*

*Surgeons*, 185 F.3d at 616.  The deceived audience must be the intended audience for the

statement.  *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 922 (3d.

Cir. 1990).  Concern or confusion of the audience does not amount to deception.  *See Am.*

*Council of Certified Podiatric Physicians & Surgeons*, 185 F.3d at 617.  While common sense

and personal experience serve as useful aids for the deception determination, they are not

substitutes for other, harder evidence, such as consumer surveys.  *Id*. at 617-18.

Wazana relies on Lexmark's own survey for support of its deception claim. [R. 622

-39-

attach. B].  Lexmark's survey included those people who were involved in the cartridge purchase

decisions and those people responsible for replacing used cartridges with new or repaired

cartridges. [*Id*. at 7, 17-18].  When asked about the "environmentally friendly message" of the

Prebate program, the survey participants touted the benefits of helping the environment and

recycling and also noted the importance of conveying that message on the cartridge label. [*Id*. at

15, 21].  The participants even went so far as to suggest names for the program that necessarily

conveyed the importance of the environmental effects of Prebate. [*Id*. at 25].  This evidence is

sufficient to send the issue of actual deception to the jury.  To the extent that the methods of this

survey are attacked, that is within Lexmark's province to present on cross.  To conclude, for the

purposes of summary judgment and with all conflicting facts resolved in favor of Wazana, the

evidence presented by Wazana is enough that a reasonable jury could find in favor of Wazana.

Thus, as to whether monetary damages might be recovered on the two environmental statements

at issue, Lexmark's Motion must be denied.

The standard for receiving injunctive relief is lower than that for monetary relief.

Because the claims for monetary relief must be submitted to a jury, so too must the claims for

injunctive relief.  *See Max Daetwyler Corp. v. Input Graphics, Inc.*, 608 F. Supp. 1549, 1551

(E.D. Penn. 1985) (stating that in contrast with money damages, if injunctive relief is sought, a

plaintiff need only show that "the defendant's representations about its product have a tendency

to deceive consumers . . . ."); *see also Am. Council of Certified Podiatric Physicians & Surgeons*,

185 F.3d at 618. ("Although plaintiff need not present consumer surveys or testimony

demonstrating actual deception, it must present evidence of some sort demonstrating that

consumers were misled.").  The aforementioned facts would also satisfy this lower standard.

In sum, Wazana has met its burden under both the injunctive and monetary relief standards.  Thus, this Court must deny Lexmark's Motion for Summary Judgment regarding the Lanham Act claims.

### iii.   Profit Disgorgement

The final issue for which Lexmark seeks summary judgment regards the measure of damages, specifically whether profit discouragement is an appropriate remedy.  Profit disgorgement is an equitable remedy available under the Lanham Act, and it cannot be used as a penalty.  *Balance Dynamics Corp.*, 204 F.3d at 695.  A court cannot require disgorgement "unless there is some proof that plaintiff lost sales or profits, or that defendant gained them, the principles of equity do not warrant an award of defendant's profits."  *Id.*  Thus, assuming that Wazana is successful on its Lanham Act claims, the question is whether there is sufficient evidence to support a claim that Lexmark unfairly profited from its statements.  Given the number of Lanham Act statements that will be decided at trial but which were not briefed in Lexmark's original Memorandum, and the amount of disputed expert evidence [*Compare* R. 622 at 30-32, *with* 679 at 3-5], this Court declines to make a decision which will become either moot or clearer after trial.  Therefore, Lexmark's Motion, as it relates to profit disgorgement, is denied.

### III.

### <u>CONCLUSION</u>

Accordingly, for the foregoing reasons and being sufficiently advised, it is hereby **ORDERED** as follows:

1.   that Defendant's Motion for Summary Judgment [R. 529] is **DENIED in part** and **GRANTED in part**;

2.      that Counterclaim-Defendant's Motion fro Summary Judgment [R. 534] is

**DENIED in part** and **GRANTED in part**;

3.      that Counterclaim-Defendant's Motion for Hearing [R. 564] on its Motion for

Summary Judgment is **DENIED as moot**; and

4.      this Memorandum Opinion and Order is entered as an erratum to replace Docket

Entry 1035, and it contains no substantive changes from the previously entered order.  The clerk

of court is directed to strike Docket Entry Number 1035 from the docket.

This 3nd day of May, 2007.


Signed By:

*Gregory F. Van Tatenhove*

**United States District Judge**