UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| STATIC CONTROL COMPONENTS, INC., | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| V. | ) | |
| | ) | CONSOLIDATED CIVIL ACTION NOS. |
| LEXMARK INTERNATIONAL, INC., | ) | |
| | ) | 5:02-571 AND 5:04-84 |
| Defendant/Counterclaim Plaintiff, | ) | |
| | ) | |
| V. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| NER DATA PRODUCTS, INC., ET AL., | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |
| | ) | |

*** *** *** ***

Lexmark's Motion for Summary Judgment of Active Inducement of Patent Infringement against Static Control [Components, Inc.] is before the Court for consideration. [tendered at R. 532; admitted at R. 657]. Because Static Control Components ("SCC") partially defends against Lexmark's Motion by arguing, as further explained below, that SCC's replacement microchips have uses that do not infringe on Lexmark's patents, the Court will additionally address SCC's Motion for Partial Summary Judgment that Certain Cartridges are Not Subject to any "Single-Use Restriction." [R. 540 (quotes in the original)]. For the reasons set forth below, Lexmark's Motion will be denied and SCC's Motion denied in part and granted in part.

# I.

## BACKGROUND

Briefly, the status of the parties is as follows: Lexmark is a large producer of printers and

toner cartridges for its printers.  SCC is "a leading supplier to toner cartridge remanufacturers." [R. 172 at 16, Case No. 5:02-571].  The remanufacturers, which include the other Counterclaim Defendants in this case, take used toner cartridges, repair them, refill the toner, et cetera and resell the cartridges to end-user consumers.  SCC sells to the remanufacturers parts and supplies for reworking the used toner cartridges, such as replacement parts, toner, and microchips.  [R. 1].

Lexmark and SCC first began litigation in this Court in 2002 when Lexmark filed suit against SCC, alleging, *inter alia*, that SCC's sale of "SMARTEK" microchips infringed on Lexmark's copyrighted "Toner Loading Programs."  [R. 1, Case No. 5:02-571].  In 2004, SCC filed a declaratory judgment action, alleging, *inter alia*, that its new "re-engineered" microchips did not infringe on any of Lexmark's copyrights.  [R. 1, Case No. 5:04-84].  The cases were ultimately consolidated with Case No. 5:04-84 as the lead case, and all citations in this Order refer to that lead case unless otherwise noted.  [R. 140].  Lexmark filed a Counterclaim/Third Party Complaint to the 2004 litigation initiated by SCC, in which it alleged patent claims against SCC and the Counterclaim Defendant remanufacturers to this case.  [R. 67].  These patent claims in Lexmark's Counterclaim are the basis for its current Motion to the degree that Lexmark alleges active inducement of patent infringement against SCC.

The primary, though not only, theory on which Lexmark alleges direct patent infringement against the remanufacturers and active inducement of patent infringement against SCC is predicated on Lexmark's use of single-use restrictions on the majority of its cartridges at issue.  These "restricted" cartridges have been commonly referred to as "Prebate cartridges" for the reasons that follow:  Lexmark runs what it called at one time its "Prebate Program" and what now is referred to as the  "Lexmark Return Program."  [R. 594 at 3, n.4].  In that program,

Lexmark's customers buy printer cartridges at an up-front discount in exchange for the customer

agreeing to use the cartridge only once and then return the empty cartridge only to Lexmark.

According to Lexmark, Lexmark offers "'[r]egular' toner cartridge[s] for those customers who

do not choose the Prebate/Cartridge Return Program toner cartridge[s] with [their] terms." [R. 2

at 8]. Therefore, "Prebate" is temporally the reverse of a rebate.

Over the years, the precise language of Lexmark's Prebate terms printed across the top of

Prebate cartridge boxes has varied.  [*See, e.g.,* R. 573 at 3].  However, currently the terms read:

> RETURN EMPTY CARTRIDGE TO LEXMARK FOR REMANUFACTURING AND RECYCLING
>
> Please read before opening.  Opening this package or using the patented cartridge inside confirms your acceptance of the following license agreement.  This patented Return Program cartridge is sold at a special price subject to a restriction that it may be used only once.  Following this initial use, you agree to return the empty cartridge only to Lexmark for remanufacturing and recycling.  If you don't accept these terms, return the unopened package to your point of purchase.  A regular price cartridge without these terms is available.

[R. 594, 3-4 (Lexmark has provided the Court with a demonstrative cartridge and cartridge box

with the above Prebate language, as Lexmark represented that it would at Record 519 at 9,

n.13)].  Including English, these terms are printed in six different languages. *Id.*

Lexmark's second theory of direct patent infringement is predicated on the idea that the

first sale of cartridges in foreign nations does not exhaust Lexmark's patents on those cartridges

in the United States.  *See Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094, 1105 (Fed.

Cir. 2001) (citing *Boesch v. Graff*, 133 U.S. 697, 701-703 (1890)).  Accordingly, Lexmark argues

that regardless of whether a single use restriction reads on its cartridges, the Counterclaim

Defendant remanufacturers of printer cartridges infringe upon the patents that read upon

cartridges originally sold overseas by reselling them without license in the United States.

Lexmark gets its OEM ("Original Equipment Manufacturer") Cartridges to market in a variety of manners.  First, Lexmark has distribution contracts with distributors or retailers to sell Lexmark-branded cartridges.  [*See, e.g.,* R. 540, Ex. C (OfficeMax contract)].  Second, Lexmark sometimes distributes its cartridges through other companies with the understanding that the companies' brands, rather than Lexmark's brand, will appear on the packaging received by end users.  *Id.* at Ex. B (IBM contract).  Lexmark typically does not sell directly to end users; however, Lexmark makes exceptions for those end-users who buy in large quantities, such as various state agencies or larger companies.  *Id.* at Ex. D, V, W, X, Y, AA, and EE.  When Lexmark sells directly to an end user, it typically will enter into a "master contract" with that end user, which sets forth the guidelines and conditions for the end user to later place cartridge orders directly with Lexmark.  *Id.*  While the foregoing methods of distributing its products are the most common methods, there are sometimes variations.  For instance, Lexmark entered into a "master 'services' contract" with Dell, covering "maintenance and printer service and cartridge supply."  [R. 619 at 27].  Finally, at least some of Lexmark's contracts more properly address the sale of printers than cartridges, but cartridges are distributed under these contracts to the extent that the printers are sold with an accompanying cartridge.  [*See, e.g.,* R. 540 at Ex. A (IBM contract)].

Lexmark's current Motion concerns its claim against SCC for actively inducing remanufacturers to infringe Lexmark's patents on various brands of its toner cartridges pursuant to Title 35 U.S.C. § 271(b).  [R. 67 at ¶ 89].  Section 271(b) states that "[w]hoever actively induces infringement of a patent shall be liable as an infringer."  More specifically, SCC sells replacement microchips to remanufacturers for use in remanufacturing Lexmark's cartridges.

-4-

Lexmark argues: "SCC sells and distributes replacement microchips with full knowledge and intent that its customers – including Counterclaim Defendants MSE, Pendl, and NER – use these microchips to remanufacture and resell Lexmark's patented toner cartridges in violation of Lexmark's federal patent rights." [R. 532 at 1].

The Court of Appeals for the Federal Circuit has recently reiterated the elemental standard for proving active inducement:

> To establish liability under section 271(b), a patent holder must prove that once the defendants knew of the patent, they "actively and knowingly aid[ed] and abett[ed] another's direct infringement." However, "knowledge of the acts alleged to constitute infringement" is not enough. The "mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven."

*DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (citations omitted); *see also Mansville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990). Moreover, "inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *DSU Med. Corp.*, 471 F.3d at 1307 (citations omitted). Essential to proving active inducement is proving underlying acts of direct infringement, whether by circumstantial evidence or otherwise. *Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1377 (Fed. Cir. 2005) (citation omitted).

## II.

## DISCUSSION

### A.   **Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that judgment for the moving party is

appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See also Browning v. Dep't of Army*, 436 F.3d 692, 695 (6th Cir. 2006). While all inferences are drawn in favor of the non-moving party, that party still must present some affirmative evidence supporting its position to defeat an otherwise appropriate motion for summary judgment. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986) (non-movant must "do more than simply show there is some metaphysical doubt as to the material facts") (citations omitted); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). Stated alternatively, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). The foregoing standards for summary judgment review apply to patent cases as well. *See, e.g., Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1560-61 (Fed. Cir. 1988).

**B.   Analysis**

The Court does not approach this Motion from whole cloth. Rather, the Court has already ruled that summary judgment in Lexmark's favor regarding direct infringement with respect to the remanufacturing Counterclaim Defendants, namely Pendl Companies, Inc. and Wazana Brother International, Inc. d/b/a Micro Solutions Enterprises,[1] is inappropriate *at least* until claim construction disputes are resolved. [R. 1008 at 34]. However, the Court additionally

_____

[1]  Lexmark has settled its claims with a third remanufacturing Counterclaim Defendant, NER Data Products, Inc. [R. 864].

cannot find underlying direct infringement on summary judgment, because the asserted direct infringement is not merely with respect to Pendl and Wazana, but with respect to an entire group of remanufacturers, which the Court has reason to believe number in the thousands. [R. 616 at 3 n.3]. It is incumbent on Lexmark to prove direct infringement with regard to this category of alleged infringers, rather than merely two members of the group considered at Record No. 1008, and SCC has argued, though its Motion was denied, that Lexmark lacks the proof necessary for a reasonable juror to determine that the group of remanufacturers as a whole infringe on Lexmark's patents. [*See* R. 1051 (Order)]; *Dynacore Holdings Corp. v. U.S. Phillips Corp.*, 363 F.3d 1263, 1274 (Fed. Cir. 2004) (Regarding prospective damages against SCC, Lexmark proceeds under the theory that: "Plaintiffs who identify an entire category of infringers (e.g., the defendant's customers) may cast their theories of vicarious liability more broadly, and may consequently seek damages or injunctions across the entire category.") (citing *Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d 1343 (Fed. Cir. 2003)).

SCC largely relies on prior summary judgment pleadings, specifically the pleadings for Lexmark's Motion for Summary Judgment of Direct Infringement of Nine Patents Against the Remanufacturers [R. 519 (Motion) and 1008 (Order)], as argument that Lexmark cannot satisfy the direct infringement element of inducement on summary judgment. In response to Lexmark's current Motion, SCC largely devotes its Response to arguing that Lexmark cannot satisfy its additional burden for proving inducement on summary judgment—*i.e.* proof of "specific intent and action to induce." *DSU Med. Corp.*, 471 F.3d at 1305. Because this is an issue that is likely to resurface in the future, the Court will consider the parties arguments on this point.

SCC chiefly argues that if there are lawful, non-infringing uses for its microchips, then

the factually-intensive process of proving specific intent and making credibility determinations

cannot be done on summary judgment.  [R. 634 at 2].  SCC cites *Metro-Goldwyn-Mayer Studios,*

*Inc. v. Grokster, Ltd.* for its argument.  545 U.S. 913 (2005).  There, the Supreme Court held:

> In sum, where an article is "good for nothing else" but infringement, . . . there is no
> legitimate public interest in its unlicensed availability, and there is no injustice in
> presuming or imputing an intent to infringe . . . .  Conversely, the [staple article of
> commerce] doctrine absolves the equivocal conduct of selling an item with substantial
> lawful as well as unlawful uses, and limits liability to instances of more acute fault than
> the mere understanding that some of one's products will be misused.  It leaves breathing
> room for innovation and a vigorous commerce.

*Id.* at 932 (citations omitted).  SCC proceeds to argue specific uses of its microchips in

Lexmark's cartridges that do not infringe on Lexmark's patents, assuming *arguendo* that

Lexmark's theories of patent infringement are correct.  However, Lexmark correctly notes that

the "staple-article rule" will not preclude liability "where evidence goes beyond a product's

characteristics or the knowledge that it may be put to infringing uses[] and shows statements or

actions directed to promoting infringement."  *Id.* at 935.  Lexmark argues that the staple-article

rule is inapplicable here, because there is direct and allegedly un-rebuttable evidence that SCC's

conduct with regard to the sale of its microchips "shows statements or actions directed to

promoting infringement."  *Id.*  The Court will first address the "staple-article rule" and then

Lexmark's argument that the only dispositive consideration here is that evidence shows that SCC

has conducted itself in a manner to promote infringement as a matter of law.

### 1.    Lawful, Non-Infringing Uses of Static Control's Microchips

As an initial matter, while Lexmark argues that staple-article rule is irrelevant in this case,

given SCC's alleged "statements or actions directed to promoting infringement," it is worth

noting that the staple-article rule does not favor summary judgment on inducement in favor of

Lexmark either.  SCC has set forth various situations in which the microchips are in fact used for

non-infringing purposes.  For instance, even though Lexmark contends that replacement

microchips are unnecessary for cartridges originally sold without restriction in the United States,

SCC points to evidence that the remanufacturers replace those microchips anyway for various

reasons.[2]  [R. 634 at 5-8].  Lexmark argues that SCC's volume of sales for microchips does not

support the position that SCC intends for its microchips to be used only for limited legal uses,

but the Court believes this is an issue of credibility for the jury to decide.

        The parties have specifically argued over whether the sale of two classes of cartridges

sold in the United States constitute unrestricted sales, even if Lexmark's Prebate label appears on

those cartridges.  If these cartridges, as addressed below, are sold without restriction in the

United States, that represents additional classes of cartridges onto which SCC's microchips can

be incorporated without there being any predicate direct infringement during the remanufacturing

process.  First, SCC argues that all cartridges sold in North Carolina after October 1, 2003, are

not subject to Prebate, even if a cartridge is labeled with Prebate, as a result of the legal effect of

North Carolina General Statute § 75-36.  Second, SCC argues that sixteen direct sales contracts

or master contracts between Lexmark and third parties disavow or otherwise nullify the terms of

Prebate on cartridges sold under the contracts.  Thus, SCC argues, despite the Prebate labels that

read on the cartridges sold under the contracts, these cartridges are sold without restriction, and

---

[2]  The Court agrees with Lexmark that merely pointing to instances when a microchip
may be used for a non-infringing purpose does not in and of itself satisfy SCC's burden of
proving, as an affirmative defense to infringement, that remanufacturers in fact use these
cartridges on which Lexmark's patent rights are exhausted.  *See Jazz Photo Corp. v. United
States*, 439 F.3d 1344, 1350 (Fed. Cir. 2006); [R. 682 at 2].  However, pointing out non-
infringing uses does prevent the presumption of inducement that is warranted when the "article is
'good for nothing else' but infringement."  *Grokster*, 545 U.S. at 932.

-9-

remanufacturers can legally remanufacture these cartridges upon an unrestricted first sale that

exhausts Lexmark's patent rights in those specific articles.  These two classes of cartridges are

the subject of SCC's Motion for Partial Summary Judgment that Certain Cartridges are Not

Subject to Any "Single-Use Restriction."[3]  [R. 540].

(a)    <b>The North Carolina Statute</b>

North Carolina General Statute § 75-36 (the "Statute"), effective October 1, 2003, and

entitled, "Certain contracts relating to toner or inkjet cartridges void and unenforceable as a

matter of public policy," reads as follows:

> Any provision in any agreement or contract that prohibits the reusing, remanufacturing, or
> refilling of a toner or inkjet cartridge is void and unenforceable as a matter of public
> policy.  Nothing in this section shall prevent any maintenance contract that warrants the
> performance of equipment under the contract from requiring the use of new or specified
> toner or inkjet cartridges in the equipment under contract.

SCC argues that this Statute nullifies any Prebate agreements for cartridges originally sold in

North Carolina on or after October 1, 2003.  The parties concur, and the Court agrees, that the

interpretation of the Statute is a matter of law for the Court to decide.  *See, e.g., George E.*

*Warren Corp. v. United States*, 341 F.3d 1348, 1350 (Fed. Cir. 2003).  No legislative history

informs the scope or meaning of this Statute, other than to say that the Statute "applies to

agreements or contracts entered into on or after [October 1, 2003]" and that the "act does not

---

[3]  Lexmark argues that SCC's Motion goes to issues of damages in this case, rather than
liability for inducement, and SCC bears the burden of proving as an affirmative defense that
Lexmark "exhausted its patent rights in particular Lexmark cartridges that were remanufactured."
[R. 619 at 3].  However, SCC is correct that the subject matter of its Motion is also relevant to
the affirmative defense of patent misuse.  Potentially relevant to Lexmark's argument that SCC
bears the burden of proving patent exhaustion on particular cartridges is the issue of whether
Lexmark prevents SCC from meeting its burden by making certain unrestricted cartridges, with
regard to which the remanufacturers have every right to remanufacture, indistinguishable from
restricted cartridges.

-10-

apply to or affect any litigation pending before that date." 2003 N.C. Sess. Laws 386.

Given the lack of legislative history regarding the cartridge-remanufacturing Statute,[4] the Court more or less is left with the task of determining the meaning of "prohibit" in the Statute. The Court does not believe that Lexmark's Prebate program prohibits the reusing, remanufacturing, or refilling of a cartridge within the meaning of the Statute. At most, Lexmark's program restricts available options to end-user consumers for remanufacturing used cartridges, but Lexmark is itself its own remanufacturer. To the extent that the Counterclaim Defendants take issue with Lexmark's representations about the fate of cartridges once returned to Lexmark, that is a different consideration that is irrelevant here. [*See, e.g.,* R. 1040, regarding the Lanham Act]. The North Carolina legislature was competent to enact the statute to read more broadly, perhaps voiding any provision that would *restrict* or *inhibit* the remanufacturing of cartridges, but the legislature chose not to do so. Additionally, in other instances in North Carolina law, the term "prohibit" means total prohibition, rather than merely "to hinder." *See* N.C. GEN. STAT. § 75-38 (2007) (prohibiting excessive pricing during states of disaster, emergency, or abnormal market disruptions); *Id.* at § 106-65.74 (2007) ("The Commissioner is authorized to issue regulations prohibiting the planting of noncommercial cotton [under certain circumstances]."); *Id.* at § 14-321.1 (2007) (statute entitled, "Prohibit baby sitting service by sex offender . . ."); *Id.* at § 75A-15(b1) (2007) ("The Commission may adopt rules to prohibit entry of vessels into public swimming areas . . . ."); *Cf.* N.C. GEN. STAT. § 75B-7 (2007) (in which the Chapter, entitled "Discrimination in Business," "shall not be deemed to supercede, *restrict* or

---

[4] Additionally, neither has any other court considered this statute in a published opinion or an opinion otherwise made available on Westlaw or LexisNexis's electronic databases.

otherwise limit the continuing applicability of the antitrust or anti-discrimination laws . . . ." (emphasis added)).

Lexmark additionally argues that were the Statute to be read to nullify its Prebate terms on cartridges sold in North Carolina, then the Statute itself would be preempted by the Patent Act. The Court will briefly frame this issue, but need not reach a conclusion, given the Court's interpretation of the Statute above. In *Mallinckrodt, Inc. v. Medipart, Inc.*, the Court of Appeals for the Federal Circuit noted that the legality of restrictive patent licenses "seems clear." 976 F.2d 700, 704 (Fed. Cir. 1992) (citation omitted). However, the court also noted that "the question of whether a license restriction is binding on the purchaser is indeed one of contract law." *Id.* at 707 n.6. (citing *Keeler v. Standard Folding Bed Co.*, 157 U.S. 659, 666 (1895)). Accordingly, there is no dispute that typical, across-the-board principles of state contract law, whether under the Uniform Commercial Code or otherwise, govern restrictive patent licenses. However, the current issue is whether the scheme of the Patent Act leaves room for a state to target and ban restrictive patent licenses of a precise subject matter on public policy grounds, when that license is "clearly legal" under patent law. The Court need not force the issue, because the Court has already determined that Prebate is not affected under the terms of the Statute.

### (b) Contracts Between Lexmark and Third Parties

SCC additionally argues that seventeen contracts between Lexmark and third parties each have terms that cause an unrestricted first sale in the United States of Lexmark cartridges. These first sales, SCC argues, exhaust Lexmark's right under patent law to restrict the use of those cartridges subsequent to the sales, even though Lexmark for the most part labels these cartridges

with its Prebate restriction.[5]  The Court will consider the nature of these contracts in turn.

### (1)   Lexmark-IBM Agreement I

Two Lexmark-IBM agreements are addressed in SCC's Motion.  The first agreement is a master procurement contract, which SCC argues is silent regarding Prebate but contains a modification clause that requires any amendment be in writing that specifically references the master contract and that is signed by the authorized representatives of the parties.  [R. 540, Exhibit A].  The Court agrees with Lexmark that this clause is irrelevant to the extent that this contract merely sets up a system for Lexmark to directly distribute its cartridges though a sales distribution contract regarding Lexmark-branded printers.  This contract is not self-executing, because it contains no reference to a particular price certain for cartridges/printers or a quantity of printers with accompanying cartridges to be delivered to IBM.  *see id.* at LXK-LOR 203732 ("Supplier shall only provide Products and Services as specified in a [Work Authorization].").  Accordingly, Prebate on cartridges ultimately delivered to IBM and then sold to end users with Lexmark-branded printers does nothing to modify the master procurement contract.  SCC's Motion will be denied regarding this contract.

### (2)   Other Contracts Allegedly Silent Regarding Prebate, But Which Include General Integration or Modification Clauses or Both

---

[5]  SCC's Motion originally concerned eighteen contracts, but SCC withdrew its Motion to the extent it originally sought judgment that no valid "single-use restriction" reads on cartridges sold pursuant to a contract between Lexmark and Fleet National Bank.  [R. 674 at 7].  This number considers the "California Agreements" as two contracts, though SCC discusses them together.  [R. 540 at 12].

For cartridges sold under one contract between Lexmark and IBM, IBM's own restrictive language, rather than Prebate, reads on the cartridges when purchased by the end user.  [R. 619 at 8].

In addition to the Lexmark-IBM Agreement I, *supra*, SCC argues that various contracts that are silent with regard to Prebate preclude the incorporation of Prebate terms because of either general modification or integration clauses in the contracts.  These contracts include Lexmark's Southern Agreement [R. 540, Ex. D], AAFES Agreement [*Id.* at Ex. V], BHR Agreement [*Id.* at Ex. W], BellSouth Technology Services, Inc. Agreement [*Id.* at Ex. X], Citizens Bank of Rhode Island Agreement [*Id.* at Ex. Y], Prudential Real Estate Affiliates, Inc. Agreement [*Id.* at Ex. AA], and Texas Agreement [*Id.* at Ex. EE].  Like the IBM Agreement I, these contracts are all master contracts for the purpose of setting up distribution or purchasing arrangements with Lexmark directly.  These specific seven entities that contract with Lexmark are all end user consumers of the cartridges procured pursuant to the master contracts.  These contracts do not affect the analysis of Prebate when the buyers must separately order and accept Prebate cartridges (or printers with Prebate cartridges included) subsequent to entering the contracts.  SCC makes much ado about Lexmark's failure to include any of these subsequent purchase orders as exhibits (or to produce them during discovery), but the Court does not believe that to matter with regard to SCC's current Motion.  What is clear is that the master contracts themselves do not vitiate the terms of Prebate subsequently entered into sometime after the actual order of those cartridges.  SCC's Motion will be denied with respect to these seven contracts.

### (3)    Contracts that Allegedly Affirmatively Disclaim Prebate

SCC argues that various contracts address and affirmatively disclaim Lexmark's terms of Prebate or at least disclaim "shrinkwrap agreements" in general.  Assuming this were true, Lexmark argues that the parties' subsequent course of performance—*i.e.* subsequent orders of specific quantities of Prebate cartridges or printers with Prebate cartridges pre-installed—under

-14-

the U.C.C. demonstrates acquiescence to the terms of Prebate.  [R. 619]; *see* KY. REV. STAT.

ANN. § 355.1-303 (2006).  Course of performance aside, there is also an argument to be made

that if a master contract in fact disclaims Prebate, then Lexmark's subsequent delivery of Prebate

cartridges would constitute nonconforming goods, concerning which the buyer could demand

cure.  However, the buyers' use of the cartridges represents acceptance of nonconforming goods.

This theory reflects Judge Easterbrook's observation with respect to shrinkwrap licenses that

"[t]erms of use are no less a part of 'the product' than are the size of the database and the speed

with which the software compiles listings."  *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1453 (7th

Cir. 1996).

SCC's rebuttal to the above argument is compelling: these buyers believe that they have

successfully contracted around shrinkwrap licenses and negotiated for them to be held for naught

in the master contract.  Accordingly, buyers have no reason to think that when Prebate cartridges

arrive that using those cartridges constitutes acceptance of nonconforming goods.  Rather, the

goods appear to be conforming, because the Prebate terms have been previously negotiated to

specifically not apply to that buyer.  [R. 674 at 12].  Just because the literal words appear on the

cartridge does not necessarily mean that the terms are "charged" with meaning or have any legal

effect for the purpose of enforcing patent rights.  The Court must reconcile Lexmark and SCC's

positions by looking to the provisions of the relevant contracts themselves for the parties' intent.

### (i)  Contracts Silent Regarding Prebate, But Which Allegedly Contain General "Anti-Shrinkwrap Terms" Provisions that SCC Argues Disclaim Prebate

The relevant alleged  "anti-shrinkwrap" provision in an agreement between Lexmark and

the State of Louisiana reads:

> TERMS AND CONDITIONS: This contract contains all terms and conditions with respect to the commodities herein.  Any vendor contracts, forms or other materials submitted with bid may cause bid to be rejected.
>
> The Purchase/Release Order is the only binding document to be issued against this contract.  Signing of vendors' pre-printed forms is not allowed.

[R. 540 at 22, Ex. DD at 224964].  The first sentence appears to be an integration clause like those integration clauses referenced above.  The second sentence does not nullify any "vendor contracts, forms or other materials submitted with bid" but merely gives Louisiana the option of rejecting those bids.  Finally, Prebate does not "issue against the [master] contract" but is part of a subsequent order of specific quantities of cartridges that must occur for the master contract to have any effect.  The Court does not believe that the above clause implicates Prebate at all, and accordingly, SCC's Motion will be denied with respect to this contract.  Ultimately the terms are too general to express an intent to nullify the terms of Prebate on any cartridges bought under the contract.

Three other contracts have terms that better address "shrinkwrap licenses" than the Louisiana agreement.  With regard to the Lexmark-Georgia agreement, the relevant alleged "anti-shrinkwrap" provision reads:

> Neither the State nor any User Agency shall be bound by any terms and conditions included in any Vendor packaging, invoice, catalog, brochure, technical data sheets, or other document which attempts to impose any condition in variance with or in addition to the terms and conditions contained herein.

[R. 540 at 21,  Exhibit CC at LXK-LOR224914].  Similar terms read in the Lexmark-Florida Agreement:

> The Contractor may not unilaterally modify the terms of the Contract by affixing additional terms to product upon delivery (e.g., attachment or inclusion of standard preprinted forms, product literature, "shrink wrap" terms accompanying or affixed to a

-16-

product, whether written or electronic) or by incorporating such terms onto the
Contractor's order or fiscal or other documents forwarded by the Contractor for payment
Finally, Lexmark and various states entered into the Western States Contracting Alliance

[R, 540, Ex. BB at LXK-LOR 224641].  Finally, Lexmark and various states entered into the

Western States Contracting Alliance ("WSCA") Agreement for the purpose of end-using states

buying Lexmark products directly from Lexmark.  SCC cites at least eleven states that entered

the WSCA Agreement via Participating Addenda.  [R. 540 at 10, ¶ 26].  With the exception of

two states, SCC argues that the state's individual Participating Addenda "each contain an

additional integration clause expressly disclaiming "'shrink-wrap'-type terms" in part as follows:

> Terms and conditions inconsistent with, contrary or in addition to the terms and
> conditions of this Addendum and the Price Agreement, together with its exhibits, shall
> not be added to or incorporated into this Addendum or the Price Agreement and its
> exhibits, by any subsequent purchase order or otherwise, and any such attempts to add or
> incorporate such terms and conditions are hereby rejected.  The terms and conditions of
> this Addendum and the Price Agreement and its exhibits shall prevail and govern in the
> case of any such inconsistent or additional terms.

[*See, e.g.,* Ex. G at LXK-SCC-04-275380 (Colorado's Participating Addendum)].

The Court does not believe that these contracts contemplate Prebate to the degree that a

customer could see Prebate terms on the cartridges and reasonably determine that the terms do

not apply because of the master contracts referenced above.  Buying a single use cartridge is no

different conceptually then purchasing a cartridge with high yield toner.  *ProCD*, 86 F.3d at

1453.  Shrinkwrap terms are traditionally thought to be more along the lines of terms limiting

warranty, imposing an arbitration agreement, etc., rather than terms that affect the very nature of

the product.  While the Court has no doubt that parties can expressly disclaim Prebate terms by

contract, the disclaimer needs to be more express than the above contracts to conclude that the

master contracts insulate a buyer from accepting nonconforming goods to a degree that

establishes a course of performance.

Finally, a contract between Dell and Lexmark is the only contract cited by SCC that is a "master 'services' contract for maintenance and printer service and cartridge supply." [R. 619 at 27]. This contract does not mention Prebate, but contains an integration clause that SCC claims "expressly disclaims 'shrink-wrap' type terms:"

> Each party agrees that use of pre-printed forms, including, but not limited to e-mail, purchase orders, acknowledgments or invoices, is for convenience only and all pre-printed terms and conditions stated thereon, except as specifically set forth in this Agreement, are void and of no effect.

[R. 540 at 16, Ex. U at LXK-LOR 203451, ¶ 8.15]. The Court does not find this provision to be a disclaimer of Prebate. Prebate is not a "form." It is an agreement that literally reads on the product itself. Accordingly, the Court finds that it would be unreasonable for Dell to assume that the terms of Prebate on cartridges that it accepts under the master contract have no effect, and to the extent that the provision is ambiguous regarding whether Prebate terms constitute a "pre-printed forms," Lexmark's argument regarding course of performance is well taken.

### (ii)       The Lexmark-California Agreements

With regard to two Lexmark contracts with California, SCC states that "California state law prohibits California state agencies from purchasing printer cartridges from manufacturers that restrict the recycling or remanufacture of those cartridge." [R. 540 at 12, citing CAL. PUB. CONT. CODE § 12156(b)]. This is a mischaracterization of California law, which actually holds:

> a manufacturer, wholesaler, distributor, retailer, or remanufacturer who establishes a recycling or remanufacturing program that is available to its customers[6] may enter into signed agreements with those customers consenting to the return of the used cartridge to

---

[6] "Customers" here refers to California state agencies. *See* CAL. PUB. CONT. CODE § 12156(a).

the manufacturer, wholesaler, distributor, retailer, or remanufacturer, only for either of the following purposes:
(1) Recycling and remanufacturing, for purposes of making the remanufactured cartridge available for purchase.
(2) Recycling.

CAL. PUB. CONT. CODE § 12156(b).  With regard to the first contract, entered into between

Lexmark and the California Department of General Services ("DGS"), that contract reads:

> In reference to Public Contract Code Section 12156, when DGS and state agencies choose to purchase Lexmark Int'l Inc. printer and/or duplication cartridges they consent to return the used cartridges to Lexmark Int'l Inc. directly or indirectly by returning the cartridge to the entity from whom the cartridges were purchased or any third party of the agency's choice, only for either of the following purposes:
>
> > (1) Recycling and remanufacturing, for purposes of making the remanufactured cartridge available for purchase.
> > (2) Recycling.
>
> Both parties understand that the DGS and state agencies will use reasonable efforts to return cartridges, for recycling and/or remanufacturing, and agree that DGS and state agencies do not guarantee that each Lexmark Int'l Inc. cartridges will be returned to Lexmark Int'l Inc.[7]

[R. 540, Ex. R at LXK-LOR 103878].  Given that SCC's citation of California law actually

endorses programs like Lexmark's, the Court views this provision as merely expressing the

consent as contemplated in § 12156(b).  To wit, California, in compliance with its code,

consented to the validity of Prebate.

Lexmark's second contract concerning California specifically is referred to as a

"California Multiple Award Schedule ('CMAS') contract."  [R. 619 at 16, ¶ 36].  This is a master

contract for direct sales, executed through subsequent orders, to California as an end user of the

_____

[7]  Just to clear any potential confusion, the Court reads the phrase "by returning the cartridges to . . . any third party of the agency's choice" as a means of effectuating an indirect return of the cartridges *to Lexmark*.

cartridges.  [R. 540, Ex. T at LXK-SCC-04-274913].  SCC claims that the contract expressly

disclaims "'shrink-wrap'-type terms that conflict with the CMAS agreement" as follows:

> CMAS Conflict of Terms.  The California Multiple Award Schedule terms and conditions shall prevail if there is a conflict between the terms and condition of the contractor's federal GSA (or other multiple award contract), packaging, invoices, catalogs, brochures, technical data sheets or other documents.

[R. 540 at 14-15, ¶ 44, quoting Ex. T at LXK-SCC-04-274921, ¶ 60].  Where's the conflict?

### (iii)    Lexmark-OfficeMax Agreement

Like the Louisiana, Georgia, and Florida contracts, *supra*, SCC argues that Lexmark's

contract with OfficeMax contains terms as follows that disclaim Prebate:

> <u>CONTROLLING TERMS</u>.  OfficeMax objects to the inclusion of any different or additional terms by supplier in supplier's acceptance of this program.  If supplier includes or attaches any different or additional terms in supplier's purported acceptance, commences performance, or tenders the Goods, a contract of sale will result upon the terms and conditions as stated herein, without inclusion of any different or additional terms and conditions.

[R. 540, Ex. C at 4, ¶ 5].  Unlike the Louisiana, Georgia, and Florida contracts, under which

those entities are end users of Lexmark's cartridges, the OfficeMax contract is a distribution

contract contemplating resale of Lexmark products to end users.  Accordingly, here the intent of

the parties appears not to disclaim Prebate, but rather disclaim any terms that may alter the

master contract.  Under this situation, it seems clear that Prebate is "no less a part of 'the

product' than are" any other characteristics of a Lexmark toner cartridge.  *ProCD*, 86 F.3d at

1453.  Prebate is for the end user to accept or reject by returning the cartridge, but Prebate has no

affect on the Lexmark and OfficeMax's master distribution contract.

### (4)    Lexmark-IBM Agreement II

-20-

Lexmark has another distribution contract with IBM that specifically addresses

Lexmark's Prebate program.  This contract contemplates the ultimate sale of Lexmark-

manufacturered goods to end users under IBM's brand name.  [R. 619 at 7].  That agreement

provides that:

> The parties acknowledge that at this time the IBM Green program does not incorporate restricted patent rights, including restrictions as to the use of Supplies under a party's patents as under Lexmark's Prebate license program.  If the parties later choose to incorporate all of Lexmark Prebate license program terms and conditions, both parties understand that additional terms will be required in this Agreement to reflect the conditional patent license that would apply to the Supplies being purchased for use on the Printers being purchased hereunder.

[R. 540, Ex. B at LXK-SCC-04-261533, ¶ 7].  The Court believes this to be a clear manifestation

of intent that Lexmark cartridges delivered to IBM for sale to end users, either as cartridges

included with the sale of printers or otherwise, are unrestricted cartridges with regard to

Lexmark's patent rights.

Lexmark argues that IBM's own restrictive license on said cartridges is sufficient to

achieve the same use restrictions under patent law as Prebate cartridges achieve.  IBM's license

language is referenced in the Lexmark-IBM Agreement II:

> IBM has elected not to utilize the Prebate terms, but rather on the use-and-return only version of the cartridge, IBM will implement an IBM Green program.  The terms would read essentially as follows:
>
> IBM Green
>
> "Please read before opening.  This all new cartridge is sold at a special price based on your agreement to return the empty cartridge to IBM for recycling.  A regularly priced cartridge without restriction is also available."

-21-

Both the prebate and the IBM Green offering are to promote returns for remanufacturing.

*Id.* at LXK-SCC-04-261532 ¶ 3.  At the least, given the agreement between Lexmark and IBM that "IBM Green program does not incorporate restricted patent rights," IBM's Green program language cannot be considered a restrictive *patent* license that would enable Lexmark to sue remanufacturers for direct infringement of Lexmark's patents upon the remanufacturer of those cartridges.  IBM's terms are at most a restrictive property use agreement under contract law between IBM and the end user.  If IBM's agreement is enforceable, which is an issue not before the Court, then the remedy for breach would be an action in contract between IBM and the end user.  IBM simply has no patent rights in the cartridges, which it can "restrict" with respect to the end user.  That cartridges returned to IBM under IBM's Green program are delivered to Lexmark is also irrelevant.  The fate of cartridges returned to IBM is exclusively between IBM and Lexmark but does not affect the unrestricted sale *under patent law* to the end user.  Accordingly, SCC's motion will be granted with respect to the Lexmark-IBM Agreement II, or more specifically, with respect to cartridges that are sold to end users that bear IBM's Green program label.

     **2.**     **Alleged Evidence of Inducement Despite Whether SCC's Microchips May be Used for Non-Infringing Purposes in Some Circumstances**

Lexmark argues that non-infringing uses for SCC's microchips are immaterial when there is allegedly undeniable evidence that SCC has conducted itself in a manner directed to promoting infringement.  *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 935 (2005) ("We hold that one who distributes a device with the object of promoting its use to

infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." *Id.* at 919). It bears repeating that Lexmark's Motion must be denied because Lexmark is not entitled to summary judgment on direct infringement with respect to the class of remanufacturers that SCC allegedly induces. Nevertheless, the second consideration for inducement requires not merely scienter, but specific intent to cause underlying infringement. *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (citations omitted). SCC may (or may not, given various affirmative defenses) have a long row to hoe at trial regarding the issue of inducement. Nevertheless, the Court believes that SCC has set forth at least the minimum necessary to present its case opposing Lexmark to the jury for consideration. For instance, the Court agrees that a reasonable juror could find SCC's circulation of the "Anti-Prebate Kit," composing largely of a letter from Professor Walter Blakey that more or less said he found nothing wrong with remanufacturing Prebate cartridges, to be *equivocal* evidence of specific intent, because SCC later circulated Lexmark's rebuttal letter to its customers. [R. 634 at 27]. And, for instance, although SCC's Motion at Record No. 540 was by and large not well taken by the Court, there is a factual argument to be made to the jury as to whether many classes of Prebate cartridges were legitimately, though incorrectly, thought by SCC to be the proper and legal subject of remanufacture. [R. 634 at 31].

### III.

### CONCLUSION

For the reasons set forth herein, it is hereby **ORDERED** as follows:

(1)      Lexmark's Motion for Summary Judgment of Active Inducement of Patent Infringement Against Static Control [tendered at R. 532; filed at R. 657] is **DENIED**;

(2)      Static Control Component's Motion for Partial Summary Judgment that Certain Cartridges are Not Subject to Any "Single-Use Restriction" [R. 540] is **GRANTED** in part and **DENIED** in part as follows:

(a)  SCC's Motion is **GRANTED as follows**:  Cartridges sold to end users that bear IBM's Green program label pursuant to a contract between Lexmark and IBM, located as Exhibit B to Record No. 540, are not subject to any single-use restriction *under patent law*.  The Court makes no judgment as to whether IBM may enforce its Green program restriction vis-à-vis end users who do not follow the restriction under a theory based on contract; and

(b)  SCC's Motion is otherwise **DENIED**.

This the 11th day of May, 2007.

**Signed By:**

*Gregory F. Van Tatenhove*

**United States District Judge**

-24-