UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

Eastern District of Kentucky
**FILED**

**MAR 3 1 2009**

AT LEXINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

| | |
|---|---|
| STATIC CONTROL COMPONENTS, INC., | ) ) ) ) ) |
| Plaintiff/Counterclaim Defendant, | ) CONSOLIDATED CIVIL ACTION NOS. ) |
| V. | ) 5:02-571 AND 5:04-84 ) |
| LEXMARK INTERNATIONAL, INC., | ) ) |
| Defendant/Counterclaim Plaintiff. | ) **MEMORANDUM OPINION** ) **& ORDER** ) ) ) ) |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Static Control Components, Inc.'s Motion to

Reconsider Interlocutory Order and Supplemental Opposition to Lexmark's Renewed Motion for

Judgment as a Matter of Law on Static Control's Affirmative Defense of Exhaustion [R. 1422].[1]

In this Motion, Static Control seeks to have the Court reconsider its Interlocutory Order at

Record 1008 in light of the Supreme Court's most recent statement of the law regarding patent

exhaustion, or the first sale doctrine, announced in *Quanta Computer, Inc. v. LG Electronics,*

---

[1]Lexmark argues that Local Rule 7.1 does not authorize Static Control's Supplemental
Opposition to Lexmark's Renewed Motion for Judgment as a Matter of Law on Static Control's
Affirmative Defense of Exhaustion. Regardless, the Court denied Lexmark's Renewed Motion
for Judgment as a Matter of Law on Static Control's Affirmative Defense of Exhaustion by
previous Order [R. 1429]. Accordingly, only Static Control's Motion to Reconsider remains
before the Court.

*Inc.*, 128 S. Ct. 2109 (2008). [*Id.*] After reading the parties' briefs and hearing oral arguments, this Court agrees that *Quanta* compels reconsideration and reversal of the aforementioned Order. *Quanta* has changed the landscape of the doctrine of patent exhaustion generally, and specifically the application of the doctrine to the facts of this case.

## I.

Lexmark is a large producer of printers and toner cartridges for its printers. Static Control is "a leading supplier to toner cartridge manufacturers." [R. 172 at 16, Case No. 5:02-571.] The remanufacturers take used toner cartridges, repair them, refill the toner, et cetera, and resell the cartridges to end-user consumers. Static Control sells to the remanufacturers parts and supplies for reworking the used toner cartridges, such as replacement parts, toner, and microchips. [R. 1.] Long ago, in 2002, this litigation began when Lexmark filed suit against Static Control. [5:02-571, R. 1.] Static Control filed a second suit, a declaratory judgment action, on February 24, 2004. [5:04-084, R. 1.][2] Since the filing and consolidation of these cases, this action has been appealed; numerous parties have come and gone; amended complaints, counterclaims, and cross-claims have been filed in the record; well over twenty summary judgment motions have been filed and decided, as well as comparable numbers of motions for judgment; and a jury trial has commenced and concluded.

The primary, though not only, theory on which Lexmark alleges direct patent infringement and inducement of patent infringement against Static Control is predicated on

---

[2]It is this later case, 04-084, that became the lead case, and it is the case to which all record citations refer unless otherwise noted.

Lexmark's employment of single-use restrictions on the majority of cartridges at issue. These "restricted" cartridges have been commonly referred to as "Prebate Cartridges" for the reasons that follow: Lexmark runs what it called at one time its "Prebate Program" and what now is referred to as the "Lexmark Return Program." [R. 594 at 3, n. 4.]  In that program, Lexmark's customers buy printer cartridges at an up-front discount in exchange for their agreement to use the cartridges only once and then return the empty cartridges to Lexmark.  According to Lexmark, it offers "'regular' toner cartridge[s] for those customers who do not choose the Prebate/Cartridge Return Program toner cartridge[s] with [their] terms." [R. 2 at 8.]  Therefore, "Prebate" is temporally the reverse of a rebate.[3]

In its Order at Record 1008, this Court found that Lexmark's Prebate Program avoided the exhaustion of patent rights normally associated with a patented article's first sale.  Stated otherwise, the Court upheld the validity of Lexmark's Prebate Program against Static Control's claims that it should be considered invalid under the patent exhaustion doctrine.  It is this

---

[3]Over the years, the precise language of Lexmark's Prebate terms printed across the top of Prebate cartridge boxes has varied, with a total of four different versions. [*See, e.g.*, R. 573 at 3.] The terms at issue here read:

> RETURN EMPTY CARTRIDGE TO LEXMARK FOR REMANUFACTURING AND RECYCLING
>
> Please read before opening.  Opening this package or using the patented cartridge inside confirms your acceptance of the following license agreement.  This patented Return Program cartridge is sold at a special price subject to a restriction that it may be used only once.  Following this initial use, you agree to return the empty cartridge only to Lexmark for remanufacturing and recycling.  If you don't accept these terms, return the unopened package to your point of purchase.  A regular price cartridge without these terms is available.

[R. 594 at 3-4 (Lexmark provided the Court with a demonstrative cartridge and cartridge box with the above Prebate language, as Lexmark represented it would at Record 519 at 9, n. 13).]

decision that Static Control now asks the Court to reconsider.

## II.

The authority to reconsider the Interlocutory Order at Record 1008 before final judgment has been entered is well established. Federal Rule of Civil Procedure 54(b) provides that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Additionally, in *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988), the Supreme Court stated that "[a] court has the power to revisit prior decisions of its own...in any circumstance...." Although, "where litigants have once battled for the court's decision, they should neither be required, nor without good reason, permitted to battle for it again," *Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (*quoting Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir. 1964)), there are certainly instances in which the law of the case changes before a final judgment because of "an intervening change of controlling law." *Rodriguez v. Tennessee Laborers Health & Welfare Fund*, 89 Fed. Appx. 949, 959, 2004 WL 237651, at *8 (6th Cir. Fed. 6, 2004). Here, the change or clarification in the law provided by the Supreme Court's decision in *Quanta* justifies revisiting this Court's prior decision that Lexmark's patent infringement claims are not barred by the doctrine of patent exhaustion.

## III.

### A.

*Quanta* is the latest in a long and old line of Supreme Court decisions dealing with the

4

consequences of the first sale of a patented item, a doctrine also known as patent exhaustion. Though the terms "patent exhaustion" and "first sale" are used interchangeably, some have called the phrase "patent exhaustion" a "misnomer." F. Scott Kieff, *Quanta v. LG Electronics: Frustrating Patent Deals By Taking Contracting Options Off the Table?*, 2008 Cato Sup. Ct. Rev. 315, 320 (2007-2008)(*quoting* Judge Giles S. Rich, Address at Sixth Annual Conference on International Intellectual Property Law & Policy, Fordham University (April 16, 1998)(as quoted in F. Scott Kieff, et al, Principals of Patent Law 1144 (4th ed. 2008))(hereinafter "Rich Address")). Patent rights include "the right to exclude others from making, using, offering for sale, or selling the patented invention." *Id.* at 320-21 (*quoting* Rich Address). Those who argue against using the term "patent exhaustion" note that in selling a patented article, the patentee is not exercising his right to exclude others from doing so–patent law is not involved. *Id.* at 321 (*citing* Rich Address). Thus, if the patentee is not exercising his patent rights, he cannot be "exhausting" them. *Id.* (*citing* Rich Address). The term "first sale," however, focuses attention on the terms of the sale; in this way, it moves us away from patent law and, more appropriately, on to the principles of contract, property, and antitrust law. [*See* R. 1424, attach. 1 at 5 (Mazumdar, "Supreme Court: Patent Exhaustion Doctrine Applies to Permit Post-Sale Use of Cliamed Methods," The Bureau of National Affairs, Inc., PATENT, TRADEMARK & COPYRIGHT DAILY, June 10, 2008 (quoting Witherspoon)).] And it is this framework that the Court finds most helpful when considering the teachings of *Quanta's* ancestors.

The *Quanta* Court begins with a brief survey of its decisions on patent exhaustion, thereby setting forth its own family history of the doctrine. *Quanta*, 128 S. Ct. at 2115-17. What emerges is a renewed understanding of a principle first set forth before the Civil War.

5

In 1853, the Supreme Court made its first statement on the law of patent exhaustion with

the case of *Bloomer v. McQuewan*, 55 U.S. 539. Here, the Court was asked to consider the effect

of a patent extension on purchasers of patented Woodworth planing machines. *Id.* at 548.

Specifically, the Court considered whether purchasers of licenses to sell or use the planing

machines for the duration of the original patent term could continue to use the licenses through

the extended term. *Id. See Quanta*, 128 S. Ct. at 2115. The Court held that purchasers who

bought the machine "for the purpose of using it in the ordinary pursuits of life" were not affected

by the patent extension. *McQuewan*, 55 U.S. at 549. *See Quanta*, 128 S. Ct. at 2115.

In making this decision, the *McQuewan* Court articulated a distinction between

purchasers of the right to manufacture and sell patented articles and purchasers of the right to use

such articles. According to the Court, a purchaser of the right to make and vend a patented

article

> obtains a share in the [patentee's] monopoly, and that monopoly is derived from,
> and exercised under, the protection of the United States. And the interest he
> acquires, necessarily terminates at the time limited for its continuance by the law
> which created it. The patentee cannot sell it for a longer time. And the purchaser
> buys with reference to that period; the time for which exclusive privilege is to
> endure being on of the chief elements of its value. He therefore has no just claim
> to share in a further monopoly subsequently acquired by the patentee. He does not
> purchase or pay for it.

*McQuewan*, 55 U.S. at 549. A purchaser of the right to use a patented article in the ordinary

pursuits of life, however, "stands on different ground." *Id.* The Court explained,

> In using it, he exercises no rights created by the act of Congress, nor does he
> derive title to it by virtue of the franchise or exclusive privilege granted to the
> patentee. The inventor might lawfully sell it to him, whether he had a patent or
> not, if no other patentee stood in his way. And when the machine passes to the
> hands of the purchaser, it is no longer within the limits of the monopoly. It passes
> outside of it, and is no longer under the protection of the act of Congress...The

6

implement or machine becomes his private, individual property, not protected by
the laws of the United States, but by the laws of the State in which it is situated.

*Id.* at 549-50. Thus, from the beginning the Supreme Court has recognized a difference between

end users of patented articles and licensees of the right to make and/or sell those articles.

In *Adams v. Burke*, 84 U.S. 453, 456 (1873), the Supreme Court again made a distinction

between one who manufactures and sells a patented product and one who purchases it for use.

The Court was asked whether a patent holder could restrict post-sale use of his coffin-lids to a

limited district, specifically the circle of ten miles around Boston. The Court stated,

"Whatever...may be the rule when patentees subdivide territorially their patents, as to the

exclusive right *to make* and *to sell* within a limited territory, we hold that in the class of machines

or implements we have described, when they are once lawfully made and sold, there is no

restriction on their *use* to be implied for the benefit of the patentee or his assignees or licensees."

*Id.* at 456-57. Stated otherwise, while the right of Lockhart & Seelye to make and sell the coffin-

lids was restricted to the circle of ten miles around Boston, the right of their customers to use the

coffin-lids was not. *Id.* According to the Court, "[A] purchaser...of a single coffin acquired the

right to use that coffin for the purpose for which all coffins are used." *Id.* at 456.

The Supreme Court again addressed the issue of patent exhaustion in the case of *Henry v.*

*A. B. Dick Co.*, 224 U.S. 1 (1912). This time, however, the Court held that a patent holder could

restrict a purchaser's use of his patented product. The case involved a patented mimeograph sold

by the A. B. Dick Company with the license restriction that it could be used only with stencil

paper, ink, and other supplies made by the A. B. Dick Company. *Id.* at 11. The Court explained

that, in previous cases, "the statement that a purchaser of a patented machine has an unlimited

7

right to use it for all the purposes of the invention, so long as the identity of the machine is

preserved, was made of one who bought unconditionally; that is, subject to no specified

limitation upon his right of use." *Id.* at 19.  The Court asserted that "[t]he property right to a

patented machine may pass to a purchaser with no right of use, or with only the right to use in a

specified way, or at a specified place, or for a specified purpose." *Id.* at 24.  The Court simply

required that the purchaser "have notice that he buys with only a qualified right of use." *Id.* at

26.

     *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 518 (1917),

expressly reversed *A. B. Dick Co.*  In *Motion Picture Patents*, a patent holder, by means of a plate

attached to its patented film projectors, attempted to restrict purchasers' use of the projectors to

the display of films made under a patent held by the same company. *Id.* at 506-7.  The Supreme

Court described the case as "present[ing] anew the inquiry, which is arising with increasing

frequency in recent years, as to the extent to which a patentee or his assignee is authorized by our

patent laws to prescribe by notice attached to a patented machine the conditions of its use and the

supplies which must be used in the operation of it, under pain of infringement of the patent." *Id.*

at 509.  Noting that "the primary purpose of out patent laws is not the creation of private fortunes

for the owners of patents," the Court held that

> it is not competent for the owner of a patent, by notice attached to its machine, to,
> in effect, extend the scope of its patent monopoly by restricting the use of it to
> materials necessary in its operation, but which are no part of the patented
> invention, or to send its machines forth into the channels of trade of the country
> subject to conditions as to use or royalty to be paid, to be imposed thereafter at the
> discretion of such patent owner.

*Id.* at 511, 516.  Indeed, according to the Court, "[t]he patent law furnishes no warrant for such a

practice, and the cost, inconvenience, and annoyance to the public which the opposite conclusion would occasion forbid it." *Id.* at 516.

In *Ethyl Gasoline Corporation v. United States*, 309 U.S. 436 (1940), a case not discussed in the *Quanta* Court's overview but briefly mentioned later in the opinion, the Court again referenced the doctrine of patent exhaustion. Ethyl Gasoline Corporation ("Ethyl") "engaged in the manufacture and sale of a patented fluid compound . . . which, when added to gasoline used as a motor fuel, increases the efficiency of high pressure combustion engines in which the fuel is consumed." *Id.* at 446. Ethyl "grant[ed] licenses under its patents to most of the large oil refining companies in the United States, to manufacture, sell and distribute motor fuel containing the patented fluid." *Id.* at 447. These licenses prohibited the refiners from selling the product to any jobbers other than those licensed by Ethyl. *Id.* The Government argued that "the control acquired through the licensing agreements over the refiners and jobbers ha[d] been used by [Ethyl] to control the business practices of the jobbers, particularly to maintain resale prices of the patented motor fuel in unlawful restraint of interstate commerce." *Id.* at 450. The Supreme Court agreed. Citing *Adams v. Burke* and *Motion Picture Patents*, among other cases, the Court explained that "[b]y [Ethyl's] sales to refiners it relinquishes its exclusive right to use the patented fluid and it relinquishes to the licensed jobbers its exclusive rights to sell the lead-treated fuel by permitting the licensed refiners to manufacture and sell the fuel to them." *Id.* at 457. The Court continued: "And by the authorized sales of the fuel by refiners to jobbers the patent monopoly over it is exhausted, after the sale neither appellant nor the refiners may longer rely on the patents to exercise any control over the price at which the fuel may be resold." *Id.* Though not a broad holding on the doctrine of patent exhaustion, as the Court seemed to suggest

9

that some control over the jobbers may have been lawful, the decision in *Ethyl Gasoline Corp.*
foreshadowed the Court's much broader statement of the doctrine in *United States v. Univis Lens
Co.*, 316 U.S. 241 (1942).

According to the Supreme Court, before *Quanta*, it most recently discussed patent
exhaustion in *Univis*. *Quanta*, 128 S. Ct. at 2116. The case involved the Univis Lens Company
("Lens Company"), which had owned a number of patents related to multifocal lenses. *Univis*,
316 U.S. at 243. The Lens Company organized the Univis Corporation ("Corporation") and
transferred its interest in the patents to this new entity.[4] *Id.* The Corporation licensed the Lens
Company to manufacture lens blanks and sell them to designated licensees. *Id.* Specifically, the
Corporation issued licenses to wholesalers, finishing retailers, and prescription retailers. *Id.* at
244. The licenses to wholesalers authorized them "to purchase the blanks from the Lens
Company, to finish them by grinding and polishing, and to sell them to prescription licensees" at
prices fixed by the Corporation. *Id.* Similarly, the licenses to finishing retailers authorized them
to purchase the blanks from the Lens Company, grind and polish them, adjust the lenses to the
eyes of consumers, and then sell them to their customers at prices fixed by the Corporation. *Id.*
The Government sought an injunction, claiming that the resale price provisions of this licensing
arrangement restrained trade in violation of the Sherman Act. *Id.* at 242-43. The Supreme Court
"granted certiorari to determine whether Univis' patent monopoly survived the sale of the lens
blanks by the licensed manufacturer and therefore shielded Univis' pricing scheme from the
Sherman Act." *Quanta*, 128 Sup. Ct. at 2116. Though the facts of *Univis* are not particularly

---

[4]For the purposes of the suit, the Court treated the Lens Company and the Corporation as
though they were a single corporation. *Univis,* 316 U.S. at 243.

relevant to the case at bar, the Court's holding is.  The Court held that Univis, after the sale of the lens blanks, could not set the price or "exercise any further control over the article sold."  *Univis*, 316 U.S. at 252.  Rather, "the authorized sale of an article which is capable of use only in practicing the patent is a relinquishment of the patent monopoly with respect to the article sold."  *Id.* at 249.

Another Supreme Court case addressing the issue of patent exhaustion, one not discussed by the *Quanta* Court, bears mentioning–*Mitchell v. Hawley*, 83 U.S. 544 (1872).  Like *McQuewan*, *Mitchell* is a patent extension case.  In *Mitchell*, however, the license agreement "expressly stipulated" that the licensee could not sell or grant any license to use the patented machine beyond the expiration of the term of the original patent.  *Id.* at 549.  Because of this language in the license agreement, the Court reached a different result, holding that purchasers of the machines for use in the ordinary pursuits of life could not continue to use them through the extended term.  *Id.* at 550.  The result in *Mitchell* seems inconsistent with the results reached in *Adams*, *Motion Picture Patents*, and *Univis* regarding restrictions on the post-sale use of patented products.  Language in the *Mitchell* opinion, however, suggests the Court considered the restriction at issue to be a condition limiting the right to sell, rather than a post-sale restriction on the right of use.  For example, the Court wrote that "the grantor under whom the respondents claim never acquired the right to sell the machines and give their purchasers the right to use the same...beyond the term of the original patent...."  *Id.*  In this way, *Mitchell* is distinguishable from the Court's other cases dealing with the doctrine of patent exhaustion.

Similarly, *General Talking Pictures Corp. v. Western Electric Co.*, 304 U.S. 175 (1938), another case left out of the Court's patent exhaustion overview, though discussed later in the

11

*Quanta* opinion, concerns a restriction on the sale of patented products, as opposed to a restriction on post-sale use. In the case, the license from the patent owner prohibited the manufacturer from making its initial sales of the patented amplifiers to commercial users. *Id.* at 180. *Id.* Sales to commercial users were thus unauthorized and did not result in patent exhaustion. *See Quanta* 128 S. Ct. at 2121.

In sum, the Supreme Court's overview of its history of statements on the law of patent exhaustion reveals that the Court has consistently held that patent holders may not invoke patent law to enforce restrictions on the post-sale use of their patented products. After the first authorized sale to a purchaser who buys for use in the ordinary pursuits of life, a patent holder's patent rights have been exhausted.

**B.**

*Quanta* itself reaffirms the Supreme Court's articulation of the doctrine of patent exhaustion as set forth in the cases discussed in the previous section. It represents a change in the law, however, because the Court reasserted a broad understanding of patent exhaustion in the face of Federal Circuit case law that had narrowed the scope of the doctrine. That Federal Circuit case law had been followed as binding precedent by the district courts, including this one.

*Quanta* involved a portfolio of computer technology patents purchased by LG Electronics, Inc. (LGE), hereinafter referred to as the LGE Patents. *Quanta*, 128 S. Ct. at 2113. LGE licensed to Intel Corporation a patent portfolio that included the LGE Patents. *Id.* at 2114. The License Agreement between LGE and Intel authorized Intel to manufacture and sell micropressors and chipsets that practiced the LGE Patents. *Id.* The License Agreement also provided, however, that no license was granted to Intel's customers to combine Intel products

12

practicing the LGE Patents with non-Intel products. *Id.* At the same time, the License

Agreement purported not to alter the usual rules of patent exhaustion. *Id.* In a separate

agreement (the Master Agreement) between LGE and Intel, Intel agreed to give its customers

written notice informing them that Intel's license from LGE did not extend to any products they

made by combining an Intel product with a non-Intel product. *Id.* This Master Agreement

further provided that its breach would not be grounds for termination of the patent license from

LGE to Intel. *Id.*

Quanta, a computer manufacturer, "purchased micropressors and chipsets from Intel and

received the notice required by the Master Agreement." *Id.* In spite of the notice, "Quanta

manufactured computers using Intel parts in combination with non-Intel memory and buses in

ways that practice[d] the LGE Patents." *Id.* LGE thus filed suit against Quanta, alleging that

Quanta's conduct infringed the LGE Patents. *Id.*

In its review of the case, the Federal Circuit held that the agreement between LGE and

Intel avoided the exhaustion of patent rights that usually accompanies a patented product's first

sale. *LG Electronics, Inc. v. Bizcom Electronics, Inc.*, 453 F.3d 1364, 1369-70 (Fed. Cir. 2006).

The Federal Circuit explained that the "'exhaustion doctrine . . . does not apply to an expressly

conditional sale or license.'" *Id.* at 1370 (*quoting B. Braun Med. Inc. v. Abbott Labs.*, 124 F.3d

1419, 1426 (Fed. Cir. 1997). The Federal Circuit noted that the "LGE-Intel license expressly

disclaims granting a license allowing computer system manufacturers to combine Intel's licensed

parts with other non-Intel components." *Id.* It further noted that the "conditional agreement

required Intel to notify its customers of the limited scope of the license, which it did." *Id.* Thus,

according to the Federal Circuit, "[a]lthough Intel was free to sell its micropressors and chipsets,

those sales were conditional, and Intel's customers were expressly prohibited from infringing

LGE's combination patents." *Id.* Stated otherwise, the Federal Circuit held that the agreement

between LGE and Intel made Intel's sales of the micropressors and chipsets conditional, so that

the doctrine of patent exhaustion did not apply and LGE could assert claims of patent

infringement against Quanta.

The Supreme Court, however, reversed the decision of the Federal Circuit, holding that

patent exhaustion barred LGE's claims against Quanta.[5] The Court explained that "[e]xhaustion

is triggered only by a sale authorized by the patent holder." *Quanta*, 128 S. Ct. at 2121 (citing

*United States v. Univis Lens Co.*, 316 U.S. 241, 249 (1942)). While LGE argued–and the Federal

Circuit held–that there was no authorized sale because the License Agreement did not permit

Intel to sell its products for use in combination with non-Intel products to practice the LGE

Patents, the Court noted that nothing in the License Agreement restricted Intel's right to sell

products embodying the LGE Patents. *Id.* Further, according to the Court, though LGE did

require Intel to give notice to its customers that LGE had not licensed those customers to practice

---

[5]In the case, the Supreme Court first addressed and rejected LGE's argument that the patent exhaustion doctrine was inapplicable in the case because it did not apply to method claims, which were contained in the LGE Patents. *Quanta*, 128 S. Ct. at 2117. The Court explained, "It is true that a patented method may not be sold in the same way as an article or device, but methods nonetheless may be 'embodied' in a product, the sale of which exhausts patent rights." *Id.* Next, the Court found that the Intel products sufficiently "embod[ied] the essential features of the LGE Patents because they carr[ied] out all the inventive processes when combined, according to their design, with standard components." *Id.* at 2120. This part of the *Quanta* Court's holding does not need to be addressed here. This Court held previously that Lexmark's method patent claims are subject to patent exhaustion. Specifically, this Court found that Lexmark's method patents "are so intertwined with the use of the licensed patented article itself that denying a license in the method claims to a user would deprive the user of his non-infringing, bargained-for use of the toner cartridge." [R. 1008 at 41]. Thus, the *Quanta* Court's holding with respect to method patent claims merely affirms this Court's earlier decision.

14

its patents, Intel's authority to sell was not conditioned on its customers' decision to abide by LGE's directions in that notice. *Id.* at 2121-22. Thus, the Court found that "[b]ecause Intel was authorized to sell its products to Quanta, the doctrine of patent exhaustion prevents LGE from further asserting its patent rights with respect to the patents substantially embodied by those products." *Id.* at 2122. In more general terms, "The authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control postsale use of the article." *Id.* According to the Supreme Court, then, the LGE-Intel agreement did not impose conditions on the sale of the patented products, but rather attempted to impose conditions on the use of those products after a fully authorized sale.

In its Motion to Reconsider, Static Control asserts that "[t]he patent exhaustion doctrine articulated in *Quanta* invalidates Lexmark's effort to create patent-based use restriction through its postsale Prebate terms, as well as Lexmark's attempt to enforce the Prebate terms under patent law against Static Control." [R. 1422-2 at 6.] This Court Agrees. Like LGE, Lexmark does not impose any restrictions on the sale of its patented products–toner cartridges. Additionally, like LGE, Lexmark attempts to reserve patent rights in its products through post-sale restrictions on use imposed on its customers. This is what *Quanta* says Lexmark cannot do. As Static Control puts it, "LGE could not preserve its patent rights through a postsale restriction on an authorized sale, even when the subsequent purchaser was on notice of the asserted patent rights." Now, neither can Lexmark. [R. 1422-2 at 6.]

In its Opposition to Static Control's Motion, Lexmark argues that *Quanta* "did not result in a change of the controlling law relating to conditional sales or patent exhaustion." [R. 1424 at

15

1.] Instead, Lexmark contends *Quanta* reaffirmed that patent exhaustion applies to sales that are *both* authorized and *unconditional*–and Lexmark asserts that the Prebate terms made the sale of its toner cartridges conditional. This Court agrees with Static Control, however, that, in making this argument, Lexmark confuses the distinction made in *Quanta* between conditions restricting the right to sell, like the condition in the license agreement between the patent holder and the manufacturer in *General Talking Pictures* which prohibited the manufacturer from making its initial sales of the patented amplifiers to commercial users, and post-sale conditions on use. Sales of Lexmark Prebate cartridges were unconditional. Anyone could walk into a store carrying Lexmark Prebate cartridges and purchase one. Anyone could purchase Lexmark Prebate cartridges directly from Lexmark through its website.[6] No potential buyer was required to agree to abide by the Prebate terms before purchasing a cartridge. Thus, sales of Lexmark's Prebate toner cartridges were authorized and unconditional, just like sales of LGE's patented products in *Quanta*. As such, sales of Lexmark cartridges exhausted Lexmark's patent rights in them, stripping Lexmark of the ability to control post-sale use of the cartridges through patent law.

In upholding the validity of Lexmark's Prebate Program against Static Control's charge of patent exhaustion in the Record at 1008, this Court relied in part on *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992). *Mallinckrodt* involved the sale of a patented

---

[6]In this Court's pre-*Quanta* discussion of patent exhaustion in the Record at 1008, it found that, for the purposes of patent exhaustion, it should not matter whether a patentee sells its patented articles directly to consumers or first sells to middlemen, such as an office supply store, who in turn sell to consumers. [R. 1008 at 26-27.] The Court explained that "[t]o hold otherwise would create an arbitrary distinction that direct sellers to consumers can maintain restrictive licenses on their patented products while those who happen to get their products to the consumer via middlemen cannot." [*Id.*] The Court continues to abide by this decision. Therefore, whether Lexmark sells its Prebate cartridges directly to customers through its website or indirectly through middlemen, after *Quanta* its patent rights have been exhausted.

16

medical device accompanied by a "single use only" notice. *Id.* at 701. The district court had

referenced patent exhaustion, stating that "policy considerations require that no conditions be

imposed on patented goods after their sale and that Mallinckrodt's restriction could not

'convert[] what was in substance a sale into a license.'" *Id.* at 703. The Federal Circuit,

however, found that the district court had "erred in its analysis of the law, for not all restrictions

on the use of patented goods are unenforceable." *Id.* For the Federal Circuit, the issue was not

one of patent exhaustion. Citing *Mitchell v. Hawley*, it noted that the legality of restrictive

licenses "seems clear." *Id.* at 704. Instead, the issue was "whether Mallinckrodt's restriction is

reasonably within the patent grant, or whether the patentee has ventured beyond the patent grant

and into behavior having an anticompetitive effect not justifiable under the rule of reason." *Id.* at

708.

As Lexmark points out, the Supreme Court did not expressly overrule *Mallinckrodt* in its

*Quanta* opinion. Academic literature that has followed in the wake of the *Quanta* decision has

grappled with the question of whether the Supreme Court intended to overrule *Mallinckrodt*.

Several authors believe *Mallinckrodt* is no longer good law. *See, e.g.,* Herbert Hovenkamp,

*Innovation and the Domain of Competition Policy*, 60 Ala. L. Rev. 103, n. 35 (2008). Others

have expressed the belief, or the hope, that the *Quanta* holding is limited to the very specific

facts, and the very specific license agreement, that confronted the Court. *See, e.g.,* Matthew W.

Siegal and Kevin C. Ecker, *Quanta Computer, Inc., et al. v. LG Electronics, Inc.: Patent*

*Exhaustion Restrictions May Not Be ... Exhausted*, 14 No. 11 Intell. Prop. Strategist 1 (August

2008). After reviewing *Quanta*, *Mallinckrodt*, and the parties' arguments, this Court is

persuaded that *Quanta* overruled *Mallinckrodt sub silentio*. The Supreme Court's broad

17

statement of the law of patent exhaustion simply cannot be squared with the position that the *Quanta* holding is limited to its specific facts. Further, the Federal Circuit relied in part on *Mallinckrodt* in reaching its decision in *LG Electronics, Inc. v. Bizcom Electronics, Inc.*, 453 F.3d 1364, 1369 (Fed. Cir. 2006), the decision the Supreme Court reversed in *Quanta*. It is also worth noting that the *Quanta* decision did not mention a single Federal Circuit case. As Static Control points out, however, in holding that patent exhaustion applies to method patents, the Supreme Court clearly overruled Federal Circuit precedent on that issue.[7]

In the Order at Record 1008, this Court, relying on *Jazz Photo Corp. v. Int'l Trade Comm.*, 264 F.3d 1094, 1105 (Fed. Cir. 2001), and *B. Braun Med. Inc. v. Abbott Labs.*, 124 F.3d 1419, 1426 (Fed. Cir. 1997), explained that patent exhaustion rests in part on the theory that, after the first sale, the patentee has received its full reward for the use of the article. [R. 1008 at 26.] Lexmark, however, offers its Prebate cartridges at a lower price; it demands a higher price for cartridges sold without any single-use restriction. Thus, this Court reasoned, if sales of Prebate cartridges to end users exhaust Lexmark's patent rights and Lexmark can no longer enforce its single-use restriction, Lexmark does not receive its full reward for its Prebate cartridges. [*Id.*] In its review of the *Quanta* case, the Federal Circuit also cited this theory behind the doctrine of patent exhaustion. It explained:

> [A]n unconditional sale of a patented device exhausts the patentee's right to control the purchaser's use of the device thereafter. The theory behind this rule is that in such a transaction, the patentee has bargained for, and received, an amount equal to the full value of the goods. This exhaustion doctrine, however, does not

---

[7]At the hearing on this matter in September of 2008, Lexmark argued that when the Supreme Court overrules a case it does so expressly. Lexmark provided examples of Supreme Court decisions explicitly overruling conflicting case law. In all of those cases, however, the Supreme Court overruled its own prior decisions, not the decisions of lower courts.

> apply to an expressly conditional sale or license. In such a transaction, it is more
> reasonable to infer that the parties negotiated a price that reflects only the value of
> the "use" rights conferred by the patentee.

*LG Electronics, Inc. v. Bizcom Electronics, Inc.*, 454 F.3d 1364, 1369-70 (Fed. Cir.

2006)(*quoting B. Braun Med. Inc.*, 124 F.3d at 1426). In this way, the Federal Circuit implied

that LGE had not received the full value of its patented micropressors and chipsets; rather, it had

negotiated a price that reflected only the value of those patented articles so long as they were not

used in combination with non-Intel products. As previously stated, however, the Supreme Court

reversed the decision of the Federal Circuit, finding that the sale was unconditional and therefore

patent exhaustion applied. It did not even mention the notion that LGE may not have received its

full reward from the sale of the patented items. Therefore, this Court is now persuaded that,

regardless of the fact that Lexmark may not have received the full value of its Prebate cartridges,

after *Quanta* Lexmark may not invoke patent law in order to enforce its Prebate terms.

This is not to say, however, that state contract law may not be invoked. *See Quanta*, 128

S. Ct. at 2122, n. 7. In the Order at Record 1008, this Court addressed Static Control's argument

that, regarding Prebate, Lexmark could not show any meeting of the minds as required by

Kentucky contract law, and, therefore, Prebate terms could not constitute valid, enforceable

contracts between Lexmark and it customers.[8] [R. 1008 at 19.] The Court found that

"Lexmark's Prebate agreements are akin to contracts of adhesion, so named because the contracts

'are offered to the . . . consumer on essentially a "take it or leave it" basis without affording the

consumer a realistic opportunity to bargain.'" [*Id.* at 21 (*quoting Jones v. Bituminous Cas. Co.*,

---

[8]In order for Lexmark to recover under its state law claims, claims that were later
dismissed, the existence of valid contracts was essential. [*Id.* at 20.]

19

821 S.W.2d 798, 801 (Ky. 1991)).] Additionally, the Court noted that this issue has already been

considered by the Court of Appeals for the Sixth Circuit at the preliminary injunction phase. [*Id.*

at n. 13 (*citing Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6ᵗʰ Cir.

2004)).] In Judge Feikens's opinion concurring in part and dissenting in part, he prophetically

described the merits, *vel non*, of Static Control's "meeting of the minds" argument:

> [Static Control] contends that such shrinkwrap agreements are not enforceable. In
> support of this, at least one amicus brief cites a 2001 Federal Circuit court
> decision that held there must be a "meeting of the minds in order for restrictions
> in the agreement to be enforceable. Other circuits have upheld the validity of
> shrinkwrap agreements. Here, the shrinkwrap agreement was clear and the district
> court could find that it supports the conclusion that there was a meeting of the
> minds and the agreement is enforceable . . . Finally, I note this case is factually
> different from *Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp. Inc.*,
> 123 F.3d 1445 (Fed. Cir. 1997), in which the shrinkwrap agreement contained
> only a warning against refilling, and did not condition the sale[9] on a promise not
> to refill.

[*Id.* at 25 (*quoting Lexmark Int'l, Inc.*, 387 F.3d at 563, n. 10).] Accordingly, this Court denied

Static Control's motion for partial summary judgment on the state contract law issue.

On March 5, 2009, Lexmark filed a Notice of Authority [R. 1437] regarding *Monsanto*

*Co. v. Scruggs*, 2009 WL 536833 (N.D. Miss. Mar. 3, 2009). *Monsanto* is a seed patent case,

and it is important to understand its unique facts. The Monsanto Company used its patented

biotechnology to develop herbicide resistant soybeans and cotton. *Monsanto Co. v. Scruggs*, 459

F.3d 1328, 1332-33 (Fed. Cir. 2006). Monsanto began licensing its biotechnology to seed

companies, and these licenses imposed certain restrictions. *Id.* at 1333. For example, seed

companies were prohibited from selling seed containing Monsanto's technology to growers who

---

[9]Of course, after *Quanta*, we understand that the Prebate agreement is not a condition on
the sale of the cartridge, but rather a condition on its use.

had not signed one of Monsanto's license agreements. *Id.* Additionally, seed sold to licensed growers could only be used to grow a single commercial crop. *Id.* Scruggs purchased seeds containing Monsanto's technology from the seed companies without signing a license agreement. *Id.* After planting the purchased seeds, Scruggs retained the new generation of seeds and used them to plant subsequent generations of crops. *Id.* Monsanto filed suit against Scruggs for infringement of its patent rights. *Id.* The district court granted summary judgment in favor of Monsanto, denying Scruggs' cross-motion for summary judgment. *Id.*

In the order filed in the record by Lexmark, the district court rejected the defendants' argument that it should reconsider its decision to deny them summary judgment in light of the Supreme Court's decision in *Quanta*. *Monsanto Co.*, 2009 WL 536833, at *1. Lexmark undoubtedly filed it because the court "conclude[d] that defendants read *Quanta* too broadly." *Id.* As Static Control points out, however, the facts in *Monsanto* are readily distinguishable from the facts in *Quanta* and in this case. The license agreements between Monsanto and the seed companies only permitted sale of the seed to licensed growers. *Id.* Because Scruggs did not have a license, any sale to him was unauthorized. *Id.* Neither LGE nor Lexmark restricted the sale of their patented products to licensed purchasers. Further, the district court reminded the parties that

> the "first sale" doctrine of exhaustion of the patent right is not implicated, as the new seeds grown from the original batch had never been sold. Without the actual sale of the second generation seed to Scruggs, there can be no patent exhaustion. The fact that a patented technology can replicate itself does not give a purchaser the right to use replicated copies of the technology. Applying the first sale doctrine to subsequent generations of self-replicating technology would eviscerate the rights of the patent holder.

*Id.* (*quoting Monsanto Co.*, 459 F.3d at 1336)(internal citations and quotation marks omitted).

Here, however, Static Control engaged in repair, not reconstruction or "replication" of Lexmark's Prebate cartridges.  [*See* R. 1008 at 18-19.]  The district court in *Monsanto* even permitted an interlocutory appeal from its order due to "the wealth of persuasive authority which posits the opposite conclusion, e.g. that *Quanta's* holding on the doctrine of patent exhaustion is a substantial limitation on the rights of patent holders." *Monsanto Co.*, 2009 WL 536833, at *2. Accordingly, the *Monsanto* decision is not persuasive.

In contrast to *Monsanto*, another recent district court decision reads the *Quanta* decision very broadly.  In *LG Electronics, Inc. v. Hitachi, Ltd.*, 2009 WL 667232, at *8 (N.D. Cal. March 13, 2009), the court found that "the Supreme Court's rationale for its decision supports the conclusion that it meant 'authorized sales' to include 'authorized foreign sales.'"  In the Order at Record 1008, this Court quoted *Jazz Photo Corp.* for the proposition that

> United States patent rights are not exhausted by products of foreign provenance. To invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent.  Our decision applies only to [patented articles] for which the United States patent right has been exhausted by first sale in the United States.

*Jazz Photo Corp.*, 264 F.3d at 1105 (*citing Boesch v. Graff*, 133 U.S. 697, 701-703 (1890)).  This Court interpreted *Jazz Photo Corp.* to mean that even fully authorized first sales of patented articles overseas do not result in the exhaustion of patent rights.  While the issue of overseas sales is not before the Court in the context of Static Control's Motion to Reconsider, the Court notes that, the district court in *Hitachi*, embracing an expansive view of *Quanta*, would have likely reached a different conclusion.

## IV.

In sum, after *Quanta* this Court is compelled to reconsider and reverse a decision that at

the time was consistent with the Federal Circuit's articulation of the law.  Because Lexmark's

patent rights in its toner cartridges were exhausted by the authorized, unconditional sales of the

cartridges to end users, Lexmark's attempt to impose single-use restrictions on the cartridges

fails.  The Prebate Program is invalid under patent law.

       Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as

follows:

       1.      Static Control's Motion to Reconsider the Interlocutory Order at Record 1008 [R.

1422] is **GRANTED**;

       2.      The Court finds that Lexmark's Prebate terms are not enforceable under patent

law in light of *Quanta Computer, Inc. v. LG Electronics, Inc.*, 128 S. Ct. 2109 (2008);

       3.      The Court will schedule a telephonic status conference in this matter by

subsequent order.

       This the 31st day of March, 2009.

**Signed By:**

***Gregory F. Van Tatenhove***

**United States District Judge**