UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| STATIC CONTROL COMPONENTS, ) | |
| INC., ) | |
| ) | CONSOLIDATED CIVIL ACTION NOS. |
| Plaintiff/Counterclaim Defendant, ) | |
| ) | 5:02-571 AND 5:04-84 |
| V. ) | |
| ) | |
| LEXMARK INTERNATIONAL, INC., ) | **MEMORANDUM OPINION** |
| ) | **& ORDER** |
| Defendant/Counterclaim Plaintiff. ) | |
| ) | |
| ) | |
| ) | |
| ) | |

*** *** *** ***

This matter is before the Court on Lexmark International, Inc.'s Motion for New Trial

[R. 1458] pursuant to Federal Rule of Civil Procedure 59. Lexmark seeks a new trial on three

grounds: (1) the jury's verdict in Part I of the Special verdict form was against the weight of the

evidence; (2) it was prejudiced before and during trial by various rulings of the Court; and (3)

certain jury instructions were erroneous and prejudicial to Lexmark. [*Id.*] For the reasons set

forth below, Lexmark's motion will be denied.

**I.**

The facts of this case have often been repeated. Here, a brief summary of the facts most

relevant to this opinion:

Lexmark International, Inc. ("Lexmark"), is a large producer of printers and toner

1

cartridges for those printers. Static Control Components, Inc. ("Static Control"), is "a leading supplier to toner cartridge manufacturers." [R. 172 at 16, Case No. 5:02-571.] The remanufacturers take used toner cartridges, refurbish them, refill the toner, and resell the cartridges to end-user consumers. Static Control sells to the remanufacturers parts and supplies for reworking the used toner cartridges, including replacement parts, toner, and microchips. [R. 1.]

This litigation began eight years ago when Lexmark filed suit against Static Control.[1] [5:02-571, R.1.] The primary, though not only, theory on which Lexmark alleged direct patent infringement and inducement of patent infringement against Static Control was predicated on Lexmark's employment of single-use restrictions on the majority of toner cartridges at issue. These "restricted" cartridges have been commonly referred to as "Prebate Cartridges" because Lexmark ran what it at one time called its "Prebate Program." [R. 594 at 3 n. 4.] In that program, Lexmark's customers could buy printer cartridges at an up-front discount in exchange for their agreement to use the cartridges only once and then return the empty cartridges to Lexmark. Lexmark continued to offer "regular" toner cartridges for those customers who chose not to purchase Prebate cartridges with their terms. [R. 2 at 8.] Therefore, "Prebate" is temporally the reverse of a rebate.

After a six-week trial of this complex case in May and June of 2007, the jury found that Lexmark had not proved by a preponderance of the evidence that Static Control's customers, other than Wazana Brothers International, Inc., NER Data Products, Inc., and Pendl Companies,

---

[1]Static Control then filed a second suit, a declaratory judgment action. [5:04-084, R. 1.] The cases were consolidated, and it is the later case, 04-084, that became the lead case; it is the case to which all record citations refer unless otherwise noted.

Inc.,[2] directly infringed one or more of Lexmark's patents. [R. 1366 at 1.] Because direct infringement is a predicate to a finding of inducement of infringement, this verdict meant Static Control could not be liable for inducement as to these customers. [*See id.* at 2.] Additionally, the Jury found that Lexmark had not proved that Static Control induced Wazana Brothers, NER, and Pendl to infringe Lexmark's patents. [*Id.* at 3.]

In April of 2007, shortly before the trial, the Court found that Lexmark's Prebate Program avoided the exhaustion of patent rights normally associated with a patented article's first sale consistent with then-binding Federal Circuit precedent. *See Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992). [R. 1008.] Upon Static Control's Motion, however, the Court reversed this decision in March of 2009 in light of the Supreme Court's subsequent holding and statement of the law regarding patent exhaustion in *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008). [R. 1443.] Specifically, this Court held that because Lexmark's patent rights in its toner cartridges were exhausted by the authorized, unconditional sales of the cartridges to end users, Lexmark's attempt to impose single-use restrictions on the cartridges failed, and therefore Lexmark's Prebate terms were not enforceable under patent law. [*Id.*] For the purposes of Lexmark's motion for a new trial, however, the Court will assume that the Prebate Program is valid and enforceable under patent law, as that was the law of the case during the trial. Further, both parties largely made their arguments on this assumption. [*See* R. 1458 at 3 n. 3.]

---

[2]Lexmark settled its claims of direct infringement against these three remanufacturers out of court. During trial, the Court held as a matter of law that Lexmark had satisfied its burden of proving direct infringement with respect to Wazana Brothers, NER, and Pendl. [R. 1245.]

## II.

Under Federal Rule of Civil Procedure 59(a), "a new trial is warranted when a jury has reached a 'seriously erroneous result' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.*, the proceedings being influenced by prejudice or bias." *Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1045-46 (6th Cir. 1996) (citations omitted). Only the first and third on this list are at issue in Lexmark's motion for a new trial.

"Generally, the grant or denial of a new trial is purely within the discretion of the trial court . . . ." *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989) (citations omitted). In particular, where "a trial court has improperly admitted evidence and a substantial right of a party has been affected," the court may order a new trial on part or all of the issues. *Id.* With respect to motions for new trials premised on the notion that the verdict was against the weight of the evidence, however, the Sixth Circuit has cautioned:

> When no undesirable or pernicious element has occurred or been introduced into the trial and the trial judge nonetheless grants a new trial on the ground that the verdict was against the weight of the evidence, the trial judge in negating the jury's verdict has, to some extent at least, substituted his judgment of the facts and credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts.

*Holmes*, 78 F.3d at 1047 (quoting *Duncan v. Duncan*, 377 F.2d 49, 54 (6th Cir.), *cert. denied*, 389 U.S. 913 (1967)). Accordingly, the Sixth Circuit "has determined that a jury's verdict should not be overturned as being against the weight of the evidence unless the verdict was unreasonable." *Id.* (citing *Duncan*, 377 F.2d at 52).

## III.

## A.

Lexmark first argues that the jury's answers to Question Nos. 1, 2.1, 2.2, 3.1, 3.2, and 4 of Part I of the Special Verdict Form were against the weight of the evidence. These questions related to Lexmark's claims of direct infringement against Static Control's customers and inducement of infringement against Static Control. [*See* R. 1366.] As noted previously, the jury's verdicts on these claims were unfavorable to Lexmark. [*See id.*]

Lexmark raised a similar argument to the one advanced in its current motion before. During the trial, for example, Lexmark made a motion for judgment as a matter of law with respect to direct infringement and inducement of infringement. This motion was denied. [R. 1356.] After the trial, Lexmark renewed it motion for judgment as a matter of law on these issues. Again, that motion was denied. [R. 1430.]

As noted by Lexmark, the standards for reviewing a motion for judgment as a matter of law are different from the standards for reviewing a motion for a new trial. Namely, in reviewing a motion for judgment as a matter of law, the Court must view the evidence in a light most favorable to the party against whom it is made, and the motion should be granted "[o]nly when it is clear that reasonable people could come to but one conclusion from the evidence . . . ." *Hill v. McIntyre*, 884 F.2d 271, 274 (6th Cir. 1989) (citation omitted). Clearly, this is a more stringent standard than evaluating whether the verdict was against the weight of the evidence.

Although a different standard applies, the Court reaches the same result it reached in its disposition of Lexmark's renewed motion for judgment as a matter of law. In that opinion, the Court stated with respect to Lexmark's claims of direct infringement:

First, though not required to do so, Lexmark presented little direct evidence of infringement by these customers [other than Wazana Brothers, NER, and Pendl] generally, and specifically, by implication, little direct evidence of infringement of the '015 patent covering encoder wheels[3] and the '661 patent covering the wing-like guides on Lexmark's toner cartridges. Instead, Lexmark chose to build its case around direct evidence of infringement by Wazana, NER, and Pendl, three remanufacturers that, as previously stated, this Court held liable for direct infringement as a matter of law. Lexmark then asked the jury to infer direct infringement by the entire class. The Court finds that it was reasonable for the jury to decide that Lexmark had not proven its case for infringement by the entire class of Static Control customers by a preponderance of the evidence.

For example, when Static Control asked Lexmark witness Dr. Reinholtz whether he knew if any of Lexmark's patents covered any cartridges remanufactured by specific Static Control customers, he responded in the negative. In the case, it was determined that repair and remanufacture of two types of Lexmark toner cartridges, "regular" or Non-Prebate cartridges and IBM Green cartridges, did not constitute patent infringement. Thus, in light of Dr. Reinholtz's testimony, the jury reasonably could have concluded that Lexmark had not proven by a preponderance of the evidence that all of Static Control's customers remanufactured Prebate or overseas cartridges, thereby infringing Lexmark's patent rights.

With respect to the '015 patent, the jury heard evidence that many IBM cartridges and "regular" Non-Prebate cartridges, all of which were sold with Lexmark encoder wheels, and encoder wheels made and sold by Static Control for some two years before the Lexmark '015 patent issued, were available to remanufacturers. These cartridges could be used without infringing the '015 patent. The jury reasonably could find in favor of Static Control for this reason as well.

[R. 1430 at 7-9 (internal citations omitted).] Further, regarding Lexmark's claim that Static Control induced infringement on the part of Wazana Brothers, NER, and Pendl, the Court stated that because Static Control's microchips have non-infringing uses, the jury was reasonable not to infer or presume inducement of infringement based on their sale to remanufacturers. [*Id.* at 9-10.] The Court also found that it was reasonable for the jury to conclude that Static Control's Anti-Prebate kit and other conversations with remanufacturers regarding the Prebate Program did

---

[3]During the trial, the Court found Static Control liable for direct infringement of Lexmark's '015 patent as a matter of law. [R. 1376 at 16-20 (Tr. June 20, 2007).]

not actually induce Wazana Brothers, NER, and Pendl to infringe Lexmark's patents. [*Id.* at 10.] And the Court noted that the jury reasonably could have found that Static Control lacked the specific intent to induce infringement, as, for example, evidence was introduced that Static Control provided its customers with oral and written instructions regarding the lawful, non-infringing uses of its microchips. [*Id.* at 11.]

For the same reasons, the Court finds that the jury's verdict in Part I of the Special Verdict Form was, at the very least, reasonable.[4] *See Holmes*, 78 F.3d at 1047. Accordingly, the Court must deny Lexmark's motion for a new trial on the ground that the verdict was against the weight of the evidence.[5]

### B.

Lexmark next argues that several pretrial rulings resulted in irrelevant, inadmissible, and highly prejudicial evidence being presented to the jury. The Court disagrees.

### 1.

First, Lexmark contends that the Court erred by denying Lexmark's request to try the issues of liability for patent infringement and willfulness together, and by trying Static Control's misuse and other equitable defenses at the same time as Lexmark's underlying claims for patent infringement and inducement to commit patent infringement.

---

[4]The Court adopts its reasoning in Record No. 1430 as if fully set forth herein.

[5]Static Control creatively argues that Lexmark's motion for a new trial is untimely to the extent it challenges jury issues not decided by the verdict. Static Control is correct that the jury did not answer Questions Nos. 2.1, 3.1, 3.2, and 4 in Part I of the Special Verdict Form. Without getting into the mechanics of Static Control's argument, however, the Court notes that the jury did not answer those questions because it was instructed not to do so in light of its answers to Question Nos. 1 and 2.2. Thus, the jury's failure to answer those questions was an answer in and of itself, and those issues were decided by the verdict.

In its February 2007 response to a motion by Wazana Brothers, NER, and Pendl to phase the trial into three parts, Lexmark submitted its own proposed organization of the trial. [R. 760.] Lexmark based its proposal on the organization of the trial in *Hunter Douglas, Inc. v. Comfortex Corp.*, 44 F. Supp. 2d 145 (N.D.N.Y. 1999). Under Lexmark's trifurcated proposal, its patent claims, including willfulness, would be tried first, along with affirmative defenses to those claims, with the exception of misuse. [R. 760 at 4.[6]] Then, the jury would consider damages on Lexmark's claims in the second phase of the trial. [*Id.*] Only in the third and final phase would the jury hear evidence relating to Lexmark's opponents' defense of misuse.[7] [*Id.*] According to Lexmark, its trial plan would enhance convenience and economy, reduce juror confusion, and avoid prejudice to all parties. [*Id.* at 1.] Specifically, Lexmark argued that trying misuse along with its affirmative infringement claims would operate to prejudice Lexmark. [*Id.* at 19.] Additionally, Lexmark argued that because its evidence regarding liability for direct infringement and inducement of infringement substantially overlapped with its evidence regarding willful infringement, it would be most efficient to try the issues of liability and willfulness together. [*Id.* at 9.]

Under Federal Rule of Civil Procedure 42(b), "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues,

---

[6]Page numbers correspond with the numbers on the original document, not the cm/ecf page numbers imposed by the Court upon filing.

[7]Like Lexmark, Wazana Brothers, NER, and Pendl also proposed separating the trial into three phases. [*See* R. 718.] Under their proposal, however, the issue of patent misuse would have been tried first, with Lexmark's affirmative claims of patent infringement coming in the second phase of the trial. [*See id.* at 2-3.] The trial would have concluded with evidence regarding damages, including evidence on the issue of willful infringement. [*Id.* at 3.]

claims, crossclaims, counterclaims, or third-party claims." The Sixth Circuit has found that a

district court has broad discretion to order separate trials. *In re Bendectin Litigation*, 857 F.2d

290, 307 (6th Cir. 1988). In particular, a "district court has broad discretion to bifurcate the

liability and damages phases of a trial." *Gafford v. General Elec. Co.*, 997 F.2d 150, 171-72 (6th

Cir. 1993), *rev'd on other grounds by Hertz Corp. v. Friend*, 130 S. Ct. 1181 (2010). The

decision regarding whether or not to bifurcate (or trifurcate) a trial is based on the specific facts

of each case. *Bendectin*, 857 F.2d at 307. In making this decision, the "major consideration" is

which course will most likely "result in a just final disposition of the litigation." *Id.* at 307-8

(quoting *In re Innotron Diagnostics*, 800 F.2d 1077, 1084 (Fed. Cir. 1986)). Indeed, the other

considerations of convenience, efficiency, and economy must yield to the consideration of

fairness. *Id.* at 308.

In the Final Trial Scheduling Order entered May 9, 2007, the Court set forth its decision

to use two phases for the trial. [R. 1070 at 5.] In the first phase, the parties tried "all affirmative

claims and related defenses, including infringement-related claims and issues, inducement to

infringement claims and defenses . . . [and] patent misuse issues and defenses . . . ." [*Id.*] The

second phase was to include damage-related issues, including willfulness. [*Id.*]

The Court explained to the parties that its organization of the trial established "broad

perimeters for the presentation of evidence" within which the parties were expected to structure

their cases. [*Id.*] Specifically, the Court permitted the parties to do five- to ten-minute

introductions and/or closings to each topic. [*Id.*] The Court further permitted the parties to

structure those issues serving as both affirmative defenses and claims within whichever portion

of the trial they determined to be most appropriate. [*Id.*] Despite these otherwise broad

perimeters, the Court stated that Lexmark would lead phase one with its claims, followed by the other parties' defenses or their proof for their claims. [*Id.*]

In setting forth its decision to bifurcate the trial, the Court noted that it had considered the various proposals and arguments of each party regarding other forms of organization. [*Id.* at 4-5.] Additionally, the Court noted its responsibility to make fairness to the parties its paramount concern in reaching its decision. Specifically, the Court stated that

> separation of issues "should be resorted to only in the exercise of informed discretion and in a case and at a juncture which move the court to conclude that such action will really further convenience or avoid prejudice" and . . . that a "paramount consideration at all times in the administration of justice is a fair and impartial trial to all litigants.

[*Id.* at 4 (citing *Frasier v. Twentieth Century-Fox Film Corp.*, 119 F. Supp. 495, 497 (D. Neb. 1954)).]

In its motion for a new trial, Lexmark does not raise any arguments regarding the organization of the trial that were not already raised and considered by the Court when it entered the Final Trial Scheduling Order. Significantly, the Court adopted neither of the parties' proposed plans [*see* R. 718, 760], instead crafting its own organizational structure for the trial. The Court believed then, and the Court continues to believe now, that its decision to bifurcate the trial into liability and damages phases served the interests of convenience, efficiency, and economy, without prejudicing Lexmark or any other party. Specifically, two of Lexmark's main concerns about the plan set forth by Wazana Brothers, NER, and Pendl were the potential for jury confusion and prejudice to Lexmark that could result from trying its opponents' defenses, such as misuse, before trying Lexmark's affirmative patent infringement claims. [*See* R. 760 at 17-18, 21.] Under the Court's bifurcated plan, however, Lexmark was permitted to lead the first phase

10

of the trial with its claims, and the parties were permitted to provide short introductions and closings to each topic. In this way, the Court addressed Lexmark's concerns, guarding against jury confusion and prejudice. Accordingly, Lexmark's motion for a new trial due to the Court's organization of the trial will be denied.

## 2.

Lexmark also argues that the Court committed reversible error by trying all of Static Control's equitable defenses to the jury in an advisory capacity. Pursuant to Federal Rule of Civil Procedure 39(c)(1), "[i]n an action not triable of right by a jury, the court . . . may try any issue with an advisory jury." A court's decision to try an issue to an advisory jury under Rule 39(c) is "entirely discretionary." *Starr Intern. Co. v. American Intern. Group, Inc.*, 623 F. Supp. 2d 497, 502 (S.D.N.Y. 2009). "The Court, of course, will ultimately make its own independent findings of fact and draw its own conclusions of law as to matters that fall within its purview, but will also benefit from the parties' arguments to the jury on these issues." *Id.* (internal citation omitted). *See also Hyde Properties v. McCoy*, 507 F.2d 301, 306 (6th Cir. 1974) (noting that it is within the discretion of the trial court to accept or reject the verdict of an advisory jury).

Here again, Lexmark does not raise any new arguments as it relates to the Court's decision to try Static Control's equitable defenses to an advisory jury, instead referencing its past pleadings and arguments on this issue. [*See* R. 1458 at 6.] Previously, Lexmark argued that submitting the issues of patent misuse, laches, and estoppel to the jury could prejudice its case, as it could "invite the jury to make decisions relating to Lexmark's inducement claim based on [improper] 'equitable considerations.'" [R. 1353 at 7. *See also* R. 1375 at 11-12 (Tr. June 19, 2007.] The Court did not accept this argument. [R. 1375 at 12: 13-14.] "[J]uries are presumed

to follow their instructions." *Zafiro v. United States*, 506 U.S. 534, 540 (1993) (citation and internal quotation marks omitted). *See United States v. Tines*, 70 F.3d 891, 898 (6th Cir. 1995). The Court had and has no reason to doubt that the jury properly followed and based its decisions on the instructions, including the inducement instruction, which set forth the four elements Lexmark had to prove in order to establish Static Control's liability. [*See* R. 1365, Instruction No. 2.2.] Accordingly, Lexmark's motion for a new trial on the ground that the Court erroneously tried Static Control's equitable defenses to an advisory jury will be denied.

**3.**

Next, Lexmark summarily argues that a new trial is warranted because Static Control was allowed to ambush Lexmark by asserting entirely new theories of patent misuse on the eve of trial, and to pursue those theories at trial. Lexmark notes that it raised these arguments in its Motion to Preclude Certain Patent Misuse Allegations from Being Presented to the Jury [R. 1137] made shortly before trial. Specifically, Lexmark asked the Court to preclude Static Control from including in its opening statement or its evidence presented to the jury several categories of misuse that (1) were not viable in light of various rulings by the Court and/or (2) were asserted without fair notice to Lexmark. [*Id.*] According to Lexmark, this Motion was denied to its "severe prejudice." [R. 1458 at 7.]

As the Court explained in its Order [R. 1165] denying Lexmark's motion, however, Static Control's pretrial memorandum setting forth its misuse theories was filed before the Court ruled on several summary judgment motions. Thus, to the extent any of Static Control's misuse theories were no longer viable, the Court expected Static Control to follow its substantive holdings in the case, but would not "preemptively order" Static Control to comply with the

Court's orders. [*Id.* at 2.] Additionally, with respect to Lexmark's claim that it had insufficient notice of two of Static Control's theories of misuse, the Court held that allowing those theories to go forward would not prejudice Lexmark because "Lexmark possesse[d] all the tools it[] need[ed], without further discovery or preparation, to fully rebut [Static Control]'s proof, if any, of bad faith." [*Id.* at 4.]

The Court incorporates its prior Order [R. 1165] as if fully set forth herein. In light of its reasoning, the motion for a new trial on the ground that Static Control asserted theories of patent misuse without fair notice to Lexmark will be denied.

**4.**

Finally, Lexmark argues that the Court erred prior to trial by excluding reference to the Ninth Circuit's opinion in *Arizona Cartridge Remanufacturers' Ass'n v. Lexmark*, 421 F.3d 981 (9th Cir. 2005) (hereinafter "*ACRA*"), and to a Federal Trade Commission ("FTC") letter.

In *ACRA*, an association of wholesalers that sell remanufactured printer cartridges sued Lexmark, "alleging that several of the company's statements regarding the terms and benefits associated with purchasing a Prebate cartridge are false and violate California's unfair competition laws." *Id.* at 984. Specifically, the association alleged that Lexmark "deceptively suggests that the conditions placed on the outside of the Prebate package create an enforceable agreement with consumers to return used cartridges." *Id.* The association further claimed that Lexmark "misleads consumers by falsely promising that they will save money when purchasing Prebate cartridges, when in fact Lexmark cannot control the price charged by retailers." *Id.* Third and finally, the association contended that Lexmark's use of a "lock-out" chip on its cartridges constitutes an unfair business practice." *Id.*

The district court granted summary judgment in favor of Lexmark on all of the association's claims. *Id.* at 983. On appeal, the Ninth Circuit affirmed the district court's decision. *Id.* In doing so, the court noted that the case involved the "consideration of important questions of patent and contract law . . . ." *Id.* at 985. According to the court, however, "at its core the dispute . . . reduce[d] to state claims of unfair competition and misleading business practices related to Lexmark's advertising." *Id.*

In the instant case, Wazana Brothers, before it settled with Lexmark, moved to exclude from trial the Ninth Circuit's holding in *ACRA*. [*See* R. 1082 at 5.] Lexmark opposed the motion. [*See id.* at 6.] This Court held that the *ACRA* opinion was admissible on the issue of the Defendants' advice of counsel defense, but was inadmissible for any other purpose. [*Id.*] The Court explained:

> The Court thinks that to the extent that Lexmark plans to use the *ACRA* litigation and holding as evidence of notice of patent infringement, this evidence must be allowed. This evidence is relevant evidence of the parties' knowledge during the time period in which the advice of counsel defense is asserted. *See* Fed. R. Evid. 401. On the other hand, to the extent that Lexmark seeks to introduce the *ACRA* litigation for any other propositions, it must be excluded on relevance and prejudice grounds. *See* Fed. R. Evid. 403. As evidenced in the many summary judgment opinions from this Court . . ., this action is factually distinct from the *ACRA* case. Furthermore, the two cases are largely legally distinct: while the advice of counsel defense in this action is predicated on federal patent law, the *ACRA* action was based mostly in California's state laws. The prior[] ACRA litigation is not, therefore, relevant to this litigation, but even if it were relevant, its many factual and legal[] difference[s] would make it too prejudicial to be admitted.

[R. 1082 at 6.] At trial, the Court would not allow Lexmark to ask a direct question referencing the *ACRA* decision, stating that such a question "causes us to get into having to inform the jury of the law as it relates to that particular case. I do think that's subject to a great deal of potential

prejudice in terms of the ability to do that." [R. 1269 at 82 (Tr. June 5, 2007).] The Court, however, allowed Lexmark "a little leeway" to ask "a general question" regarding *ACRA*, and particularly regarding the efforts taken by Static Control to determine the state of the law relating to the Prebate Program, when a witness opened the door to such questioning. [*Id.* at 82-3.]

Thus, the Court believed then, and it continues to believe now, that the *ACRA* holding, because it related to particular California state law claims, was not relevant to the case at bar. Moreover, to the extent that it was relevant, its probative value was substantially outweighed by the danger of unfair prejudice and confusion of the issues. *See* Fed. R. Evid. 403. Accordingly, the Court properly limited use of the *ACRA* decision at trial.

The FTC letter relates to a finding by the FTC that Lexmark's Prebate Program did not appear to call for antitrust enforcement action. [*See* R. 1458, Attach. 3 (filed under seal).] Again, Wazana Brothers moved for exclusion of the letter. [*See* R. 1082 at 5-6.] The Court found that the letter must be excluded if offered for its truth. [*Id.* at 7.] Citing *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651 (7th Cir. 2002), the Court explained that Lexmark could not use the FTC's decision not to take action as a sword because inaction on the part of the government cannot be used to prove innocence, and therefore such inaction is irrelevant. [R. 1082 at 7.]

The Court also found, however, that the FTC letter could be used for impeachment purposes. [*Id.*] The Court stated,

> [I]f Wazana uses an expert whose credentials are based, at least in part, on his former employ at the FTC, then Wazana will have opened the door to Lexmark's evidence related to any FTC investigation of the Prebate program which occurred during the expert's tenure at the FTC. Lexmark may, therefore, use the letter for the limited purposes of impeachment. Wazana's argument that its expert might

> not have had knowledge of the report or that the report lacks fundamental analysis crucial to the expert's opinion goes to the weight of the impeachment material.

[*Id.* (internal citation omitted).]

The Court finds no reason to reverse its decision with respect to the FTC letter. Lexmark's motion for a new trial on the ground that the Court erred by excluding the *ACRA* decision and the FTC letter must therefore be denied.

### C.

Lexmark also argues that the trial itself was unfair for several reasons. Again, the Court disagrees.

### 1.

Lexmark argues that the trial was unfair because it was precluded from offering relevant opinion-of-counsel evidence that is admissible under controlling Federal Circuit law. Specifically, Lexmark contends that the Court precluded Lexmark from asking Static Control if it sought the advice of counsel in direct contravention of *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683 (Fed. Cir. 2008), a decision that post-dates the trial of this matter in 2007. A review of the record, however, reveals that the Court's rulings were consistent with *Broadcom*.

In *Broadcom*, the Federal Circuit rejected Qualcomm's argument that the district court erred by instructing the jury that it could "consider failure to obtain an opinion of counsel as a factor in determining whether Qualcomm had the requisite level of intent to induce infringement of Broadcom's patents." *Id.* at 699. The court explained that affirmative intent to induce infringement may be shown by establishing: (1) that the defendant intended to cause the acts that constitute direct infringement; and (2) that the defendant knew or should have known that its

action[s] would cause direct infringement. *Id.* (citing *DSU Medical Corp. V. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006)). Accordingly, the court held that opinion-of-counsel evidence is relevant to the second prong of this analysis, as it may reflect what the alleged infringer "knew or should have known." *Id.* In particular, the court found that "the failure to procure such an opinion may be probative of intent in this context." *Id.* The court reasoned that "[i]t would be manifestly unfair to allow opinion-of-counsel evidence to serve an exculpatory function . . . and yet not permit patentees to identify failures to procure such advice as circumstantial evidence of intent to infringe." *Id.* The *Broadcom* court emphasized, however, that it remains improper to allow an adverse inference or evidentiary presumption that an opinion of counsel, if it had been procured, would have been unfavorable. *Id.* (citing *Knorr-Bremse Systeme Fuer Nutzfahrzeuge, GmbH v. Dana Corp.*, 383 F.2d 1337, 1346 (Fed. Cir. 2004) (en banc)). Thus, in brief, *Broadcom* stands for the proposition that whether or not a party who is alleged to have induced patent infringement sought the advice of an attorney is relevant to the determination of whether that party intended to induce infringement; if the party did not seek an opinion of counsel, however, it is error to allow the jury to infer that such an opinion would have been unfavorable.

Here, Static Control and Wazana Brothers moved to exclude from trial any argument that a negative inference should be drawn from any party's failure to obtain an exculpatory opinion of counsel. [*See* R. 1082 at 12.] The Court noted that, in the context of willful infringement, it is generally the job of the jury to draw negative inferences when necessary. [*Id.*] Consistent with *Broadcom*, however, the Court stated that the jury's ability to make a negative inference in the context of a party's failure to obtain an opinion of counsel is limited, in that the jury cannot infer that such an opinion would have been unfavorable. [*Id.* (citing *Knorr-Bremse*, 383 F.3d at 1344-

17

46).] Thus, the Court granted Static Control and Wazana Brothers' motion "to the extent articulated by *Knorr-Bremse*." [*Id.*] The Court otherwise denied the motion. [*Id.*]

During trial, the Court permitted Lexmark to question Static Control founder and CEO Ed Swartz about any opinions of counsel Static Control sought or received regarding the Prebate Program. For example, counsel for Lexmark and Mr. Swartz had the following exchange:

> Q.   Did you seek out–and a yes-or-no answer–did you seek out any legal advice relating to prebate cartridges when it was introduced into the marketplace?
>
> A.   We–we sought advice about prebate cartridges that had been either put into the landfill or were on the way to the landfill.
>
> Q.   Was that all that you sought advice on?
>
> A.   Yes, sir.
>
> Q.   Cartridges in the landfill?
>
> A.   Or on the way to the landfill.

[R. 1269 at 94-95 (Tr. June 5, 2007).] Mr. Swartz went on to explain that Static Control sought advice from an attorney who was an expert on abandoned property, but his opinion did not deal with the application of patent law to the Prebate Program. [*See id.* at 105, 107.] Later, Static Control objected when Lexmark asked Mr. Swartz whether his company sought any legal advice specifically dealing with patent law or antitrust law. [*See id.* at 108.] The Court sustained the objection on the ground that Lexmark had already asked the more general question, *not* on the ground that Lexmark was prohibited from asking whether Static Control procured an opinion of counsel. [*Id.* at 109.]

Thus, the Court did not prohibit Lexmark from introducing admissible opinion-of-counsel

evidence.[8]  Lexmark's motion for a new trial on this basis must be denied.

## 2.

Lexmark next contends that Static Control was allowed to ambush Lexmark by presenting to the jury entirely new and previously undisclosed expert opinions that, despite taking 240 hours over six weeks by Static Control's experts to prepare, Lexmark was forced to respond to in just four days.  Lexmark refers to the testimony of Static Control's expert economist Dr. Gregory Vistnes.  A review of the record reveals that the Court took appropriate steps to assure that Lexmark was not prejudiced by Dr. Vistnes's testimony.

This Court held Dr. Vistnes's testimony admissible in a written Order entered May 12, 2007.  [*See* R. 1083.]  During the trial in June, Lexmark stated that it had received some demonstratives from Static Control suggesting that Dr. Vistnes was rendering new opinions and performing analytical work that was not contained in his initial report.  [R. 1313 at 18-19 (Tr. June 13, 2007.]  According to Lexmark, Dr. Vistnes's opinions about the anticompetitive affect of Lexmark's alleged patent misuse originally related to the Prebate Program;[9] after the Court

---

[8]Two minor statements by the Court appear inconsistent with *Broadcom*, which, again, was decided after the trial of this matter was completed.  At trial, outside the presence of the jury, the Court did state, "I don't think it's fair to argue as it relates to intent that the mere absence of seeking counsel can be–a negative inference can go to that."  [R. 1269 at 180 (Tr. June 5, 2007).]  Further, in a footnote in Record No. 1082 the Court rejected Lexmark's argument that it was entitled to know if a consultation with counsel occurred and an opinion existed.  [R. 1082 at 13 n. 2.]  But these statements must be read in the context of the Court's ultimate ruling at Record No. 1082 in accordance with *Knorr-Bremse*.  *See supra* at 17.  Further, the Court provided sufficient leniency to Lexmark's counsel to question Static Control CEO Ed Swartz about opinions of counsel sought or received to correct any error in its prior statements.  *See supra* at 18.

[9]Dr. Vistnes did not render an opinion an misuse.  [*See* R. 1313 at 34.]  Rather, he assumed patent misuse on the part of Lexmark, and rendered opinions about the competitive affect of that misue.  [*See id.*]

held Prebate valid and enforceable, however, he was forced to perform a different anticompetitive analysis. [*Id.* at 27.] Lexmark thus asked the Court to exclude Dr. Vistnes's testimony.

After hearing the parties arguments and taking a brief recess to review Dr. Vistnes's report and his demonstratives, among other documents, the Court ruled as follows:

> Well, the motion made by Lexmark this morning focuses our attention on a long-running discussion, actually, in this case as it relates to what constitutes misuse. There's been some pas de deux, this dance that's gone on for weeks where Lexmark has stood and said, "We don't know what the allegations of misuse are here," kind of fairly said that at the time. "We're not sure exactly what the factual predicates for misuse are going to be."
>
> [Static Control] [h]as said, "Well, we have started to identify these. They have developed, in part, in response to the Court's opinions."
>
> Assumptions that were made initially as to the factual predicates for misuse are no longer on the table because of my rulings, as I have ruled on the dispositive motions in this particular case.
>
> I think there's been a bit of posturing, really on both sides. It's hard for me to conceive that Lexmark comes to the table today shocked–shocked–that an expert by [Static Control] would be testifying as it relates to these factual predicates and making the anticompetitive analysis and providing the anticompetitive analysis that they are going to provide.
>
> On the other hand, I think this has been a developing theory as it relates to precisely what is misuse, what are the factual predicates as it relates to misuse on [Static Control]'s side of the courtroom.
>
> Now, my sense is that experts from time to time will provide analysis in the course of trial that relates to the development of the testimony at trial. It's not unusual. Lexmark argued as it relates to their damages expert, Paul Myers, that the analysis might change based on testimony at trial. I don't think that that's necessarily an inappropriate position to have taken.
>
> But I have looked at Dr. Vistnes'[s] report, I have considered the arguments, I have reviewed the cases that both sides have identified; and I do think, based on the predicates to Dr. Vistnes'[s] testimony, that it would be prejudicial to Lexmark to call Dr. Vistnes as a witness today and to ask them to cross-examine him today.

[*Id.* at 53-4.] Although the Court felt that it would be prejudicial to Lexmark to allow Static Control to call Dr. Vistnes to the stand that day, the Court did not exclude Dr. Vistnes's

testimony.  Rather, the Court permitted Lexmark to depose Dr. Vistnes during the previously

scheduled four-day recess, holding that he could be called when trial resumed.  [*Id.* at 55.]

Following the desposition, Lexmark re-raised its objection to Dr. Vistnes's testimony.

[*See* R. 1344.]  After hearing arguments from both parties, the Court noted that Dr. Vistnes was a

very important witness for Static Control, and thus excluding his testimony would be a sanction

that would only be used in the rarest of circumstances.  [R. 1520 at 23 (Tr. June 18, 2007).]  The

Court further stated that Dr. Vistnes's developing opinion was not of the sort that would prevent

Lexmark from being able to respond through its own rebuttal case.  [*Id.* at 24.]  The Court

therefore again decided not to exclude Dr. Vistnes's testimony, explaining, "I think that the

importance of this particular testimony outweighs any potential prejudice to Lexmark in

proceeding, particularly given the continuance that we had, the opportunity that Lexmark has had

to depose this particular witness."  [*Id.* at 26.]  The Court did, however, impose sanctions against

Static Control, recessing the trial for the day after Dr. Vistnes's direct testimony so Lexmark

would have a break before beginning its cross-examination and allowing Lexmark's rebuttal

expert to review Dr. Vistnes's direct testimony in preparation for Lexmark's rebuttal case.  [*See

id.* at 26-27.]

The district court is granted broad discretion to decide whether exclusion is the proper

remedy for the failure to properly disclose evidence.  *See Murphy v. Magnolia Electric Power

Association*, 639 F.2d 232, 234 (5th Cir. 1981); *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th

Cir. 2003).  Among the factors courts consider in determining whether exclusion is warranted

are: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the

ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the

bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David*, 324

F.3d at 857. *See also Murphy*, 639 F.3d at 235 (listing other factors such as the need for time to

prepare to meet the testimony and the possibility of a continuance).

Here, the Court continues to believe that the harsh remedy of exclusion was not warranted

for Static Control's failure to supplement Dr. Vistnes's report. Any prejudice or surprise was

cured by the sanctions imposed by the Court. In particular, Lexmark was given time to depose

Dr. Vistnes and otherwise prepare to cross-examine him. In *In re BendectinLitigation*, the Sixth

Circuit stated that "[t]he care and legal skill demonstrated in their advocacy leads us to conclude

that they perceived no prejudice in fact from the amount of time available to them to reform their

strategy." 857 F.3d at 315. The Court expresses the same sentiment about Lexmark in this case.

In addition to challenging his testimony generally, Lexmark makes specific objections to

certain statement made by Dr. Vistnes. First, Lexmark objects to Dr. Vistnes's use of the term

"locked-in" consumer. [*See* R. 1520 at 103] Lexmark objected to Dr. Vistnes's use of this term

during his testimony at trial. [*Id.* at 103-104.] Specifically, at the bench and outside the presence

of the jury, counsel for Lexmark objected on the ground that "locked-in" is a legal term with

legal significance in analyzing aftermarkets, not an economic term. [*Id.*] As a remedy, the Court

directed counsel for Static Control to ask Dr. Vistnes what he meant by the term, so it would be

clear to the jury. [*Id.* at 104.] Counsel then asked, "Dr. Vistnes, you just used the term 'locked-

in,' 'locked-in customers.' Could you explain in a little more detail what that term means to you,

as an economist?" [*Id.*] Dr. Vistnes explained that to him, a customer is "locked-in" if there is a

large cost to switch brands or products. [*Id.*] Dr. Vistnes provided the example of a Lexmark

printer owner who wants to purchase a Hewlett-Packard ("HP") cartridge, but can only buy the

cartridge if he purchases an HP printer it will be compatible with. [*Id.*] Thus, because he explained his use of the term to the jury, Lexmark was not prejudiced by Dr. Vistnes's references to "locked-in" consumers or customers.

Lexmark also objects to Dr. Vistnes's use of the term "killer chip" to refer to the single-use chip in Lexmark's Prebate cartridges. [*See id.* at 90.] The Court cautioned Static Control's counsel against use of the term, noting, however, that it could not necessarily prevent the witness from responding with the phrase. [*Id.* at 93.] The Court also instructed Static Control's counsel to ask Dr. Vistnes a question that would clarify for the jury that his reference to a "killer chip" was a reference to the single-use chip in Lexmark's Prebate cartridges. [*Id.* at 94.] Counsel complied. [*Id.*] Accordingly, the Court does not find that Dr. Vistnes's use of the term "killer chip" made the trial unfair to Lexmark.

Lexmark next objects to Dr. Vistnes's testimony regarding printer purchasing decisions, arguing that such testimony was beyond his expertise. Dr. Vistnes testified that, within a company, the people who decide what printer to purchase are often different from the people who decide what type of cartridge to purchase for the printer. [*Id.* at 112-13.] He further testified about the implications of having different people making those purchasing decisions. [*Id.* at 113.] Dr. Vistnes's statements on this subject were very brief, taking up less than two double-spaced pages in the transcript. *After* Dr. Vistnes finished giving this testimony, Lexmark objected on the ground that he was "talking about a subject far from his expertise." [*Id.* at 114.] In response, counsel for Static Control stated that it in his "experience . . . as an economist and a lawyer, that kind of analysis about who actually made the purchasing decisions is given a great deal of weight." [*Id.*] Counsel further stated that he was finished questioning Dr. Vistnes on the

subject and would move along, and he then did so. [*Id.*] The Court finds no prejudice to Lexmark based on Dr. Vistnes's testimony regarding printer and cartridge purchasing decisions, especially since Dr. Vistnes stated that this testimony was based in part on information he reviewed in Lexmark's documents. [*See id.* at 112.]

Lexmark's final objection to Dr. Vistnes's testimony relates to his statement that the unreasonable restraint on competition caused by any Lexmark patent misuse is significant in the market for Lexmark-compatible replacement toner cartridges. [*See id.* at 123.] At trial, Lexmark objected to this statement on the ground that it was not within the careful assumptions laid by Dr. Vistnes's testimony. [*Id.*] The Court, however, found, and continues to find, that Dr. Vistnes's testimony stayed within his assumptions. [*See id.* at 124.] Specifically, because he testified that the unreasonable restraint on competition caused by "any" patent misuse is significant, it was clear that he was assuming patent misuse on the part of Lexmark, and not forming an opinion as to misuse himself.

Accordingly, both Lexmark's general objection to the admissibility of Dr. Vistnes's testimony and its specific objections to particular statements made by Dr. Vistnes must be overruled. A new trial is not warranted on these grounds.

**3.**

Lexmark's third argument with respect to the trial is that Static Control was allowed to offer prejudicial evidence in support of its defense of estoppel, and Lexmark was not allowed to sufficiently rebut that evidence. On direct examination, Bill Swartz testified that he had a telephone conversation with former Lexmark employee Tom Lamb in March of 1999 in which

Lamb stated, "We'll let bygones be bygones . . . ."[10]  [R. 1269 at 201 (Tr. June 4, 2007).]  On

cross-examination, Lexmark effectively attacked Swartz's credibility with respect to the alleged

"bygones" statement.  Lexmark elicited from Swartz, for example, that at the time the "bygones

be bygones" statement was purportedly made, Static Control had a lawsuit pending against

Lexmark in North Carolina, though it never served the complaint, that was ultimately dismissed

in June of 1999.  [R. 1277 at 101 (Tr. June 5, 2007).]  Lexmark further elicited that during the

"time frame of letting bygones be bygones," Static Control filed a declaratory judgment action

against Dallas Semiconductor in North Carolina, and then added Lexmark as a defendant to the

suit.  [*Id.* at 102-104.]

The Court, however, would not allow Lexmark to use a transcript of the conversation

between Mr. Swartz and Mr. Lamb.  The parties explained that Mr. Swartz taped the

conversation and all other phone conversations at the time because he was in the middle of a

custody battle with his ex-wife.  [*Id.* at 8.]  He then transcribed the conversation.  [*Id.* at 10.]

According to Lexmark, the transcript did not contain the "bygones" statement.  [*Id.* at 9.]  After

reviewing the transcript, the Court excluded it on the following grounds: (1) that Lexmark

designated the exhibit too late, particularly since Lexmark should have anticipated wanting to use

it; and (2) that the potential prejudice from having to explain the context of the conversation, *i.e.*

the custody battle that led to Mr. Swartz taping his phone calls, outweighed its probative value.

[*Id.* at 14, 92.]  The Court held that the transcript could not be used for any purpose, including

impeachment.  [*See id.* at 92.]  The Court stands by its decision.  Accordingly, Lexmark's motion

---

[10]Tom Lamb's statement was admitted as the admission of a party-opponent.  [*See* R.
1277 at 10-11.]

for a new trial on the ground that Static Control was allowed to offer prejudicial evidence regarding its estoppel defense that Lexmark was not allowed to sufficiently rebut must be denied.[11]

**4.**

Next, Lexmark argues that Static Control was allowed to present a "good faith" defense to Lexmark's inducement claim that is not recognized by law, irrelevant, and highly prejudicial. The record does not support this contention.

Lexmark's argument centers around Static Control's references to North Carolina Statute § 75-36. This statute made "[a]ny provision in any agreement or contract that prohibits the reusing, remanufacturing, or refilling of a toner or inkjet cartridge . . . void and unenforceable as a matter of public policy." N.C. Gen. Stat. Ann. § 75-36 (West 2003). Static Control argued that the statute invalidated Lexmark's Prebate Program in the state of North Carolina after the law took effect in October of 2003. [*See* R. 929.] Accordingly, Static Control claimed that it could inform its customers that they could lawfully remanufacture Prebate cartridges first sold in North Carolina after October 1, 2003, without inducing infringement of Lexmark's patents. [*See id.*] Before trial, however, the Court ruled that § 75-36 did not invalidate Lexmark's single-use restriction on Prebate cartridges. [*See* R. 1081 at 10-12; R. 1365 at 15 (Jury Instruction 1.11).]

Nevertheless, the Court permitted Static Control to reference § 75-36 as part of its argument to the jury that it had a good faith belief that it could sell its microchips for use in

---

[11]Moreover, the Court notes that ultimately no decision was made regarding the application of Static Control's estoppel defense. The Court exercised its discretion not to rule on the equitable defenses, based in part on the jury's finding of non-infringement. [*See* R. 1430 at 13-16.]

remanufacturing Prebate cartridges first sold in North Carolina after October 1, 2003, without inducing infringement of any of Lexmark's patents. [*See* R. 1365 at 19 (Jury Instruction 2.2).] The Court did so, however, not because it recognized a good faith defense to inducement, but because evidence of the statute was relevant to the jury's determination of whether Static Control possessed the requisite specific intent to induce infringement.

In *DSU Medical Corp. v. JMS Co., Ltd.*, the Federal Circuit stated that a party accused of inducing infringement "must be shown . . . to have *knowingly* induced infringement, not merely knowingly induced the *acts* that constitute direct infringement." 471 F.3d 1293, 1306 (Fed. Cir. 2006) (internal citation and quotation marks omitted) (emphasis in original). The court explained further:

> It must be established that the defendant possessed specific intent to encourage another's infringement and not merely that the defendant had knowledge of the acts alleged to constitute inducement. The plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts *and* that he knew or should have known his actions would induce actual infringements.

*Id.* (quoting *Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990) (emphasis in original)).

Here, evidence of North Carolina's statute was relevant to the question of whether Static Control knew or should have known that its actions would induce actual infringements of Lexmark's patents, and whether it knew or should have known that, despite its warnings, remanufacturers used Static Control microchips on Prebate cartridges not originally sold in North Carolina after October 1, 2003. [*See* R. 1365 at 19 (Jury Instruction 2.2).] Accordingly, Lexmark's motion for a new trial on the grounds that admission of the statute was irrelevant and prejudicial must be denied.

**5.**

Lexmark next claims that Static Control was allowed to present, and Lexmark was prevented from rebutting, evidence concerning its "mislabeling" theory of misuse which was irrelevant and highly prejudicial. To the extent Lexmark's complaint about the mislabeling theory of patent misuse serves as a reiteration of its broader complaints about trying Static Control's equitable defenses in the same phase of the trial as Lexmark's underlying infringement claims and trying Static Control's equitable defenses to the jury in an advisory capacity, those issues have already been discussed and ruled on by the Court. Further, Lexmark's specific objections to the mislabeling evidence must be denied.

Prior to trial, Lexmark filed a Motion to Preclude Certain Patent Misuse Allegations From Being Presented to the Jury [R. 1137], including Static Control's mislabeling theory of misuse. Under this theory, Static Control alleged and attempted to prove that Lexmark exceeded the scope of its patent rights by stamping Prebate terms on non-Prebate cartridges. [*See id.* at 6-7.] The Court denied Lexmark's motion, finding that Lexmark had not shown and could not show any prejudice from permitting Static Control to move forward with its mislabeling theory of patent misuse. [R. 1165 at 3-4.] The Court has not changed its mind.

Lexmark argues that Static Control's theory was not supported by any legitimate evidence because, for example, Lexmark demonstrated that the non-Prebate cartridge labels are clear and not misleading, and testimony from Static Control's customers demonstrated that they under stood the non-Prebate labels. But this is really an argument that Static Control should not prevail on its claim of patent misuse, not an argument that the evidence presented on the mislabeling

theory was irrelevant or prejudicial.[12]

Lexmark also complains that it was precluded from showing the jury color versions of the Prebate and non-Prebate cartridge labels after Static Control attempted to demonstrate their confusing nature based on black-and-white exhibits. The Court did direct Lexmark to use the black-and-white photographs of the labels already in evidence, but it did so only after Lexmark displayed the actual cartridges themselves, in color, to the jury, and it noted that Lexmark made its "point well about the color" during its examination of Lexmark witness Janet M. Smith. [*See* R. 1197 at 231-36 (Tr. May 23, 2007).]

Lexmark contends that Smith was improperly prohibited from testifying regarding whether she believed that Static Control and others were confused by the Prebate and non-Prebate labels. The record reveals that Smith was allowed to respond when counsel for Lexmark asked her whether she had ever had a customer complain to her that the non-Prebate cartridge labels were confusing. [*Id.* at 247.] She was then properly prevented from responding when asked whether she believed Static Control knew the difference between a Prebate and a regular cartridge [*id.* at 247-48], as she would have no personal knowledge about what Static Control knew or did not know.

In sum, evidence of Static Control's mislabeling theory of patent misuse was neither irrelevant nor unfairly prejudicial to Lexmark, and Lexmark was permitted to effectively counter Static Control's allegations on this issue. Therefore, a new trial is not warranted.

---

[12]The Court notes that the jury, working in its advisory capacity, found in favor of Lexmark on Static Control's mislabeling theory of patent misuse, as it determined that the language on Lexmark's non-Prebate cartridge labels is not "clearly false." [R. 1366 at 13.]

**6.**

Lexmark next contends that allowing evidence and argument as to Static Control's other misuse theories was also highly prejudicial. Lexmark points specifically to testimony Static Control elicited from Lexmark witness Tony Zupancic that Lexmark burned and destroyed empty cartridges. The Court disagrees that allowing this evidence was error.

During the trial, the Court entered a written Order [R. 1260] regarding Lexmark's motion to limit the scope of Static Control's affirmative defenses. As part of that motion, Lexmark sought to exclude evidence that Lexmark destroys toner cartridges returned to Lexmark that could have been remanufactured by third parties. [*See id.* at 3.] Lexmark argued that such evidence was irrelevant to Static Control's misuse defense. [*See id.*]

The Court, however, denied Lexmark's motion. The Court had previously held that Static Control had to establish that Lexmark's misuse conduct unreasonably restrained competition in the relevant market in order to prevail on its misuse defense. Thus, evidence that Lexmark incinerated returned cartridges addressed Lexmark's non-Prebate market-related power, and was therefore potentially relevant to proving misuse by Lexmark. [*Id.* at 3-4.] In particular, the Court found that Lexmark's efforts to limit the availability of non-Prebate cartridges could be found to have eliminated the choice of remanufactured cartridges which customers would have reasonably expected to be able to purchase at the time they first purchased their printers. [*Id.* at 4 (citing *PSI Repair Services, Inc. v. Honeywell, Inc.*, 104 F.3d 811, 814 (6th Cir. 1997).] In other words, these efforts could be found to have unreasonably restrained competition in the relevant market.

After Zupancic was called to testify, Lexmark renewed its objection to his testimony

about Lexmark's disposal of empty cartridges. [R. 1294 at 165-66 (Tr. June 11, 2007).] The Court, after hearing argument from the parties at the bench, noted that Lexmark's objection was well-preserved, but allowed the testimony to go forward. [*Id.* at 166-68.] Later, the Court reiterated that because Zupancic's testimony related to what Lexmark does to affect the pool of cartridges available, it would be allowed. [*Id.* at 180.] Accordingly, for the reasons stated in the Court's prior Order [R. 1260] and on the record at trial, no new trial is warranted based on the admission of testimony from Zupancic that Lexmark burns empty cartridges.

**7.**

Finally, Lexmark claims that it was prejudiced at trial by the inclusion of multiple irrelevant and highly prejudicial arguments in Static Control's closing. Specifically, Lexmark points to the following statements made by Static Control:

- Referring to Lexmark as a "monopolist."[13]

- Referring to Lexmark as having burned hundreds of thousands of cartridges.

- Referring to the alleged "bygones-be-bygones" statement.

- Referring to Lexmark's "killer chip."

- Comparing the size of Lexmark and Static Control.

- Arguing that Static Control can "barely afford to fight this battle."

- Arguing that Lexmark pays money to prevent empty cartridges from being remanufacturable.

- Stating that, if Lexmark prevailed, "a lot of people will lose their jobs," that

---

[13]Technically, counsel for Static Control remarked that "[w]hen the customer doesn't win, a company in Lexmark's position *becomes a monopolist*, gets closer and closer to or perhaps even achieves a 100 percent market share." [R. 1379 at B-15 (Tr. June 21, 2007) (emphasis added).]

"some of the people you saw testify lose their companies," and "even Static
Control could go out of business."

•    Arguing any issues concerning Static Control's equitable defenses that should
     never have been presented to the jury in the first place.

[R. 1458 at 27-28.]

To the extent that Lexmark asks for a new trial based on Static Control's argument

related to its equitable defenses, or based on Static Control's references to the alleged "bygones-

be-bygones" statement and to Lexmark's practice of burning empty cartridges, the Court has

addressed those issues previously in this Opinion and will not address them again here.  With

respect to the other comments, however, the Sixth Circuit has stated that "where there is a

reasonable probability that the verdict of a jury has been influenced by" prejudicial remarks made

by counsel, "it should be set aside." *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749,

756 (6th Cir. 1980).  Further, in determining whether there is a reasonable probability that the

verdict has been influenced by improper conduct, "a court must examine, on a case-by-case basis,

the totality of the circumstances, including the nature of the comments, their frequency, their

possible relevancy to the real issues before the jury, the manner in which the parties and the court

treated the comments, the strength of the case (e.g., whether it is a close case), and the verdict

itself." *Id.*

The Court notes that Lexmark did not object to any of the statements it now claims were

prejudicial.  [*See* R. 1379 at B-15, B-18, B-21, B-22, B-37-8, B-39, B-40, B-66, B-67.]  While

the failure to contemporaneously object to statements made by opposing counsel during closing

arguments does not waive the right to raise an appeal on the issue, it does "raise the degree of

prejudice which must be demonstrated in order to get a new trial on appeal." *Strickland v.*

*Owens Corning*, 142 F.3d 353, 358 (6th Cir. 1998).  In *Igo v. Coachmen Industries, Inc.*, 938 F.2d 650, 654 (6th Cir. 1991), a case cited by Lexmark, for example, the Sixth Circuit found that inappropriate statements by the plaintiffs' counsel warranted a new trial even though counsel for the defendant failed to object.  In that case, however, the court described the conduct of the plaintiffs' counsel as "outrageous."  *Id.*  In particular, the court noted that counsel for the plaintiffs  stated that the defendant was only sorry that the plaintiffs had survived the motor vehicle accident giving rise to the lawsuit, and he further stated that the defendant had hoped the plaintiffs would not survive long enough to go to trial.  *Id.* at 653.  No such egregious conduct occurred here.

Instead, this case is much more like *Strickland*.  There, the defendant claimed that the plaintiff's "closing argument constituted an improper appeal to class prejudice and pandering to the perception that corporations wield disparate power."  *Strickland*, 142 F.2d at 359 (internal quotation marks omitted).  The Sixth Circuit explained that "[i]t is true that an 'us-against-them plea can have no appeal other than to prejudice by pitting "the community" against a nonresident corporation [and] is an improper distraction from the jury's sworn duty to reach a fair, honest and just verdict.'"  *Id.* (quoting *Westbrook v. General Tire & Rubber Co.*, 754 F.2d 1233, 1238 (5th Cir. 1985)).  The Sixth Circuit found, however, that "[a]lthough there was an 'us-against-the-powerful-corporation' flavor to" the plaintiff's closing remarks, "those remarks were not so prejudicial as to mandate a new trial, especially where no objection was raised . . . ."  *Id.*  Similarly, here, assuming Static Control's statements about Lexmark's relative size and economic wealth were improper, under the totality of the circumstances they were not so prejudicial as to warrant a new trial.  Nor were such remarks pervasive throughout the trial.  *See*

*City of Cleveland*, 624 F.2d at 757-58 (granting a new trial where the plaintiff's counsel made improper comments about the financial disparity between the parties that "permeated the entire trial" and were repeated even after the judge sustained the objections of the defendant and admonished the jury).  Additionally, as pointed out by Static Control [*see* R. 1489 at 42], these statements were relevant to the jury's determination of whether Static Control had the intent to induce infringement by its customers, as the jury could draw the inference that Static Control had no desire to expose itself to an expensive lawsuit.  Accordingly, Lexmark's motion for a new trial on the ground that Static Control made improper remarks during closing arguments must be denied.

**D.**

Finally, Lexmark argues that it is entitled to a new trial because the patent jury instruction on inducement of infringement was legally erroneous and prejudicial.  This argument is without merit.

"'The question of whether a jury instruction on an issue of patent law is erroneous is a matter of Federal Circuit law . . . .'" *Eolas Technologies, Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1332 (Fed. Cir. 2005) (quoting *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1363 (Fed. Cir. 2004)).  Other issues with regard to jury instructions, however, remain subject to the law of the circuit in which the lawsuit was tried.  *See Serio-U.S. Idustries, Inc. v. Plastic Recovery Technologies Corp.*, 459 F.3d 1311, 1317 (Fed. Cir. 2006).  In the Sixth Circuit, "[a] judgment on a jury verdict may be vacated when the instructions, viewed as a whole, were confusing, misleading, and prejudicial." *Jones v. Consolidated Rail Corp.*, 800 F.2d 590, 592 (6th Cir. 1986) (citation omitted).

Lexmark claims that the inducement instruction was erroneous and prejudicial for at least four reasons. First, Lexmark contends that the instruction, after properly explaining the four elements Lexmark had to prove by a preponderance of the evidence to establish inducement, went on to improperly describe two lawful and non-infringing uses of Static Control's microchips that do not directly infringe any Lexmark patent. According to Lexmark, while such non-infringing uses are theoretically relevant to Static Control's exhaustion defense, they are legally irrelevant to Lexmark's burden of proof with respect to its inducement claim.

But the non-infringing uses of Static Control's microchips *were* relevant to two of the elements Lexmark had to prove as part of its inducement claim. The inducement instruction informed the jury that in order to hold Static Control liable for inducement of infringement of a Lexmark patent, Lexmark had to prove:

> First, Static Control encouraged or instructed a remanufacturer how to remanufacture Lexmark toner cartridges;
> Second, a remanufacturer following the encouragement or instruction would necessarily infringe, or that one or more remanufacturers directly infringed, one or more of Lexmark's patents;
> Third, Static Control intended to cause the acts that constitute direct infringement; and
> Fourth, Static Control knew or should have known that its actions would induce actual infringement of one or more of Lexmark's patents.

[R. 1365 at 17 (Jury Instruction 2.2).] The instruction then explained the two non-infringing uses of Static Control's microchips: (1) for the remanufacture of non-Prebate cartridges first sold by Lexmark in the United States; and (2) for the remanufacture of any cartridge made by Lexmark and delivered to end users under the IBM brand. [*Id.* at 18.] These non-infringing uses were relevant to the jury's determination of whether a remanufacturer following Static Control's encouragement or instruction would necessarily infringe Lexmark patents, and also to the jury's

determination of whether Static Control possessed the specific intent to induce infringement. Therefore, it was neither erroneous nor prejudicial to include them in the inducement instruction.

Second, Lexmark contends that the inducement instruction should not have informed the jury about Static Control's alleged good faith belief regarding cartridges first sold by Lexmark in North Carolina after October 1, 2003. In the instruction, the jury was informed that Static Control claimed to have a good faith belief that cartridges sold in North Carolina after October 1, 2003, could be remanufactured without directly infringing Lexmark's patent rights. [*See id.* at 19.] As stated previously, however, Static Control's good faith belief grounded in North Carolina statute § 75-36 was relevant to the jury's determination of whether Static Control had the requisite specific intent to induce infringement. And, despite Lexmark's arguments to the contrary, including this information did not force Lexmark to prove additional elements in order to prevail on its inducement claim.

Third, Lexmark claims that including information about Static Control's alleged good faith belief that it did not induce the infringement of Lexmark's patents was tantamount to the Court endorsing Static Control's position. This claim is not supported by the text of the instruction. For example, the inducement instruction explained to the jury *both* Static Control's "conten[tion] that it had a good faith belief that" cartridges first sold in North Carolina after October 1, 2003, could be remanufactured without directly infringing any of Lexmark's patent rights *and* Lexmark's contention that Static Control did not act in good faith. [R. 1365 at 19.] The instruction further explained Lexmark's position that "Static Control deliberately intended that its microchips should be used in the remanufacture of . . . Prebate cartridges." [*Id.*] Thus, because the inducement instruction set forth both parties' positions, the jury could not reasonably

36

have construed it to endorse the position of any one party.

Finally, Lexmark argues that instructing the jury about Static Control's alleged good faith belief was especially prejudicial because the Court excluded from evidence any reference to Static Control's advice of counsel that may or may not have formed the basis of any good faith belief. As stated previously, however, the Court permitted Lexmark to question Static Control founder and CEO Ed Swartz about any opinions of counsel Static Control sought or received.

Thus, the jury instruction on inducement of patent infringement was not legally erroneous or prejudicial to Lexmark. Nor did it make the jury instruction viewed as a whole confusing, misleading, or prejudicial. Lexmark's motion for a new trial on this ground must be denied.

## IV.

In sum, the jury's verdict in this case was not against the weight of the evidence, and Lexmark was not unfairly prejudiced by any of the Court's pretrial rulings or trial decisions or by the jury instructions. None of the "errors" alleged by Lexmark, either singly or in combination, merit a new trial. Accordingly, it is hereby **ORDERED** that Lexmark International, Inc.'s Motion for New Trial [R. 1458] is **DENIED**. The Clerk of the Court is **DIRECTED** to send a copy of this Order to the Clerk of the Court of Appeals for the Sixth Circuit.

This the 28th day of October, 2010.

**Signed By:**

_**Gregory F. Van Tatenhove**_

**United States District Judge**